## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JONATHAN SEGAL, on behalf of himself )
and Derivatively on Behalf of Nominal )
Parties GEISHA LLC, a Delaware Limited )
Liability Company, and )
OSSS HOSPITALITY LLC, a Delaware )
Limited Liability Company, )
                                  )
        Plaintiff, )
                                  )
        v. )
                                  )
GEISHA NYC LLC, )
a Delaware Limited Liability Company; )
OSSS HOSPITALITY NYC, LLC, )
a New York Limited Liability Company; )
RICK WAHLSTEDT; JEFFREY BEERS; )
MIAE LIM; )
NORDIC MANAGEMENT, INC., )
a Delaware Corporation. )
                                  )
        Defendants. )

**FILED**

JAN 0 5 2006

**MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT**

# 06C 0057

Case No.

Judge    **JUDGE GOTTSCHALL**

Magistrate Judge

**MAGISTRATE JUDGE VALDEZ**

## COMPLAINT FOR DAMAGES AS WELL AS INJUNCTIVE, DECLARATORY, AND OTHER RELIEF

Plaintiff JONATHAN SEGAL ("Segal"), on his own behalf and on behalf of OSSS

HOSPITALITY LLC and GEISHA LLC, complains against Defendants GEISHA NYC LLC,

OSSS HOSPITALITY NYC, LLC, RICK WAHLSTEDT, JEFFREY BEERS, MIAE LIM, and

NORDIC MANAGEMENT, INC., (collectively "Defendants") as follows:

### Nature of the Case

1.    This case concerns the successful restaurant concept JAPONAIS operating in

Chicago and the actual and planned expansion of that concept nationwide.

2.    In September of 2003, Segal and his business partners opened JAPONAIS, a

restaurant in Chicago, Illinois, ("Chicago JAPONAIS") fusing modern Japanese and European

cuisine, to great acclaim in the popular River North restaurant district. JAPONAIS, which sports a 300-seat space described by the Chicago Tribune as "industrial-chic," features two dining rooms, a sushi bar, and a downstairs lounge and patio. JAPONAIS has been a successful venture, receiving nationwide publicity and attention for its upscale and trend-setting restaurant and lounge, including articles about the restaurant in national publications such as *People Magazine, Travel & Leisure, Us Weekly*, and *Food & Wine,* as well as coverage from the three major television networks.

3.     Plaintiff Segal is a co-founder of the JAPONAIS concept and has always intended to participate in the national expansion of the JAPONAIS concept. Recently, however, his business partners have begun the expansion without him and, over his express objection, barred him from participating in the expansion in the manner required by contract and law.

4.     Instead of allowing Segal, the individual who initially jointly developed the concept for the JAPONAIS restaurant and lounge, to participate in the expansion of the JAPONAIS concept, Defendants secretly commenced expansion without informing Segal. Further, after Segal learned of the actual and proposed expansions and demanded to participate as a founder, Defendants refused to permit Segal to participate in the manner demanded by law and by contract.

5.     In addition to violating their contractual obligations by expanding to the exclusion of Segal, Defendants Geisha NYC LLC ("Geisha NYC") and OSSS Hospitality NYC LLC ("Hospitality NYC") have misappropriated the JAPONAIS design, name and other intellectual property without purchasing, licensing, or otherwise lawfully obtaining the rights to use that name and design from Geisha, LLC ("Geisha Chicago"), the actual owner. The individual Defendants permitted Defendants Geisha NYC and Hospitality NYC to misappropriate Geisha

2

Chicago's valuable intellectual property and, as a result, to violate federal law and to harm Segal and the companies that rightfully control the intellectual property.

6.    Mayer, Brown, Rowe, Maw, LLP ("Mayer, Brown") a law firm, has aided and assisted with these actions and should be disqualified from further representation of any of the Defendants.

## The Parties

7.    Nominal party Geisha, LLC, ("Geisha Chicago"), a Delaware limited liability company, has registered its assumed name JAPONAIS and has both its business and offices at 600 West Chicago Avenue, Chicago, Illinois 60610. Geisha Chicago owns the Chicago JAPONAIS restaurant and lounge and all intellectual property associated therewith, including all rights in the JAPONAIS name and design. On information and belief, Geisha Chicago has not provided formal permission for any other entity to use its intellectual property.

8.    Nominal party OSSS Hospitality LLC, ("Hospitality Chicago"), a Delaware limited liability company, provides management services to Geisha Chicago. Hospitality Chicago earns a management fee for the management services it provides to Geisha Chicago.

9.    Plaintiff Segal is an individual residing in the State of Illinois. Segal owns and, at all relevant times, owned 18.5% of Geisha Chicago. Segal is also the 15% owner of Hospitality Chicago.

10.    Defendant Geisha NYC, LLC ("Geisha NYC") is a limited liability company organized under the laws of Delaware and the purported owner of the New York JAPONAIS restaurant.

11.    Defendant OSSS Hospitality NYC, LLC ("Hospitality NYC") is a limited liability company organized under the laws of New York. Hospitality NYC is the managing member of

3

Geisha NYC and owns 6% of that entity. On information and belief, Hospitality NYC provides management services to Geisha NYC and earns significant funds from such services.

12.     Defendant Rick Wahlstedt owns 18.5% of Geisha Chicago and 29% of Hospitality Chicago. On information and belief, Wahlstedt is also the Chief Executive Officer and sole owner of Defendant Nordic Management, Inc.

13.     Defendant Nordic Management, Inc. ("Nordic") is a Delaware corporation with its principal place of business at 83 Mustato Road, Katonah, New York 10536. On information and belief, Nordic is solely owned by Defendant Wahlstedt and enjoys an agency relationship with Wahlstedt. Nordic owns 28.17% of Hospitality NYC. Nordic Management, Inc. has, at best, made only a nominal economic contribution to the JAPONAIS concept. On information and belief, Nordic owns a significant percentage of Geisha NYC, or, by way of alternate pleading, Wahlstedt owns such interest directly.

14.     Defendant Jeffrey Beers owns 8% of Geisha Chicago, 10% of Hospitality Chicago, and 28.17% of Hospitality NYC. On information and belief, Beers is an individual residing in the State of New York at 311 East 83rd Street, New York, New York 10028. On information and belief, Beers owns a significant percentage of Geisha NYC.

15.     Defendant Miae Lim owns 29.5% of Geisha Chicago, 29% of Hospitality Chicago, and 28.17% of Hospitality NYC. On information and belief, Lim is an individual residing in the State of Illinois at 2607 West Huron Street, Chicago, Illinois 60612. On information and belief, Lim owns a significant percentage of Geisha NYC.

4

## Jurisdiction

16.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 (Lanham Act); 28 U.S.C. § 1331 (federal question); and 28 U.S.C. § 1338(a) (trademark actions). The Court has supplemental jurisdiction over Plaintiff's other claims pursuant to 28 U.S.C. §1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court has the authority to declare the rights and other legal relations of the parties, as sought in portions of this complaint, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

18.     This Court has personal jurisdiction over Defendant Lim because she is domiciled in Illinois.

19.     This Court has personal jurisdiction over Defendants Wahlstedt, Beers, Geisha NYC, Hospitality NYC, and Nordic Management, Inc. because each has conducted business within the District, is causing harm to Segal, Geisha Chicago, and Hospitality Chicago, and because each intended that Segal and/or Geisha Chicago and Hospitality Chicago suffer the effect of the harm caused by Defendants' wrongful actions within this District.

## Core Allegations

20.     In early 2003, Segal and Defendant Wahlstedt jointly developed a concept for a restaurant fusing Japanese and European Cuisine. Segal and Wahlstedt thereafter recruited a culinary expert, Miae Lim (who, in turn, recruited chefs Gene Kato and Jun Ichikawa), an architect, Jeffrey Beers, and others to develop and implement the concept. Segal, Wahlstedt, Lim, non-party Jean Goutal, and Beers considered themselves the founding members. At all times, Segal and Wahlstedt, and, later, Lim and Beers each intended that the JAPONAIS concept

5

would be developed nationally. The founding members anticipated opening restaurants based upon the JAPONAIS concept in various locations throughout the United States. As jointly intended, the founding members would all have the right and opportunity to share in the development and expansion.

## Creation of Geisha Chicago and Hospitality Chicago

21.     Segal, Wahlstedt and others agreed that they should commence the JAPONAIS project with a single restaurant in Chicago.

22.     With the advice of counsel, Segal, Wahlstedt and others created two corporate entities: Geisha Chicago and Hospitality Chicago. Collectively, Geisha Chicago and Hospitality Chicago would have responsibility for owning and operating the initial Chicago JAPONAIS restaurant.

23.     On information and belief, Defendant Wahlstedt selected Mayer, Brown to provide legal advice to the Founders (as defined by the relevant agreements) regarding the creation and structure of Geisha Chicago and Hospitality Chicago and to continue provide legal advice on expansion for the benefit of all of the Founders. Segal was not informed that Mayer, Brown was representing any of the Founders individually.

24.     Under the structure developed by the Founding Members with advice of counsel, Geisha Chicago owns the Chicago JAPONAIS restaurant and all intellectual property related to that concept whether used in Chicago or elsewhere. Hospitality Chicago provides management services to the restaurant itself while also providing guidelines for additional expansion. See Geisha LLC Operation Agreement ("Geisha Chicago Operating Agreement"), attached hereto as Exhibit A.

6

25.     Hospitality Chicago was created by, and operates pursuant to, the Amended and Restated Operating Agreement of OSSS Hospitality LLC ("Hospitality Chicago Operating Agreement"), a copy of which is attached hereto as Exhibit B.

26.     Under the Hospitality Chicago Operating Agreement, Segal, as well as Defendants Beers, Lim, and Wahlstedt are defined as "Founders." Ex. B.

27.     The Hospitality Chicago Operating Agreement states, in relevant part,

6.2.    Expansion

6.2.1   If at least two of the Founders (the **Expanding Founders**) desire to open a restaurant in a location outside the greater Chicagoland area based upon the Restaurants [sic] Concept (an **Expansion**), the Expanding Founders shall deliver written notice (the **Expansion Notice**) of the Expansion to the other Founders (the **Non-Expanding Founders**) setting forth the material terms of the Expansion as well as the terms and conditions pursuant to which the Non-Expanding Founders may invest in the Expansion. The terms and conditions of the Non-Expanding Founders [sic] investment in the Expansion shall be no less advantageous than those offered to other investors in the Expansion (excluding the Expanding Founders). Upon receipt of the Expansion Notice, a Non-Expanding Founder shall have a period of ten (10) Business Days to deliver to the Expanding Founders his agreement to participate in the Expansion on the terms and conditions set forth in the Expansion Notice. The Expanding Founders and the Non-Expanding Founders agree to negotiate in good faith and agree to execute and deliver any additional documents and instruments necessary, proper or advisable to implement the provisions of this Section 6.2. Notwithstanding the foregoing, if Members holding the Required Interest desire to open a restaurant in a new location within the greater Chicagoland area, all of the Founders must be afforded the opportunity to invest in such restaurant on terms that are no less advantageous than those available to other Founders, and each Founder shall be entitled to receive notice and shall deliver his or her agreement to participate in a manner consistent with the procedures established for an Expansion. WITH RESPECT TO AN EXPANSION PURSUANT TO THIS SECTION 6.2, EACH NON-EXPANDING FOUNDER (AND EACH MEMBER THAT IS NOT A FOUNDER) HEREBY IRREVOCABLY WAIVES, RELEASES, ACQUITS AND FOREVER DISCHARGES THE EXPANDING FOUNDERS, AND EACH OF THEIR SUCCESSORS AND ASSIGNS, FROM AND AGAINST ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, PROCEEDINGS, COMPLAINTS OR OTHER ACTIONS OF ANY KIND, IN LAW OR EQUITY, ASSERTING THAT SUCH NON-EXPANDING FOUNDER (OR ANY MEMBER THAT IS NOT A FOUNDER) HAS AN INTEREST OF ANY KIND IN THE ITEMS OF INCOME, GAIN, LOSSES AND DEDUCTIONS AND EXPENSES ALLOCATED TO THE EXPANDING

7

FOUNDERS IN AN EXPANSION, AND EACH NON-EXPANDING FOUNDER (AND EACH MEMBER THAT IS NOT A FOUNDER) FURTHER AGREES NOT TO CHALLENGE, DELAY OR OTHERWISE INHIBIT AN EXPANSION CARRIED OUT IN ACCORDANCE WITH THE TERMS OF THIS <u>SECTION 6.2</u>. EACH NON-FOUNDER MEMBER SHALL HAVE NO RIGHT TO PARTICIPATE IN ANY EXPANSION OF THE CONCEPT UNDER THIS AGREEMENT.

*See* Ex. A.

28.     This provision did not alter, and was not intended to alter, the fiduciary duties of disclosure and honest dealing the Founders owed to one another.

29.     This provision did not provide any Founder the right or opportunity to exclude any other Founder from expansion.

30.     The intent of Section 6.2.1 was to ensure fair and equal opportunities for all Founding Members with regard to the expansion of the JAPONAIS concept and to augment the fiduciary duties already existing between and among the Founding Members.

31.     The Founders also provided ownership positions in Geisha Chicago and Hospitality Chicago to various JAPONAIS staff members in return for, at best, nominal monetary contributions. Sandy Park, the General Manager of JAPONAIS in Chicago, was given a 2.5% ownership interest in Geisha Chicago and a 3% interest in Hospitality Chicago, while Gene Kato, the Executive Chef, was given a 5% ownership interest in Hospitality Chicago and Jun Ichikawa, the co-Executive Chef, was also given a 5% ownership interest in Hospitality Chicago. Likewise, Burgher, hired as a controller, received a 3% interest in Geisha Chicago.

32.     After opening in September 2003, JAPONAIS Chicago has been successful financially, with net sales of approximately $19,000,000.00. Segal, primarily through his ownership interest in Hospitality Chicago, has earned substantial monies as a result of those sales. All the Founders, including Segal, believed this success was a precursor to the intended national expansion.

8

33. Geisha Chicago has spent substantial amounts of time, money, and effort developing the JAPONAIS concept, including the development and marketing of the JAPONAIS name and design, as well as the development of goodwill and a positive reputation in its business. To date, Geisha has spent in excess of $1,000,000.00 on the promotion, advertising, and marketing under the JAPONAIS name and concept.

34. For example, one important aspect of Geisha Chicago's investment in the JAPONAIS concept included the early 2003 engagement of a top Chicago advertising and media marketing firm, Vertis, Inc. ("Vertis"), to create a unique design for the JAPONAIS restaurant that would capture the image and brand Geisha Chicago wished to convey for its new restaurant and lounge. Vertis created the original design for the JAPONAIS trademark, which incorporates a new and unique lettering design. Geisha Chicago has not, on information and belief, licensed the JAPONAIS name or design to Geisha New York or to anyone else. *See* Copy of JAPONAIS design, attached hereto as Exhibit C.

35. The JAPONAIS design has been continuously used and displayed in connection with the JAPONAIS Chicago restaurant and lounge since at least as early as April 2003.

36. Through its continuous use of the JAPONAIS design since opening in April 2003, Geisha Chicago has acquired substantial goodwill and customer recognition throughout the United States and Hospitality Chicago has shared in the benefits of such promotion.

37. As a result of its promotion, advertising, and use of the JAPONAIS design and name in connection with its restaurant and lounge, Geisha Chicago has acquired trademark rights and goodwill in the JAPONAIS name and design within the restaurant and lounge market.

38. On information and belief, all other JAPONAIS intellectual property is owned by Geisha Chicago.

9

39.     The JAPONAIS design and name are integral parts of Geisha Chicago's business and of the business of the related entity, Hospitality Chicago. Geisha Chicago has filed an action under the Lanham Act and federal and state trademark theories to protect its valuable rights in the JAPONAIS name and design. That action, styled *Geisha LLC d/b/a JAPONAIS v. Roy Tuccillo*, case number 05C5529, is pending in the U.S. District Court for the Northern District of Illinois before Judge Rebecca Pallmeyer.

40.     On information and belief, absent contrary lawful agreement, Geisha Chicago and Hospitality Chicago have the exclusive right to market, brand, and provide restaurant services, throughout the nation, using the JAPONAIS design name, and concept.

41.     At all times, Segal desired to expand the JAPONAIS concept beyond Chicago and had the ability and resources needed to participate in any such expansion.

### Defendants' Wrongful Actions

42.     At sometime in 2004 or early 2005, unbeknownst to Segal, and in violation of the Hospitality Chicago Operating Agreement, which allowed him the opportunity as a Founder to participate in the expansion if he so desired, Defendants Lim, Wahlstedt, Beers, began to develop expansion plans for one or more additional JAPONAIS locations. Defendants Lim, Wahlstedt, and Beers informed persons other than Segal of the expansion and, on information and belief, took affirmative steps to conceal such expansion activities from Segal.

43.     Defendants, without notice to Segal, sought out Segal's business contacts as investors in the expansion.

44.     In March 2005, also without the knowledge of Segal, Defendants signed a lease for a New York location at 225 Park Avenue South to operate a JAPONAIS restaurant.

45.     After the lease was signed, the other Founders informed Segal that he could not participate on the same terms as the other Founders, in violation of the Hospitality Chicago Operating Agreement.

46.     On information and belief, the New York restaurant is currently under construction and scheduled to open in April 2006.

47.     On information and belief, Defendants Lim, Wahlstedt, Beers, other undisclosed individuals have also entered into a licensing agreement with an unknown entity to open a JAPONAIS restaurant in Las Vegas, Nevada at some point in 2006.

48.     The value and goodwill acquired in the JAPONAIS name and design, and owned by Geisha Chicago, are critical assets in the national expansion of JAPONAIS. Indeed, the value of the name, reputation, and goodwill established through the Chicago JAPONAIS restaurant and lounge is what attracted, and will continue to attract, business opportunities for Geisha Chicago and its investors, owners and business partners.

49.     Further, on information and belief, Geisha Chicago's ownership and rights in the JAPONAIS name and design represent essential factors in the financing of the proposed Las Vegas expansion, which is based on the licensing of the JAPONAIS name and design.

50.     To the best of Segal's knowledge, neither Hospitality Chicago nor Geisha Chicago have received any payments for the use of the JAPONAIS trademarks, trade names, trade dress, and other intellectual property from the Defendants or third party partners in connection with the proposed expansion in New York and Las Vegas, or any other undisclosed possible expansion.

51.     Defendants have not disclosed, and continue to resist disclosing, to Segal the use or proposed use of the JAPONAIS trademarks, trade names, trade dress, and other intellectual

11

property rightfully owned by Geisha Chicago, nor the use or proposed use of Geisha Chicago's and/or Hospitality Chicago's staff and other resources in connection with any actual or proposed expansion.

## Creation of Geisha NYC and Hospitality NYC

52.     On information and belief, Defendants Wahlstedt, Lim, and Beers and other unknown persons created two corporate entities in order to conduct an expansion of the JAPONAIS concept to New York City: Geisha NYC and Hospitality NYC. Attached hereto as Exhibits D and E are the Operating Agreements of each entity.

53.     The New York JAPONAIS and the intended Las Vegas JAPONAIS restaurant use the same trade names and are, by design of the Defendants, an extension of the initial JAPONAIS concept.  They represent the continuation of the national expansion of the JAPONAIS concept began in Chicago.

54.     As soon as Segal learned of the proposed New York expansion, he informed the other Founders that he desired to participate in the expansion. Defendant Wahlstedt informed him he could not participate.

55.     Even after the initial refusal of his request to participate, Segal asked to be included in the expansion and was told he was somehow ineligible.  However, Segal has never been informed of the legal basis for the refusal and has merely been told that Defendant Lim objected to his participation.

56.     In lieu of participation as a Founder, the other Founders offered Segal an alternate and unacceptable proposal.

57.     By letter of May 16, 2005, Defendants purported to offer Segal the opportunity to invest in Geisha NYC and to participate in Hospitality NYC. See May 16, 2005 Letter, attached hereto as Exhibit F.

58.     The proposal to Segal had two separate basic components. First, Segal was allowed, as with any other qualified investor, to invest in Geisha NYC pursuant to a private placement membership. Id. Four "Class A" Units of Geisha NYC were offered to all potential investors at a purchase price of $500,000 per unit. Owners of Class A units in Geisha NYC would collectively receive an interest in the proposed JAPONAIS restaurant in the Mirage Hotel and Casino in Las Vegas, Nevada ("JAPONAIS-Mirage"). The interest in the JAPONAIS-Mirage provides for Class A owners collectively to receive 10% of the cash distributions made by that entity. Segal was not offered or informed of the rights of the other Founders in Geisha NYC

59.     Second, Segal was offered the opportunity to purchase units in Hospitality NYC but only if he relinquished a significant portion of his rights in Geisha Chicago. Segal was offered a maximum of three Class B, non-voting units in Hospitality NYC as Managing Member of Geisha NYC with respect to the expansion to New York in exchange for 1 ½ of his existing Class A units in Hospitality Chicago for each desired Class B unit in Hospitality NYC. Id. Thus, if Segal were to seek to obtain three Class B Units in Hospitality NYC, his existing balance of Class A Units in Hospitality Chicago would have been reduced by 4 ½ units. Stated differently, Segal would have been required to trade higher-value Class A units in Geisha Chicago for a smaller quantity of lower-value Class B units in Hospitality NYC.

60.     With respect to the likely JAPONAIS expansion in Las Vegas, Segal was offered the ability to purchase three Class B, non-voting Units in the Managing Member of that entity in

13

exchange for 1 ½ Class A units in Hospitality Chicago for each Class B Unit obtained in the new expansion entity. Thus, in order to participate in either the New York or proposed Las Vegas expansions, Segal would be forced to forfeit all or part of his ownership interests in the Chicago JAPONAIS restaurant and lounge of which he was a Founder.

61.     The offer made to Segal, however, was inferior to the offer made to the other Founders of Hospitality Chicago. Specifically, Defendants Beers, Lim, and Nordic (which is apparently owned in its entirety by Defendant Wahlstedt) will each own 28.17% of Hospitality NYC. See Hospitality NYC Operating Agreement, Exhibit E. The units owned by Defendants Beers, Lim, and Nordic are all voting units.

62.     Additionally, Lim, Beers and Wahlstedt arranged for non-Founding Members to have interests. Non-parties Burgher (2%), Ichikawa (6%), Kato (5%), and Park (2%) will each own nonvoting units of Hospitality NYC. Id.

63.     The Defendants have not disclosed their ownership interest in Geisha NYC, but on information and belief, it is a controlling share.

64.     Not only was the offer made to Segal inferior to the opportunities provided to the other Founders, but it was inferior to the offers made to other investors that were not Founders. For example, in at least one case, Defendant Nordic, an investor not even associated with Geisha Chicago or Hospitality Chicago, was offered investment opportunities in Geisha NYC and Hospitality NYC far superior to the offer made to Segal, one of the leading Founders of Geisha Chicago and Hospitality Chicago and co-creator of the original JAPONAIS concept.

65.     Further, on information and belief the Founding Members even offered staff members at Geisha Chicago, such as non-party Julio Burbano, ownership interests without requiring the staff members to relinquish any additional rights, as was required of Segal. At no

14

time was Segal permitted to obtain an ownership interest in either Geisha NYC or Hospitality NYC under such favorable terms, or at the price per unit of ownership interest offered to persons or entities who were not Founders.

66. Despite their current and intended use of the valuable JAPONAIS trade name and design, Defendants have not, according to information available to Segal, purchased, licensed, or otherwise lawfully obtained the rights to use that trade name and design, which are the sole property of Geisha Chicago, a completely separate entity from either of the entity Defendants in this matter.

67. Thus, the other Founders both excluded Segal from the ongoing expansion and further failed to provide any compensation Geisha Chicago and Hospitality Chicago for the use of it intellectual property thus causing injury to Segal, Geisha Chicago and Hospitality Chicago.

68. Furthermore, Defendants have not provided any indication to Segal that would lead him to expect that he will be treated any differently in the future with respect to any other possible JAPONAIS expansion opportunities that may currently or at some future time exist. Rather, Defendants will continue to exclude Segal from, and keep Segal uninformed regarding, any other possible JAPONAIS expansion opportunities that may currently or at some future time exist.

69. By letter of October 21, 2005, Segal declined Defendant's offer to participate in the New York expansion at the inferior terms offered to him and demanded his full rights as Founder. See October 21, 2005 Letter, attached hereto as Exhibit G.

70. By letter dated October 28, 2005, Defendants refused Segal's demand and failed to provide any additional information. See October 28, 2005 Letter, attached hereto as Exhibit H.

71.     The conduct of Defendants in refusing to allow Segal to participate in the expansion of JAPONAIS to New York and Las Vegas and otherwise act to prevent him from participating in and benefiting from the expansion violates Segal's rights and defendants' obligations under the operating agreements of Geisha Chicago and Hospitality Chicago. Defendants' actions have been carried out by Mayer, Brown.

72.     The Defendants on their own and through Mayer, Brown have refused to enforce those rights.

## Derivative and Demand Excused Allegations

73.     Segal brings Counts VI through IX derivatively in the right and for the benefit of Geisha Chicago to redress injuries suffered and to be suffered by Geisha Chicago and Hospitality Chicago and as a result of the trademark infringement and false designation of origin by the named Defendants.

74.     Plaintiff will adequately and fairly represent the interests of Geisha Chicago and Hospitality Chicago and its members in enforcing and prosecuting its rights.

75.     As a result of the facts set forth herein, Segal has not made any demand on Geisha Chicago and/or Hospitality Chicago to institute this action. Such demand would be a futile and useless act because the members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action on behalf of the companies or its shareholders:

a.      All of the members of Geisha Chicago and Hospitality Chicago named as defendants herein, who collectively own 82% and 84% of those respective entities, failed to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment.

b.      There exists a substantial likelihood that the members will be held personally liable for their actions, and therefore the members are incapable of independently and disinterestedly considering a demand to commence this action.

## Count I:     Breach of Contract

### Breach of Section 6.2.1 of the Hospitality Chicago Operating Agreement
### (Against Defendants Wahlstedt, Beers, and Lim)

76.     Segal incorporates by reference the allegations contained in Paragraphs 1 through 71 as if fully set forth herein.

77.     At all relevant times, Segal has desired to participate in the national expansion of the JAPONAIS concept.

78.     Section 6.2.1 does not permit Expanding Founders to exclude other Founders who desire to expand to other cities and provides that Founders that so desire to participate in the expansion may do so as an Expanding Founder. *See* Exhibit A.

79.     Thus, under the terms of 6.2.1, Segal is entitled to be treated as an Expanding Founder for all expansion or development based upon the JAPONAIS concept and intellectual property.

80.     By their actions, however, Defendants have not permitted Segal to participate as an Expanding Founder in the New York expansion in either Geisha NYC or Hospitality NYC, as well as the expansion opportunities in Las Vegas or nationally.

81.     This refusal to allow Segal to participate as an Expanding Founder under section 6.2.1 constitutes a breach of the agreement.

82.     Defendants' breaches of section 6.2.1 have harmed Segal by depriving him of the opportunity to participate in the New York expansion, the Las Vegas expansion and such other opportunities as may be available.

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

17

## Count II:    Breach of Contract

### Breach of Section 6.2.1 Obligation to Offer at Same Terms
### (Against Defendants Wahlstedt, Beers, and Lim)

83.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 78 as if fully set forth herein and presents this Count by way of alternate pleading.

84.    As set forth in 6.2.1, "The terms and conditions of the Non-Expanding Founders investment in the Expansion shall be no less advantageous than those offered to other investors in the Expansion (excluding the Expanding Founders)."

85.    Thus, Defendants must offer terms to Segal (if he is deemed to be a Non-Expanding Founder) that are "no less advantageous than those offered to other investors in the Expansion."

86.    Segal was not offered terms that are as advantageous as those offered to other investors in the New York or Las Vegas expansions because, among other things, other persons or entities who were not Founders were offered a more favorable price per unit of ownership interest.

87.    Defendant Nordic Management was permitted to obtain a 28.17% ownership share in Geisha New York. The expansion offer to Segal was less advantageous than the expansion offer made to Nordic, even though Nordic is not a Founder.

88.    Non-party Burgher was permitted to obtain a 2% ownership share in Geisha NYC. The expansion offer to Segal was less advantageous than the expansion offer made to Burgher, even though Burgher is not a Founder.

89.    Non-party Ichikawa was permitted to obtain a 6% ownership share in Geisha NYC. The expansion offer to Segal was less advantageous than the expansion offer made to Ichikawa, even though Ichikawa is not a Founder.

90.     Non-party Kato was permitted to obtain a 5% ownership share in Geisha NYC. The expansion offer to Segal was less advantageous than the expansion offer made to Kato, even though Kato is not a Founder.

91.     Non-party Park was permitted to obtain a 2% ownership share in Geisha NYC. The expansion offer to Segal was less advantageous than the expansion offer made to Park, even though Park is not a Founder.

92.     Even non-party Burbano was permitted to obtain a 0.5% ownership share in Geisha NYC. The expansion offer to Segal was less advantageous than the expansion offer made to Burbano, even though Burbano is not a Founder.

93.     Defendants Wahlstedt, Beers, and Lim even offered staff members at Geisha Chicago ownership interests in the New York expansion without requiring the staff members to relinquish any additional rights. At no time was Segal permitted to obtain an ownership interest in either Geisha NYC or Hospitality NYC under such favorable terms.

94.     Thus, Defendants Wahlstedt, Beers, and Lim, and their agents, have breached 6.2.1.

95.     These breaches have harmed Segal.

96.     On information and belief, Defendants Wahlstedt, Beers, and Lim have also breached 6.2.1 by refusing to offer terms to Segal that are no less advantageous than those offered to other investors in the expansion to Las Vegas.

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

19

## Count III:    Breach of Fiduciary Duty

### (Against Defendants Lim, Wahlstedt, and Beers)

97.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 92 as if fully set forth herein.

98.    As fiduciaries of Segal within Geisha Chicago and Hospitality Chicago, Defendants Lim, Wahlstedt and Beers owed Segal the duties of good faith, fairness, and loyalty.

99.    Defendants Lim, Wahlstedt, and Beers breached those duties through at least the following ways:

- Failing to disclose and actively concealing expansion plans.

- Using the law firm representing Geisha Chicago and Hospitality Chicago to further their personal interests.

- Using corporate assets to further their personal interests and the interests of other entities, including Nordic.

- Depriving Segal of his right to participate in the national expansion under the favorable terms to which he is entitled to participate as a Founding Member or Founder.

- Conspiring to deprive Segal of his rights and desire to participate in national expansion.

- At all relevant times, failing to deal with Segal in good faith, fairness, and loyalty in an effort to prevent him from fully participating in the expansion.

100.    By way of alternate pleading, Defendants Lim, Wahlstedt, and Beers breached their duty by providing offers that, apart from the express terms of 6.2.1, failed to provide Segal a meaningful opportunity to participate in the New York, Las Vegas, and national expansions.

101.    Defendants' breach has harmed Segal by preventing him from participating in the creation of the New York, Las Vegas, and other restaurants as an Expanding Founder, despite his desire to do so and his right to do so under the Hospitality Chicago agreement.

20

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited as well as such other and further relief the Court deems appropriate.

## Count IV: Breach of Fiduciary Duty

### Usurpation of Corporate Opportunity
### (Against Defendants Lim, Wahlstedt, and Beers)

102. This Count is presented by way of alternate pleading.

103. Segal incorporates by reference the allegations contained in Paragraphs 1 through 98 as if fully set forth herein.

104. As fiduciaries within Geisha Chicago and Hospitality Chicago, Defendants Lim, Wahlstedt, and Beers owed Segal the duties of good faith, fairness, and loyalty.

105. Wahlstedt, Lim, and Beers have breached their fiduciary duty by usurping Geisha Chicago's corporate opportunities without payment to either Geisha Chicago or Chicago Hospitality, these Defendants have breached their fiduciary duties to Segal.

106. Defendants' breach and unlawful usurpation have harmed Segal by preventing him from participating in the creation of the New York, Las Vegas, and other national restaurants as an Expanding Founder, despite his desire to do so and his right to do so under the Hospitality Chicago agreement.

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

## Count V: Oppression

### (Against Defendants Lim, Wahlstedt, and Beers)

107. Segal incorporates by reference the allegations contained in Paragraphs 1 through 102 as if fully set forth herein.

108.    As a minority participant in Geisha Chicago and Hospitality Chicago, Segal had a reasonable expectation that he would be permitted to participate as a Founder in any expansion of the JAPONAIS concept, and that Defendants would not refuse to disclose expansion opportunities to him and that, further, as a Founder, he would be able to share in the rewards of the national expansion of the JAPONAIS concept.

109.    Defendants Lim, Wahlstedt, and Beers breached that reasonable expectation by hiding the New York and potential Las Vegas expansion opportunities from Segal, by forcing Segal into a lesser role in the expansions, and by offering terms to Segal that were less advantageous than those offered to other investors in the expansions.

110.    Further, Defendants' conduct is burdensome, harsh, and wrongful, and demonstrates a lack of fair dealing in the affairs of Geisha Chicago and Hospitality Chicago to the prejudice of Segal, as well as a violation of the fairness on which a member like Segal is entitled to rely. Defendants' conduct of attempting to drive Segal out of his lucrative Chicago holdings and the national expansion of the JAPONAIS concept controlled by Geisha Chicago and Hospitality Chicago is thus oppressive under Delaware law or, by way of alternate pleading, under Illinois law.

111.    Defendants' wrongful conduct has harmed Segal by preventing him from participating in the creation of the New York restaurant as an Expanding Founder or in the other expansion opportunities including Las Vegas, despite his desire and ability to do so.

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

## Count VI: Common Law Misappropriation of Trademark

### (Derivative Action)
### (Against Defendants Geisha NYC and Hospitality NYC)

112.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 107 as if fully set forth herein.

113.    Geisha Chicago, of which Segal is an 18.5% owner, and Hospitality Chicago, of which Segal is a 15% owner, have spent substantial amounts of money and effort developing the JAPONAIS design and name, as well as goodwill and reputation in the JAPONAIS business.

114.    The JAPONAIS design is the property of Geisha Chicago.

115.    Geisha Chicago has the exclusive lawful right to market, brand, and provide restaurant services, throughout the nation, using the JAPONAIS design and name.

116.    The JAPONAIS design and name are integral parts of Geisha Chicago's business.

117.    Defendants' use of the JAPONAIS design seeks to deprive Geisha Chicago and, by extension, Segal, of the substantial national goodwill and exclusive rights in the JAPONAIS design and name.

118.    Defendants' actions have been and continue to be unfair and immoral.

119.    Defendants' actions constitute a misappropriation of the JAPONAIS design and name, Geisha Chicago's exclusive rights in the JAPONAIS design and name, and JAPONAIS's goodwill.

120.    The misappropriation has been willful and wanton.

121.    Defendants' actions have harmed and continue to harm Segal.

**WHEREFORE**, Plaintiff respectfully requests such injunctive, declaratory, and monetary relief as may be merited, including a reasonable licensing fee to Geisha Chicago for Geisha NYC's unlicensed use of the JAPONAIS design and name.

23

## Count VII: Common Law Misappropriation of Identity

### (Derivative Action)
### (Against Defendants Geisha NYC and Hospitality NYC)

122.   Segal incorporates by reference the allegations contained in Paragraphs 1 through 117 as if fully set forth herein.

123.   The JAPONAIS name and design are a brand identity used by JAPONAIS, of which Segal is an 18.5% owner, to represent JAPONAIS's restaurant services.

124.   The JAPONAIS name and design are owned by Geisha Chicago, of which Segal is an 18.5% owner.

125.   The JAPONAIS name and design have been misappropriated by Defendants without Geisha Chicago's consent in creating a restaurant by the same name and design without purchasing, licensing, or otherwise lawfully obtaining the rights to use that name and design.

126.   Defendants' misappropriation is done for Defendants' own use or benefit.

127.   The actions of Defendants constitute misappropriation of JAPONAIS's brand identity.

128.   Segal has been damaged by Defendants' unlawful misappropriation inasmuch as the conduct of Defendants has jeopardized funding for additional restaurants operated under the JAPONAIS name and design.

129.   The misappropriation has been willful and wanton.

**WHEREFORE,** Plaintiff respectfully requests such injunctive, declaratory, and monetary relief as may be merited, including a reasonable licensing fee to Geisha Chicago for Geisha NYC's unlicensed use of the JAPONAIS design and name.

## Count VIII:   Unjust Enrichment

### (Derivative Action)
### Delaware Common Law
### (Against Defendants Geisha NYC and Hospitality NYC)

130.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 125 as if fully set forth herein.

131.    Defendants have unjustly used the name "JAPONAIS" and related intellectual property in a New York restaurant without purchasing, licensing, or otherwise lawfully obtaining the rights to use that trade name.

132.    Defendants use of Geisha Chicago's intellectual property violates fundamental principles of equity and good conscience.

133.    Defendants' actions constitute unjust enrichment.

134.    Defendants' actions have harmed and continue to harm Geisha Chicago and Hospitality Chicago.

**WHEREFORE**, Plaintiff respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

## Count IX:    False Designation of Origin

### Violation of 15 U.S.C. § 1125(a) (Derivative Action)
### (Against Defendants Geisha NYC and Hospitality NYC)

135.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 130 as if fully set forth herein.

136.    Geisha Chicago is the owner of the JAPONAIS name and design.

137.    Geisha Chicago has spent substantial amounts of money and effort developing the JAPONAIS design and concept, as well as goodwill and reputation in its business.

138. Geisha Chicago has the exclusive right to market, brand, and provide restaurant services, throughout the country, using the JAPONAIS name and design.

139. The use of the JAPONAIS name and design by Geisha NYC and Hospitality NYC seeks to deprive Geisha Chicago of its substantial national goodwill and is likely to cause confusion, or to cause mistake, or to deceive the public that Geisha NYC's goods and/or services are authorized by or are affiliated or associated with Geisha Chicago, and that Geisha Chicago has authorized the creation of a restaurant by the same name and that Defendants have purchased, licensed, or otherwise lawfully obtained the rights to use the JAPONAIS name and design.

140. The above-described acts of Defendants Geisha NYC and Hospitality NYC constitute a false designation of origin, sponsorship, or approval in violation of 15 U.S.C. § 1125(a), entitling the members of Geisha Chicago to relief.

141. The members of Geisha Chicago are being damaged and are likely to be damaged in the future by the acts of false designation of origin described above.

142. By reason of the willful acts conducted by Defendants in conscious disregard for the rights of the members of Geisha Chicago, the members are entitled to treble damages under 15 U.S.C. § 1117(a).

143. This is an exceptional case making Plaintiff eligible for an award of attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**WHEREFORE**, Plaintiff respectfully requests such injunctive, declaratory, and monetary relief as may be merited, including a reasonable licensing fee to Geisha Chicago for Geisha NYC's unlicensed use of the JAPONAIS design and name.

## Count X: Civil Conspiracy and Aiding and Abetting

### Delaware Common Law
### (Against Defendants Wahlstedt, Lim, Beers, Nordic, Geisha NYC and Hospitality NYC)

144.    Segal incorporates by reference the allegations contained in Paragraphs 1 through 139 as if fully set forth herein.

145.    Defendants Wahlstedt, Lim, Beers, Nordic, Geisha NYC and Hospitality NYC conspired to and did knowingly participate in the breach of Wahl's, Lim's, and Beer's fiduciary duties to Segal as members of Geisha Chicago and Hospitality Chicago by misappropriating the intellectual property of Geisha Chicago without purchasing, licensing, or otherwise lawfully obtaining the rights to use the JAPONAIS name and/or design by counseling them regarding the use of that name and design by Geisha NYC.

146.    Defendants Wahlstedt, Lim, Beers, Nordic, Geisha NYC and Hospitality NYC also conspired to and did oppress Segal and conspired to and did knowingly participate in the breach of Wahl's, Lim's, and Beer's fiduciary duties to Segal as members of Geisha Chicago and Hospitality Chicago by actively concealing the plans to expand the JAPONAIS concept to New York and Las Vegas and by depriving Segal of his right to participate in the national expansion under the favorable terms to which he is entitled to participate as a Founder.

147.    Defendants' wrongful conduct has harmed Segal by preventing him from participating in the creation of the New York restaurant as an Expanding Founder, despite his desire to do so and his right to do so under the Hospitality Chicago Operating Agreement.

**WHEREFORE**, Plaintiff Segal respectfully requests such injunctive, declaratory, and monetary relief as may be merited.

## Count XI: Declaratory And Injunctive Relief

148.     Segal incorporates by reference the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

149.     An active controversy exists between Segal and Defendants relating to the actual and planned expansion of the JAPONAIS concept. The controversy involved, among other matters, the construction and interpretation of existing documents.

150.     Among other issues requiring determination is: whether Segal is an Expanding Founder under the Hospitality Chicago Operating Agreement; whether Segal is entitled to participate in the expansion of the JAPONAIS concept on the same terms and conditions as Nordic Management; whether Nordic is Wahlstedt's agent or, in the alternative, whether Wahlstedt is Nordic's agent; whether, if an agency relationship between Nordic and Wahlstedt exists, Nordic is jointly and severally liable for Wahlstedt's acts; whether Mayer, Brown should be disqualified as attorney for the Defendants; whether communications between and among Mayer, Brown and the Defendants are privileged as against Segal and whether Defendant Segal, as a Founding Member and Founder has the right to discover such communications; whether Defendants have a fiduciary duty to disclose all expansion-related activities to Segal; and whether Defendants Geisha NYC and Hospitality NYC should pay licensing fees to Geisha Chicago and/or Hospitality Chicago, is necessary to determine the rights of the parties and to terminate the actual controversy.

**WHEREFORE,** Plaintiff Segal accordingly requests a declaration that:

   a.    Segal is an Expanding Founder pursuant to the Hospitality Chicago Operating Agreement entity to the rights and privileges of an Expanding Founder including such injunctive relief as may be necessary to implement such relief.

   b.    Segal be permitted to exercise those rights.

c.   By way of alternate pleading, Segal be deemed able to participate in any expansion on the same terms and conditions as Nordic Management or those terms pursuant to other, non-funding members.

d.   By way of alternate pleading, declaring that Mayer, Brown is disqualified from representing any of the Defendants.

e.   Segal be permitted to discover any and all communications between and among Mayer, Brown and any of the Defendants with respect to Mayer, Brown's engagement relating to JAPONAIS and the actual or possible expansion of the JAPONAIS concept, including the use of any intellectual property rightfully owned by Geisha Chicago.

f.   The Defendants, and each of them, have a fiduciary duty to disclose all expansion-related activities to Segal.

g.   By way of alternate pleading, Geisha NYC, LLC and OSSS Hospitality NYC, LLC be required to pay appropriate licensing, royalties and fees to Geisha, LLC, and OSSS Hospitality, LLC for the use of the JAPONAIS design and name.

h.   By way of alternate pleading, Nordic and Wahlstedt have an established agency relationship and that Nordic is jointly and severally liable for Wahlstedt's acts.

i.   Such other appropriate relief may be granted including injunction and declaratory relief regarding ownership interests in JAPONAIS restaurants established in violation of Segal's rights.

## Count XII:  Request For Accounting From Geisha Chicago, Hospitality Chicago, Geisha NYC, and Hospitality NYC

151.   Segal incorporates by reference the allegations contained in Paragraphs 1 through 146 as if fully set forth herein.

152.   Segal is entitled to an accounting of the financial status and expansion activities of Geisha Chicago, Hospitality Chicago, Geisha NYC, and Hospitality NYC.

**WHEREFORE**, Plaintiff Segal respectfully requests that the Court order an accounting and such other and further relief this Court deems appropriate.

## JURY DEMAND

Plaintiff demands trial by jury to the maximum extent permitted by law.

Respectfully Submitted,

**JONATHAN SEGAL**

By: _____
      One of His Attorneys

Dated: January 4, 2006

Jeffrey J. Mayer, Esq. (#6194013)
John T. Shapiro, Esq. (#6207791)
Melissa L. Benzon, Esq. (#6274556)
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois  60606-6677
Telephone:  (312) 360-6000
Facsimile:  (312) 360-6520

*967296-17*

# EXHIBIT A

**GEISHA LLC**
A Delaware Limited Liability Company

**OPERATING AGREEMENT**

Dated as of January 1, 2003

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

ARTICLE 1     DEFINITIONS ................................................................. 1

    1.1     Definitions ................................................................. 1

ARTICLE 2     ORGANIZATION ............................................................ 3

    2.1     Formation ................................................................... 3

    2.2     Name ......................................................................... 3

    2.3     Registered Office; Registered Agent; Principal Office; Other Offices ............... 3

    2.4     Purposes .................................................................... 3

    2.5     Foreign Qualification .................................................... 4

    2.6     Term ......................................................................... 4

    2.7     No State-Law Partnership ............................................. 4

ARTICLE 3     MEMBERS AND CAPITAL ............................................. 4

    3.1     Members ................................................................... 4

    3.2     Liability of Members .................................................... 5

    3.3     Lack of Authority ........................................................ 6

    3.4     Member Units ............................................................. 6

    3.5     Issuance of Additional Units and Interests; Additional Capital Contributions ............ 6

ARTICLE 4     CAPITAL ACCOUNTS ................................................... 7

    4.1     Establishment and Determination of Capital Accounts .............. 7

    4.2     Negative Capital Accounts ............................................ 7

    4.3     Company Capital .......................................................... 7

ARTICLE 5     DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES ............ 7

    5.1     Generally ................................................................... 7

    5.2     Distributions .............................................................. 7

    5.3     Allocation of Profits and Losses .................................... 8

    5.4     Special Allocations ..................................................... 8

    5.5     Amounts Withheld ...................................................... 9

    5.6     Tax Distributions ........................................................ 9

    5.7     Tax Allocations; Code Section 704(c) ............................. 9

ARTICLE 6     MANAGEMENT ......................................................... 10

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 6.1 | Management by the Managing Member | 10 |
| 6.2 | Expenses | 11 |
| 6.3 | Compensation of Managing Member | 11 |
| 6.4 | Conflicts of Interest | 11 |
| 6.5 | Successor Managing Member | 11 |
| ARTICLE 7 | MEETINGS OF MEMBERS | 12 |
| 7.1 | Member Meetings | 12 |
| 7.2 | Voting List | 13 |
| 7.3 | Proxies | 13 |
| 7.4 | Conduct of Meetings | 13 |
| 7.5 | Action by Written Consent or Telephone Conference | 13 |
| ARTICLE 8 | EXCULPATION AND INDEMNIFICATION | 14 |
| 8.1 | Exculpation | 14 |
| 8.2 | Right to Indemnification | 15 |
| 8.3 | Advance Payment | 15 |
| 8.4 | Indemnification of Employees and Agents | 15 |
| 8.5 | Appearance as a Witness | 16 |
| 8.6 | Nonexclusivity of Rights | 16 |
| 8.7 | Insurance | 16 |
| 8.8 | Savings Clause | 16 |
| ARTICLE 9 | TAXES | 17 |
| 9.1 | Tax Returns | 17 |
| 9.2 | Tax Matters Member | 17 |
| ARTICLE 10 | BOOKS, REPORTS AND COMPANY FUNDS | 17 |
| 10.1 | Maintenance of Books | 17 |
| 10.2 | Reports | 17 |
| ARTICLE 11 | TRANSFERS | 17 |
| 11.1 | Assignment by Members | 17 |
| 11.2 | Void Assignment | 18 |
| 11.3 | Substituted Member | 18 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 11.4 | Effect of Assignment | 18 |
| 11.5 | Effect of Incapacity | 19 |
| 11.6 | Interest in a Member | 19 |
| ARTICLE 12 | DISSOLUTION, LIQUIDATION AND TERMINATION | 19 |
| 12.1 | Dissolution | 19 |
| 12.2 | Liquidation and Termination | 20 |
| 12.3 | Deficit Capital Accounts | 20 |
| 12.4 | Cancellation of Certificate | 21 |
| ARTICLE 13 | GENERAL PROVISIONS | 21 |
| 13.1 | Offset | 21 |
| 13.2 | Notices | 21 |
| 13.3 | Entire Agreement | 21 |
| 13.4 | Effect of Waiver or Consent | 21 |
| 13.5 | Amendment or Modification | 21 |
| 13.6 | Binding Effect | 22 |
| 13.7 | Governing Law; Severability | 22 |
| 13.8 | Further Assurances | 22 |
| 13.9 | Waiver of Certain Rights | 22 |
| 13.10 | Indemnification and Reimbursement for Payments on Behalf of a Member | 22 |
| 13.11 | Notice of Provisions | 23 |
| 13.12 | Counterparts | 23 |

## OPERATING AGREEMENT
## OF
## GEISHA LLC
### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT of GEISHA LLC, a Delaware limited liability company (as the same may be amended or restated from time to time, the "**Agreement**"), dated as of January 1, 2003, is made by each signatory hereto as a Member.

### ARTICLE 1
### DEFINITIONS

1.1    **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"**Act**" means the Delaware Limited Liability Company Act, and any successor statute, as amended from time to time.

"**Book Value**" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation §1.704-1(b)(2)(iv)(d) - (g), provided, however, that the initial Book Value of any asset of the Company contributed by a Member to the Company shall be its fair market value at the time of its contribution.

"**Business Day**" means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of Illinois or the State of Delaware are closed.

"**Capital Contribution**" means the aggregate contribution made by a Member to the capital of the Company specified on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class A Units**" means the Units of the Members designated as Class A Units on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class B Units**" means the Units of the Members designated as Class B Units on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company**" means Geisha LLC, a Delaware limited liability company.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

1

**"Dispose"**, **"Disposed"**, " **Disposing**" or " **Disposition**" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance (including, without limitation, by operation of law) or the acts thereof.

**"Fiscal Year"** of the Company means the calendar year.

**"Incapacity"** or **"Incapacitated"** means (a) with respect to a natural person, the bankruptcy, death, incompetency or insanity of such person and (b) with respect to any other Person, the bankruptcy, liquidation, dissolution or termination of such Person.

**"Losses"** for any period means all items of Company loss, deduction and expense for such period determined according to Section 4.2.

**"Managing Member"** means the holder, from time to time, of the Class B Units. The initial Managing Member shall be OSSS Hospitality LLC, a Delaware limited liability company.

**"Member"** means any Person executing this Agreement as of the date of this Agreement as a member (including the Managing Member) or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

**"Member Nonrecourse Debt Minimum Gain"** has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(1).

**"Member Nonrecourse Deductions"** has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i).

**"Nonrecourse Deductions"** has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

**"Payment Date"** means the earlier to occur of (i) the date on which the Company, in its sole discretion, chooses to pay to the holders of the Preferred Units an amount equal to their initial Capital Contributions, together with any and all accumulated Preferred Distributions, provided that such date shall be no earlier than January 1, 2004, and (ii) January 1, 2008.

**"Person"** means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

**"Preferred Distributions"** shall mean the distributions of cash or property made to Members holding Preferred Units in accordance with Section 5.2.1.

**"Preferred Units"** means the Preferred Units of each Member set forth on Schedule A hereto, as amended from time to time in accordance with the terms of this Agreement.

**"Proceeding"** has the meaning given that term in Section 8.2.

**"Profits"** or **"Losses"** means, for each period taken into account, an amount equal to the Company's taxable income or taxable loss for such period, determined in accordance with Federal income tax principles, adjusted to the extent the Managing Member determines that such adjustment is necessary to comply with the requirements of Section 704(b) of the Code.

**"Restaurant"** means the first-class, fully staffed Japanese restaurant that is expected to consist of a dining room with sushi bar, a private party room, lounge and bar with DJ entertainment, as well as delivery, take-out and catering services to be located at 555 Chicago Avenue in Kingsbury Park, Chicago, Illinois.

**"Required Interest"** means one or more Members possessing Units (excluding all Preferred Units prior to the Payment Date) entitled to receive a majority of the Profits and Losses and other distributions more specifically described in Article 5 hereof.

**"Units"** means, as applicable, the Class A Units, the Preferred Units and the Class B Units of each Member, representing such Member's interest in the income, gains, losses, deductions and expenses of the Company as set forth on Schedule A hereto, as amended from time to time in accordance with the terms of this Agreement.

Other terms defined in this Agreement have the meanings so given them. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes.

### ARTICLE 2
### ORGANIZATION

2.1 **Formation.** The parties hereby ratify the organization of the Company as a Delaware limited liability company by the filing of a Certificate of Formation (the "**Certificate**") under and pursuant to the Act.

2.2 **Name.** The name of the Company is "Geisha LLC," and all Company business shall be conducted in that name or such other name or names that comply with applicable law as the Managing Member may select from time to time.

2.3 **Registered Office; Registered Agent; Principal Office; Other Offices.** The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by law. The principal office of the Company shall be at such place as the Managing Member may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there. The Company may have such other offices as the Managing Member may designate from time to time.

2.4 **Purposes.** The purpose of the Company is to own and operate the Restaurant and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose (including, without limitation, obtaining financing therefor) and that is not prohibited by the Act or the laws of the jurisdictions in which the Company engages in that business.

2.5 **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Delaware, the Managing Member shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managing Member, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction to the extent necessary. At the request of the Managing Member, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate (in the opinion of the Managing Member) to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business and to obtain liquor licenses for the Restaurant.

2.6 **Term.** The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of Delaware and shall continue in existence until termination and dissolution of the Company as determined under <u>Section 12.1</u> of this Agreement.

2.7 **No State-Law Partnership.** The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and, if applicable, state tax purposes, and nothing in this Agreement shall be construed to the contrary. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Neither the Company nor the Managing Member shall elect to treat the Company as an association taxable as a corporation for Federal or state income tax purposes.

### ARTICLE 3
### MEMBERS AND CAPITAL

3.1 **Members.**

3.1.1 The names, residence, business or mailing addresses, Capital Contributions and, with respect to Members, Units of the Members are set forth on <u>Schedule A</u>, as such schedule shall be amended from time to time in accordance with the terms of this Agreement. Each Member shall make its aggregate Capital Contribution to the Company in cash as and when called by the Managing Member.

3.1.2 No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law or by this Agreement. Any Member may, with the approval of the Managing

Member, make loans to the Company, and any loan by a Member to the Company shall not be considered to be a Capital Contribution.

3.1.3    Each Member shall execute a counterpart of this Agreement, and when a Person is admitted as a Member by the Managing Member, such Person shall execute a counterpart of this Agreement and such Person shall be listed as a Member on Schedule A with such Member's address, Capital Contribution and Units. Each Member acknowledges that the Managing Member has the sole right and authority to admit other members to the Company (including, without limitation, additional Members), subject to Section 3.5 below.

3.1.4    Each Member hereby represents and warrants to and acknowledges with the Company and the Managing Member that: (a) he has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (b) he is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (c) he is acquiring interests in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (d) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; and (e) the execution, delivery and performance of this Agreement does not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound. Each Member further acknowledges that any subscription for Units is not binding unless accepted in writing by the Company (by the Managing Member) in its sole discretion after the Company's receipt of all subscription documents described in any private placement memorandum prepared by the Company, properly executed. If so accepted, subscriptions for Units (i) will be binding upon the subscriber's heirs, successors, legal representatives and assigns, (ii) may not be cancelled, terminated or revoked, (iii) is not contingent upon the Company receiving a minimum number of subscriptions and (iv) will be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of Delaware).

3.2    **Liability of Members**.

3.2.1    Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatever in his capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and therefore, a Member shall be liable only to make his Capital Contribution to the Company and the other payments provided herein. Until the Capital Contribution for a Member as specified on Schedule A has been paid to the Company, such Member shall be liable to the Company for that portion of its Capital Contribution not so paid.

3.2.2 In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to Article 5 hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or distribution of any such property to any Members shall be deemed to be a compromise within the meaning of the Act, and the Members receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the Company or the other Members.

3.3    **Lack of Authority.** No Member holding Class A Units or Preferred Units has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures or incur any obligations on behalf of the Company. Each Member hereby consents to the exercise by the Managing Member of the powers conferred on it by law and this Agreement.

3.4    **Member Units.** Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company and the right to vote on certain matters as provided in this Agreement (which is non-existent with respect to Members holding Preferred Units prior to the Payment Date and limited with respect to those Members owning Class A Units and Preferred Units (from and after the Payment Date)) shall be represented by the Units owned by such Member. The ownership of Units shall entitle each Member to allocations of Profits and Losses and other items and distributions of cash and other property, but only to the extent set forth in Article 5 hereof. Each Unit shall entitle the Member owning such Unit to one vote on any matter voted on by the Members as a whole or the Members owning a particular class of Units as provided in this Agreement or as required by applicable law. Holders of the Preferred Units shall not have any voting rights prior to the Payment Date. Upon receipt of each Member's Capital Contribution set forth opposite his name on Schedule A, such Member shall be deemed to own the number of Units set forth opposite his name on Schedule A. The Managing Member may in its discretion issue certificates to the Members representing the Units held by each Member.

3.5    **Issuance of Additional Units and Interests; Additional Capital Contributions.** The Managing Member shall have the right to cause the Company to issue or sell to Members, affiliates of Members or other Persons: (a) additional Units or other interests in the Company (including other classes or series thereof having different rights); (b) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other interests in the Company; and (c) warrants, options or other rights to purchase or otherwise acquire Units or other interests in the Company. The Members existing at the time of any such issuance or sale shall have no right to purchase or otherwise participate in any such issuance or sale unless the Managing Member, in its sole discretion, permits such participation.

## ARTICLE 4
## CAPITAL ACCOUNTS

4.1     **Establishment and Determination of Capital Accounts.**  A capital account ("**Capital Account**") shall be established for each Member. Capital Accounts shall be maintained in accordance with Code Section 704(b) and Treas. Reg. § 1.704-1(b)(2)(iv), with such adjustments as may be required thereby.

4.2     **Negative Capital Accounts.**  No Member shall be required to pay to the Company or any other Member any deficit or negative balance that may exist from time to time in such Member's Capital Account.

4.3     **Company Capital.**  No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (a) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article 12 hereof, or (b) to cause a partition of the Company's assets.

## ARTICLE 5
## DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

5.1     **Generally.**  Subject to the provisions of the Act, Section 5.6 and Section 5.2.1, the Managing Member shall have sole discretion regarding the amounts and timing of distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company that shall include (but not be limited to) the payment or the making of provision for the payment when due of the Company's obligations, including the payment of any management or administrative fees and expenses, debt service of the Company (including payment on debt held by Members) or any other obligations. It is presently anticipated that the Managing Member will authorize distributions (other than the Preferred Distributions) to be made on a semi-annual basis, within a reasonable time after the quarters ending June 30 and December 31. Without limiting the provisions of Section 13.10 hereof, the Company may, if directed to do so by any court order or other governmental action, withhold distributions to a Member, or otherwise pay to another party, as directed in such court order or other governmental action, the distributions otherwise payable to such Member. In such instance, such Member shall be deemed to be an Indemnifying Member pursuant to Section 13.10.

5.2     **Distributions**.

5.2.1     Prior to the Payment Date, distributions of cash (other than tax distributions under Section 5.6 hereof) or property shall be made to the Members in the following order and proportions:

(i)     First, to the holders of Preferred Units pro rata in proportion to their respective Preferred Units until the aggregate amount distributed pursuant to this Section 5.2.1(i) is equal to an annual return of 7.5% of the initial Capital Contributions of the holders of the Preferred Units (calculated on a basis of a

365/66 – day year and the actual number of days elapsed) from and including the date of issuance of such Preferred Units to and including June 30, 2003, and thereafter an amount equal to an annual return of 12.5% on the initial Capital Contributions of the holders of the Preferred Units (calculated on a basis of a 365/66 day year and the actual number of days elapsed) from and including July 1, 2003 to and including the Payment Date; and

(ii) Second, to the Members owning Class B Units and Class A Units (if any) pro rata in proportion to their respective Units.

Notwithstanding the foregoing, the Managing Member shall, to the extent permitted by the Act, make the Preferred Distributions in semi-annual installments in arrears on July 1 and January 1 (or on the next succeeding Business Day) of each calendar year. The Preferred Distributions shall accrue, whether or not Profits or other funds are legally available and whether or not the Managing Member has authorized such distributions, from the date of issuance of the Preferred Units to and including the Payment Date or the earlier liquidation, dissolution or winding up of the Company. The accumulation of Preferred Distributions shall not bear interest. On the Payment Date, the Company agrees to pay to each holder of Preferred Units an amount equal to their initial Capital Contributions, plus any Preferred Distributions that have accrued but have not yet been paid as of such date.

5.2.2 After the Payment Date, distributions of cash (other than tax distributions under Section 5.6 hereof) or other property shall be made to the Members in the following order and proportions:

(i) 10% to the Members holding Preferred Units and Class A Units on a pro rata basis according to their ownership of Units; and

(ii) 90% to the Member holding Class B Units.

Notwithstanding the foregoing, in the event the Company issues additional equity interests after the date hereof and prior to the Payment Date, the distributions set forth in this Section 5.2.2 shall be equitably adjusted, on and as of the Payment Date, to ensure that the holders of the Preferred Units receive distributions equal to 10% of all distributions made pursuant to this Section 5.2.2. No further adjustment shall be made in this Section 5.2.2, however, for any equity issuance subsequent to the Payment Date.

5.3 **Allocation of Profits and Losses.**

5.3.1 For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Section 5.4 with respect to such Fiscal Year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 5.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (a) the amount that would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof

pursuant to Section 12.2 hereof, minus (b) the sum of (i) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

5.4     **Special Allocations.**

5.4.1    Notwithstanding anything to the contrary in this Agreement, Profits and Losses shall be allocated as though this Agreement contained (and there is hereby incorporated herein by reference) a qualified income offset provision that complies with Treasury Regulation Section 1.704-1(b)(2)(ii)(d) and minimum gain chargeback provisions that comply with the requirements of Treasury Regulation Section 1.704-2.

5.4.2    Recharacterization. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Member and, as a result of such adjustment, the Company is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by the Company, such excess deduction shall be allocated to such Member and such reduced income shall be reflected in a reduction in income allocated to such Member. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Company and, as a result of such adjustment, any Member is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by such Member, the additional Company taxable income shall be allocated to such Member.

5.5     **Amounts Withheld.**  All amounts withheld pursuant to Section 13.10 from any distribution to a Member shall be treated as amounts distributed to such Member pursuant to this Article 5 for all purposes under this Agreement.

5.6     **Tax Distributions.**  The Managing Member shall use reasonable efforts, subject to applicable covenants and restrictions contained in the Company's loan agreements and other agreements or obligations to which the Company or its properties are subject, to cause the Company to distribute to the Members with respect to each Fiscal Year of the Company an amount of cash that in the good faith judgment of the Managing Member equals (a) the amount of taxable income allocable to the Members in respect of such Fiscal Year, multiplied by (b) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (taking into account the deductibility of state income tax for federal income tax purposes and the character of the income), with such distribution to be made to the Members in the same proportions that taxable income was allocated to the Members during such Fiscal Year. Any distribution to a Member pursuant to this Section 5.6 that exceeds the amount that would have been distributed to such Member had the amount distributed pursuant to this Section 5.6 been distributed pursuant to Section 5.2 shall be treated as an advance distribution under Section 5.2 and shall be offset against subsequent distributions that such Member would otherwise be entitled to receive pursuant to Section 5.2. Such distributions may be made on a quarterly or other basis as shall be determined by the Managing Member in its sole discretion.

5.7     **Tax Allocations: Code Section 704(c).**

5.7.1   Items of income, gain, loss, deduction and expense of the Company shall be determined in accordance with Code Section 703, and, except as otherwise provided in this Article 5, the Members' distributable share of such items for purposes of Code Section 702 shall be determined in accordance with Section 5.3.1.

5.7.2   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

5.7.3   Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations pursuant to this Section 5.7 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provisions of this Agreement.

**ARTICLE 6**
**MANAGEMENT**

6.1     **Management by the Managing Member.**

6.1.1   Except for cases in which the consent of the Members is required as set forth in Section 6.1.3 of this Agreement or by non-waivable provisions of applicable law, (a) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managing Member and (b) the Managing Member may make all decisions and take all actions for the Company not otherwise provided for in this Agreement and the Managing Member shall have the exclusive right to manage the business of the Company, including, without limitation, the following:

(a)     entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b)     maintaining the assets of the Company;

(c)     collecting sums due the Company;

(d)     opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(e)     to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f)     acquiring, utilizing for Company purposes and Disposing of any asset of the Company;

(g)     hiring and employing executives, supervisors and other personnel;

(h)     selecting, removing and changing the authority and responsibility of Restaurant consultants;

(i)     obtaining insurance for the Company;

(j)     determining and modifying the name, decor and menu of the Restaurant operated by the Company;

(k)     establishing accounting reserves on the Company's books for commitments and obligations (contingent or otherwise) of the Company;

(l)     selecting, removing or changing the authority and responsibility of lawyers, accountants and consultants for the Company; and

(m)     borrowing money or otherwise committing the credit of the Company, and granting liens on the assets of the Company.

6.1.2    If the Managing Member is not a natural Person, then those persons designated by the members of the Managing Member to be responsible for the day-to-day operations of the Managing Member (individually, a "<u>Manager</u>" and collectively the "<u>Managers</u>") or such other persons as the Managers may designate in writing, may act for and in the name of the Managing Member on behalf of Company in the exercise by the Company of any of its rights or powers. Persons dealing with the Company are entitled to rely conclusively on the power and authority any Manager of the Managing Member.

6.1.3    Notwithstanding the provisions of <u>Section 6.1.1</u>, without first obtaining the consent of the Members holding the Required Interest, the Managing Member may not cause the Company to (a) sell all or substantially all of the assets of the Company; (b) merge or consolidate the Company with or into another entity; or (c) amend this Operating Agreement (other than amendments to admit new members as contemplated by <u>Section 3.5</u> or in accordance with <u>Section 13.5</u>) that would materially and adversely affect the rights of Members hereunder.

6.2     **Expenses.** All of the Company's expenses shall be billed to and paid directly by the Company. All expenses or costs directly or indirectly incurred by the Managing Member or its Managers, incurred in connection with the obligations of the Managing Member hereunder, shall be paid by the Company (such matters to include, without limitation, salaries and business expenses). Neither the Managers nor the Managing Member shall be required to devote their full time to the performance of duties for the Managing Member or the Company, as applicable.

6.3     **Compensation of Managing Member.** The Managing Member shall be entitled to receive from the Company an annual management fee, payable monthly, equal to $250,000 per annum. Such compensation shall be in addition to any reimbursement of expenses made pursuant to <u>Section 6.2</u> hereof.

6.4 **Conflicts of Interest.** Each Manager and Member at any time and from time to time may engage in and own interests in other business ventures of any and every type and description, independently or with others (including ones in competition with the Company or the Restaurant) with no obligation to offer to the Company or any other Member or Manager the right to participate therein. The Company may transact business with any Manager, Member, officer or affiliate thereof; provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties (the parties consenting to the payment of compensation and reimbursement of expenses as set forth herein). Neither any Member, the Managing Member nor any Manager shall be obligated to present any investment or business opportunity to the Company.

6.5 **Successor Managing Member.** With the consent of the Managing Member and of such number of the Members as are then required under the Act to consent to or ratify the admission of a Managing Member, the Managing Member may at any time designate one or more Persons to be successors to such Managing Member with such participation in such Managing Member's interest as such Managing Member and such successor managing members may agree upon, provided that the interests of the Members shall not be adversely affected thereby. The Managing Member shall not have any right to retire or withdraw voluntarily from the Company or to sell, transfer or assign its interest, except (a) in connection with a transfer to a successor Managing Member pursuant to the foregoing sentence, and (b) that it may substitute in its stead (without any consent of the Members) as Managing Member any entity that has acquired substantially all of the Managing Member's stock or assets and continues its business.

## ARTICLE 7
## MEETINGS OF MEMBERS

7.1 **Member Meetings**.

7.1.1 A quorum shall be present at a meeting of Members if the Members holding a Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of all Members entitled to vote is required by the Act, the affirmative vote of the Members holding the Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

7.1.2 All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Delaware as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 7.5.

7.1.3 Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting or the Members holding the Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the Members

holding the Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

7.1.4   An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held at such place, within or without the State of Delaware, on such date and at such time as the Managing Member shall fix and set forth in the notice of the meeting, which date shall be within thirteen months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred. If an annual meeting of Members is not held, such failure will not affect any action taken by the Managing Member, any Manager or any officer.

7.1.5   Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managing Member or the Members holding Units (excluding Preferred Units prior to the Payment Date) entitled to receive at least twenty percent of the Profits and Losses and other distributions more specifically described in Article 5 hereof. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

7.1.6   Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 15 nor more than 60 days before the date of the meeting, either personally or by overnight courier, by, or at the direction of the Managing Member or the Members calling the meeting, to each Member entitled to vote at such meeting. If sent by overnight courier, any such notice shall be deemed to be delivered when deposited with such courier, addressed to the Member at its address provided for in Section 13.2, with charges thereon prepaid.

7.1.7   The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managing Member declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof) or the Members entitled to receive such distribution.

7.1.8   Except as otherwise expressly provided for in this Agreement, (i) all matters to be voted on pursuant to this Agreement shall require the approval of the Members owning a majority of the Class B Units and (ii) the Members owning Class A Units and the Preferred Units shall not be entitled to vote on any matters.

7.1.9   There shall be no cumulative voting hereunder.

7.2   **Voting List.** The Managers shall make, at least ten days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof arranged in alphabetical order, with the address of and the Units held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or

principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

7.3     **Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

7.4     **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be one of the Managers (or a representative thereof). The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.5     **Action by Written Consent or Telephone Conference.**

7.5.1   Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Member or Members holding not less than the minimum percentages of Units that would be necessary to take such action at a meeting at which all Members entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the Member or Members

holding not less than the minimum Units that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office, its principal place of business or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

7.5.2 The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager.

7.5.3 If any action by Members is taken by written consent, any certificate or documents filed with the Secretary of State of Delaware as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

7.5.4 Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1 **Exculpation.** Neither the Managing Member nor any Manager shall be liable to the Company or to any Member for any loss suffered by the Company unless such loss is caused by the Managing Member's or Manager's gross negligence or willful misconduct. The Managing Member and Managers shall not be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful misconduct. The Managing Member and any Manager may consult with counsel and accountants in respect of Company affairs, and provided the Managing Member or Manager acts in good faith reliance upon the advice or opinion of such counsel or accountants, the Managing Member or Manager shall not be liable for any loss suffered by the Company in reliance thereon.

8.2 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article 8, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a

Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was the Managing Member or Manager or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent possible (except to the extent limited by the Act as in effect on the date hereof) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 8 shall continue as to a Person who has ceased to serve in the capacity that initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 8 shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. This right of indemnification shall apply to (without limitation) any acts, omissions or alleged acts or omissions of a Manager. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.3     **Advance Payment.** The right to indemnification conferred in this Article 8 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under Article 8 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 8 or otherwise.

8.4     **Indemnification of Employees and Agents.** The Company, in the sole discretion of the Managing Member, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Persons who are not or were not the Managing Member or Managers but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to the Managing Member or Managers under this Article 8.

8.5     **Appearance as a Witness.** Notwithstanding any other provision of this Article 8, the Company may pay or reimburse expenses incurred by the Managing Member or a Manager

in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6     **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article 8 shall not be exclusive of any other right that the Managing Member or a Manager or other Person indemnified pursuant to Section 8.4 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement.

8.7     **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself, the Managing Member and any Person who is or was serving as a Manager or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

8.8     **Savings Clause.** If this Article 8 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Manager and the Managing Member as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 8 that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE 9
## TAXES

9.1     **Tax Returns.** The Managing Member shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making any elections the Managing Member may deem appropriate and in the best interests of the Members. Each Member shall furnish to the Managing Member all pertinent information in its possession relating to Company's operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.2     **Tax Matters Member.** The Managing Member shall be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code and shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of section 6223 of the Code. The Managing Member shall inform each other Member of all significant matters that come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware and determining the materiality thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

## ARTICLE 10
### BOOKS, REPORTS AND COMPANY FUNDS

10.1 **Maintenance of Books.** The Company shall keep books and records of accounts.

10.2 **Reports.** On or before the 120th day following the end of each fiscal quarter and each Fiscal Year during the term of the Company, the Managing Member shall cause each Member to be furnished with an unaudited balance sheet, an income statement and a statement of changes in Members' capital of the Company for, or as of the end of, the prior fiscal quarter or Fiscal Year, as the case may be. The foregoing balance sheet and statements shall be prepared on a compilation basis by a recognized firm of certified public accountants. These annual financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied (except as therein noted). The Managing Member also may cause to be prepared and delivered to the Members quarterly unaudited financial statements and such other reports as it may deem appropriate. The Company shall bear the costs of all these reports.

## ARTICLE 11
### TRANSFERS

11.1 **Assignment by Members.** No Member shall sell, assign or transfer, or offer to sell, assign or transfer or otherwise Dispose of all or any part of such Member's Units (whether voluntarily or involuntarily) without the consent of the Managing Member, which consent may be withheld in the sole discretion of the Managing Member.

11.1.1 No admission (or purported admission) of a Member, and no Disposition (or purported Disposition) of all or any part of a Member's interest in the Company (or any economic interest therein), whether to another Member or to a Person who is not a Member, shall be effective, and any such admission or Disposition (or purported admission or Disposition) shall be void ab initio, and no Person shall otherwise become a Member if after such admission or Disposition (or purported admission or Disposition) the Company would have more than 100 Members. For purposes of determining whether the Company will have more than 100 Members, each Person indirectly owning an interest in the Company through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Member unless the Managing Member determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Company.

11.2 **Void Assignment.** Any sale, exchange or other Disposition by any Member of any Units or other interests in the Company in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company. No Disposition or assignment of any Units shall be effective if such Disposition or assignment would, in the opinion of counsel of the Company, result in termination of the Company or the treatment of the Company as an association taxable as a corporation for purposes of any applicable law.

11.3 **Substituted Member.**

11.3.1 An assignee of any Unit of a Member, or any portion thereof, shall become a substituted Member entitled to all the rights of a Member if and only if the assignor gives the assignee such right, and the Managing Member has granted its prior written consent to such assignment and substitution, which consent may be withheld in the sole discretion of the Managing Member.

11.3.2 The Company and the Managing Member shall be entitled to treat the record owner of any Unit as the absolute owner thereof and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such interest in the Company, which assignment is permitted pursuant to the terms and conditions of <u>Section 11.1</u> hereof, has been received, accepted and consented to by the Managing Member and recorded on the books of the Company.

11.3.3 Upon the admission of a substituted Member, <u>Schedule A</u> attached hereto shall be amended to reflect the name, address and Units of such substituted Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units.

11.4 **Effect of Assignment.**

11.4.1 Any Member who shall assign any Units shall cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units, except that unless and until the assignee of such Member is admitted as a substituted Member in accordance with the provisions of this <u>Article 11</u>, such assigning Member shall retain the statutory rights and obligations of an assignor Member under applicable law.

11.4.2 Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units was subject to or by which such predecessor was bound.

11.4.3 The transferee of any Unit shall be treated as having made all of the Capital Contributions made by, and received all of the distributions from the Company received by, the transferor of such Unit with respect to such Unit.

11.5 **Effect of Incapacity.** Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Incapacitated Member shall be deemed to be the assignee of such Member's Units or other interests in the Company and may, subject to <u>Section 11.1</u>, become a substituted Member upon the terms and conditions set forth in <u>Section 11.3</u>.

11.6 **Interest in a Member.** A Member that is not a natural Person may not cause or permit an interest, direct or indirect, in itself to be Disposed except in compliance with the provisions of this Article 10.

## ARTICLE 12
## DISSOLUTION, LIQUIDATION AND TERMINATION

12.1 **Dissolution.** The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

(a) the written consent of the Members holding the Required Interest and the written consent of the Managing Member;

(b) the Managing Member shall retire, resign or become Incapacitated, or there shall occur any other event that terminates the continued membership in the Company of the Managing Member, provided that if any event described in this Section 12.1(c) shall occur and there shall be at least two other Members remaining, the Company shall not be dissolved, and the business of the Company shall be continued, if the remaining Members holding the Required Interest so agree within 90 days of such event; and

(c) the entry of a decree of judicial dissolution of the Company under the Act.

Except as provided in Section 12.1(b), the death, retirement resignation, expulsion, Incapacity, bankruptcy or dissolution of a Manager or Member, or the occurrence of any other event that terminates the continued membership of a Manager or Member in the Company, shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

12.2 **Liquidation and Termination.** On dissolution of the Company, the Managing Member shall act as liquidator or may appoint one or more Members as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Managing Member. The steps to be accomplished by the liquidators are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) the liquidators shall cause the notice described in the Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder;

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts to Members), liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed in accordance with Article 5 of this Agreement by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation); provided that if the Company is dissolved and liquidated in accordance with this Article 12 prior to the Payment Date, the holders of the Preferred Units shall be entitled to receive, prior to any distribution to the other Members, distributions that, together with amounts previously distributed to the holders of Preferred Units pursuant to Section 5.2.1, equal their initial Capital Contributions and any accumulated Preferred Distributions that have accrued prior to the Company's dissolution and, thereafter, all remaining assets of the Company shall be distributed in accordance with Article 5; provided, further that if any Member holding Class A Units will not receive (provided the holders of the Preferred Units have received the distributions described in this Section 12.3(d)) distributions under this Section 12.2(d) which, when added to all prior distributions with respect to such Member holding Class A Units under Article 5 hereof, equal or exceed the aggregate Capital Contributions to the Company with respect to such Member's Units, distributions otherwise payable to the holders of the Class B Units under this Section 12.2(d) shall be reduced and shall instead be paid to such Members holding Class A Units until such Members holding Class A Units have received cumulative distributions under Article 5 and this Section 12.2(d) equal to the Capital Contributions of the Members holding Class A Units.

12.3    **Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

12.4    **Cancellation of Certificate.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managing Member (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

## ARTICLE 13
## GENERAL PROVISIONS

13.1    **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes to the Company, whether pursuant to loans from the Company or otherwise, may be deducted from that sum before payment.

13.2    **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Schedule A, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managing Member must be given at the addresses provided by written notice to each Member.

Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3    **Entire Agreement.** This Agreement constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.4    **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

13.5    **Amendment or Modification.** This Agreement may be amended from time to time by the Managing Member, without the consent of any of the Members, including, without limitation, amendments: (a) to add to the duties or obligations of the Managing Member or surrender any right or power granted to the Managing Member herein; (b) to cure any ambiguity, to correct or supplement any provision herein that may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement; and (c) to delete or add any provision of this Agreement required to be so deleted or added by a State Securities or "Blue Sky" commissioner or similar official, which addition or deletion is deemed by such official to be for the benefit or protection of the Members; provided, however, that (i) except as otherwise expressly provided herein, an amendment or modification reducing disproportionately (vis-à-vis any other Members) a Member's interest in Profits or Losses or in distributions or

increasing a Member's Capital Contribution shall be effective only with that Member's consent and (ii) an amendment or modification affecting any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the interest theretofore required. Notwithstanding the foregoing and anything to the contrary contained herein, the Managing Member may amend and modify the provisions of this Agreement and Schedule A hereto to the extent necessary to reflect the issuance of new Units or other interests in the Company as contemplated by Sections 3.4 and 3.5 hereof as determined in good faith by the Managing Member.

13.6 **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

13.7 **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.8 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.9 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to demand any distribution or withdrawal of property from the Company or to maintain any action for dissolution of the Company or for partition of the property of the Company. No Member shall have the right to withdraw from the Company.

13.10 **Indemnification and Reimbursement for Payments on Behalf of a Member.** If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "**Indemnifying Member**") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Managing Member, either:

(a) promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full

amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

(b)     the Company shall reduce distributions that would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 3.1, the amount withheld shall not be treated as a Capital Contribution).

13.11 **Notice of Provisions.** By executing this Agreement, each Member acknowledges that it has actual notice of (i) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article 11) and (ii) all of the provisions of the Certificate.

13.12 **Counterparts.** This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

Geisha LLC
a Delaware Limited Liability Company

[Agreement of Membership Counterpart Signature Page]

IN WITNESS WHEREOF, the parties hereto have hereunto duly set their hands as of the day and year first above written.

Member:

_____

(Please print or type name)


By:_____
    Name:
    Title:


Managing Member:


OSSS HOSPITALITY LLC,
a Delaware limited liability company


By:_____
    Name:
    Title:    Member

## SCHEDULE A

| Member | Capital Contributions | Units Class A | Units Preferred | Units Class B |
|---|---|---|---|---|
| OSS Hospitality LLC | $ 112,600 | 0 | 4.5 | 100 |
| Address: | $ | | | |
| Address: | $ | | | |
| Address: | $ | | | |
| Address: | $ | | | |
| Address: | $ | | | |
| Total | $ | 0 | 28 | 100 |

# EXHIBIT B

**OSSS HOSPITALITY LLC**
A Delaware Limited Liability Company

### AMENDED AND RESTATED
### OPERATING AGREEMENT

Dated as of <u>April 23, 2004</u>

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF
## OSSS HOSPITALITY LLC
### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT OF OSSS HOSPITALITY LLC, a Delaware limited liability company (as the same may be further amended or restated from time to time in accordance with its terms, the **Agreement** ), dated as of April 24, 2003, as amended and restated in its entirety on this <u>April 23, 2004</u>, is made by and among the persons set forth on <u>Schedule A</u> hereto (each, a **Member** and collectively, the **Members** ).

### ARTICLE 1
### DEFINITIONS

1.1 **Definitions.** As used in this Agreement, the following terms have the following meanings:

**Act** means the Delaware Limited Liability Company Act, and any successor statute, as amended from time to time.

**Book Value** means, with respect to any Company property, the Company s adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation /1.704-1(b)(2)(iv)(d)-(g); provided, however, that the initial Book Value of any asset of the Company contributed by a Member to the Company shall be its fair market value at the time of its contribution.

**Business Day** means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of Illinois are required or authorized to be closed for business.

**Buy-Out Event** means, with respect to Miae Lim and the Company, the occurrence of any of the following: (i) Miae Lim shall be removed as a Manager of the Company; (ii) Miae Lim shall resign as a Manager as a result of a substantial and permanent diminution of her duties as a Manager; and (iii) Miae Lim shall not have voted in favor of or otherwise approved the hiring of any General Manager or Head Chef of the Restaurant. In addition, with respect to the Company only, should Miae Lim resign as a Manager for any reason other than as a result of a substantial and permanent diminution of her duties as a Manager, Miae Lim s resignation shall constitute a Buy-Out Event and shall trigger the Company s Buy-Out option only.

**Buy-Out Price** means the pro rata price assigned to all of the Units held by Miae Lim on the date on which the Buy-Out Option is exercised, calculated as the product of (x) the distributions received by the Company as the managing member of the Subsidiary in the most recent fiscal year (exclusive of any management fees received by the Company with respect to the Subsidiary), (y) three and (z) 0.8. For example, assuming Miae Lim owns 40% of all of the then outstanding Units and the Company received distributions of $1,000,000 in the most recent fiscal year in which the Buy-Out Option was exercised, the Buy-Out Price would be equal to $960,000.

1

"**Capital Contribution**" means the aggregate contribution made by a Member to the capital of the Company specified on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class A Units**" means the Units of the Members designated as Class A Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class B Units**" means the Units of the Members designated as Class B Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement. Class B Units shall be identical to the Class A Units, except that the Class B Units shall not be entitled to vote on any matters to be decided by a vote of the Members.

"**Class C Units**" means the Units of the Members designated as Class C Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement. Class C Units shall be identical to the Class B Units, except that the Class C Units shall be subject to (a) vesting, 20% of which shall vest on each anniversary of the date of their issuance (except for the General Manager Units, 1/3 of which shall vest on each anniversary of the date of their issuance, and as otherwise determined by the Members holding the Required Interest from time to time) and (b) the Vesting Requirements. For the avoidance of doubt, Class C Units will represent an interest in the income, gains, losses, deductions and expenses of the Company, whether or not then vested, so long as the Vesting Requirements are being satisfied.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company**" means OSSS Hospitality LLC, a Delaware limited liability company.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"**Dispose**", "**Disposed**", "**Disposing**" or "**Disposition**" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance, including, without limitation, by operation of law.

"**Fiscal Year**" of the Company means the calendar year.

"**Founders**" means Jeffrey Beers, Miae Lim, Jonathan Segal and Richard Wahlstedt.

"**Incapacity**" or "**Incapacitated**" means (a) with respect to a natural person, the bankruptcy, death, incompetency or insanity of such person and (b) with respect to any other Person, the bankruptcy, liquidation, dissolution or termination of such Person.

"**Member**" means any Person executing this Agreement as of the date hereof as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(1).

"**Member Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i).

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"**Person**" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"**Profits**" or "**Losses**" means, for each period taken into account, an amount equal to the Company's taxable income or taxable loss for such period, determined in accordance with Federal income tax principles, adjusted to the extent the Members determine that such adjustment is necessary to comply with the requirements of section 704(b) of the Code.

"**Restaurant**" means the first-class, fully staffed dining room with sushi bar, lounge, catering, banquet, take-out and food service facility to be operated by the Company at 555 Chicago Avenue in Kingsbury Park, Chicago, Illinois.

"**Required Interest**" means one or more Members possessing a majority of the Class A Units owned by all Members.

"**Subsidiary**" means Geisha LLC, a Delaware limited liability company in which the Company, as of the date hereof, holds all of the issued and outstanding Class B membership units and for which the Company acts as the managing member.

"**Units**" means, as applicable, the Class A Units, the Class B Units and the Class C Units of each Member, representing such Member's interest in the income, gains, losses, deductions and expenses of the Company as set forth on Schedule A hereto, as amended from time to time in accordance with the terms of this Agreement.

"**Vesting Requirements**" means, except as otherwise determined by the Members holding the Required Interest from time to time, the continued employment by the Restaurant of any Person holding Class C Units. Should any Person holding Class C Units fail to satisfy the Vesting Requirements, any Class C Units that have not yet vested shall automatically be cancelled effective as of the date of such Person's date of termination or resignation, and at that time such Class C Units shall automatically be reallocated to Richard Wahlstedt and Miae Lim equally.

Other terms defined in this Agreement have the meanings so given them. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes. Whenever the context requires: the singular number shall include the plural, and vice versa; and the masculine gender shall include the feminine and neuter genders. As used in this Agreement,

Other terms defined in this Agreement have the meanings so given them. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes. Whenever the context requires: the singular number shall include the plural, and vice versa; and the masculine gender shall include the feminine and neuter genders. As used in this Agreement, the words include and including, and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words without limitation.

## ARTICLE 2
## ORGANIZATION

2.1 **Formation.** The parties hereby ratify the organization of the Company as a Delaware limited liability company and the filing of a Certificate of Formation (the **Certificate** ) under and pursuant to the Act.

2.2 **Name.** The name of the Company is OSSS Hospitality LLC and all Company business shall be conducted in that name or such other name or names that comply with applicable law as the Members may select from time to time.

2.3 **Registered Office; Registered Agent; Principal Office; Other Offices.** The registered office of the Company required by the Act to be maintained in the State of Delaware shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Members may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Delaware shall be the initial registered agent named in the Certificate or such other Person or Persons as the Members may designate from time to time in the manner provided by law. The principal office of the Company shall be at such place as the Members may designate from time to time, which need not be in the State of Delaware, and the Company shall maintain records there. The Company may have such other offices as the Members may designate from time to time.

2.4 **Purposes.** The purpose of the Company is to hold a membership interest in the Subsidiary and act as its managing member. The purpose of the Subsidiary is to own and operate the Restaurant and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose (including, without limitation, obtaining financing therefor) and that is not prohibited by the Act or the laws of the State of Delaware.

2.5 **Foreign Qualification.** Prior to the Company s conducting business in any jurisdiction other than Delaware, the Members shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Members, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction to the extent such qualification is required. Each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments, and submit to all background checks and furnish information in connection therewith, that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business and to obtain

4

liquor licenses and all other necessary or advisable licenses, permits or authorizations for the Restaurant, the Subsidiary and the Company.

2.6     **Term.**  The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of Delaware and shall continue in existence until termination and dissolution of the Company under <u>Section 12.1</u> of this Agreement.

2.7     **No State-Law Partnership.**  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member shall be a partner or joint venturer of any other Member, for any purposes other than federal and, if applicable, state tax purposes, and nothing in this Agreement shall be construed to the contrary.  The Members intend that the Company shall be treated as a partnership for federal and state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  Neither the Company nor any Member shall elect to treat the Company as an association taxable as a corporation for Federal or state income tax purposes.

**ARTICLE 3**
**MEMBERS AND CAPITAL**

3.1     **Members.**

3.1.1   The names, residence, business or mailing addresses, Capital Contributions and Units of the Members are set forth on <u>Schedule A</u>, as amended from time to time in accordance with the terms of this Agreement.

3.1.2   No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law or as expressly set forth in this Agreement.  Any Member may, with the approval of the Members holding the Required Interest, make loans to the Company, and any stated loan by a Member to the Company shall not be considered to be a Capital Contribution.

3.1.3   Each Member shall execute a counterpart of this Agreement, and when a Person is admitted as a Member, such Person shall execute a counterpart of this Agreement and such Person shall be listed as a Member on <u>Schedule A</u>.

3.1.4   Each Member hereby represents, warrants and acknowledges to the Company and each other Member that: (i) he is an accredited investor within the meaning of Regulation D of the Securities Act of 1933, as amended; (ii) he has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (iii) he is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) he is acquiring interests in the Company for investment purposes only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; and (vi) the execution, delivery and performance of this Agreement

such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

### 3.2 Liability of Members.

3.2.1 Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatever in his capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or the Subsidiary or the Restaurant or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or the Subsidiary or the Restaurant or for any losses of the Company or the Subsidiary or the Restaurant. A Member shall be liable only to make his Capital Contribution to the Company and the other payments provided herein. Until the Capital Contribution for a Member as specified on Schedule A has been paid to the Company, such Member shall be liable to the Company for the unpaid portion of his Capital Contribution.

3.2.2 In accordance with the Act and the laws of the State of Delaware, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to Article 5 hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or distribution of any such property to any Members shall be deemed to be a compromise within the meaning of the Act, and the Members receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the Company or the other Members.

### 3.3 Member Units.
Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company and the right to vote on certain matters as provided in this Agreement, shall be represented by the Units owned by such Member. The ownership of Units shall entitle each Member to allocations of Profits and Losses and other items and distributions of cash and other property as set forth in Article 5 hereof. Each Class A Unit shall entitle the Member owning such Class A Unit to one vote on any matter to be voted on by the Members under this Agreement or as required by applicable law. The Class B Units and the Class C Units shall not have any voting rights whatsoever. Upon receipt of each Member's Capital Contribution set forth opposite his name on Schedule A, such Member shall be deemed to own (subject to the satisfaction of the Vesting Requirements) the number of Units set forth opposite his name on Schedule A. The Company may (but shall not be required to) issue certificates representing the Units held by each Member.

### 3.4 Issuance of Additional Units and Interests; Additional Capital Contribution.
The Members holding the Required Interest shall have the right to cause the Company to issue or sell to the Members, affiliates of the Members or other Persons: (i) additional Units or other interests in the Company (including other classes or series thereof having different rights); (ii) obligations, evidences of indebtedness or other securities or interests in the Company; and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other interests in the

Company. The Members holding Class A Units existing at the time of any issuance or sale of Units shall have the right to purchase or otherwise participate in any such issuance or sale on a pro rata basis.

3.5    **Forfeiture of General Manager Units.** The Members hereby agree that, upon the terms and conditions of this Agreement, the individual initially employed as the general manager of the Restaurant, or any successor thereto (the "**General Manager**") may be allocated three Class C Units (the "**General Manager Units**"), 1/3 of which shall vest on each anniversary of the date of their issuance.

3.6    **Non-Disparagement.** Each Member hereby agrees that he or she will not, (either as a Member or after such Person ceases to be a Member) directly or indirectly (whether through an agent or other third party) criticize, disparage, defame or in any other way comment negatively to any Person about (i) the Company, (ii) the Restaurant or (iii) another Member with respect to the operation of the Restaurant or the Company or such Members past conduct or practices.

## ARTICLE 4
## CAPITAL ACCOUNTS

4.1    **Establishment and Determination of Capital Accounts.** A capital account ("**Capital Account**") shall be established for each Member. Capital Accounts shall be maintained in accordance with Code Section 704(b) and Treas. Reg. § 1.704-1(b)(2)(iv), with such adjustments as may be required thereby.

4.2    **Negative Capital Accounts.** No Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

4.3    **Company Capital.** No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (i) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article 13 hereof, (ii) to cause a partition of the Company's assets, or (iii) to withdraw from the Company.

## ARTICLE 5
## DISTRIBUTIONS; ALLOCATIONS OF
## PROFITS AND LOSSES

5.1    **Generally.** Subject to the provisions of the Act and Section 5.7 of this Agreement, the Members holding the Required Interest shall have sole discretion regarding the amounts and timing of distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as they deem necessary with respect to the reasonable business needs of the Company which shall include (without limitation) the payment or the making of provision for the payment when due of the Company's obligations, including the payment of any management or administrative fees and expenses, debt service of the Company (including payment on debt held by Members) or any other obligations.

## 5.2 Distributions.

5.2.1 Distributions of cash (other than tax distributions under Section 5.7 hereof) or property shall be made to the Members on a pro rata basis according to their ownership of Units.

## 5.3 Allocation of Profits and Losses.

5.3.1 Except as otherwise provided in this Article 5, for each Fiscal Year of the Company, all Profits and Losses shall be allocated to the Members on a pro rata basis according to their ownership of Units.

## 5.4 Management Fees.

5.4.1 Any management fees received by the Company with respect to its Subsidiary shall be allocated as follows: (i) $112,500 to each of Miae Lim and Richard Wahlstedt; and (ii) $25,000 to Jonathan Segal.

## 5.5 Special Allocations.

5.5.1 Notwithstanding anything to the contrary in this Agreement, Profits and Losses shall be allocated as though this Agreement contained (and there is hereby incorporated herein by reference) a qualified income offset provision which complies with Treasury Regulation § 1.704-1(b)(2)(ii)(d) and minimum gain chargeback provisions which comply with the requirements of Treasury Regulation Section 1.704-2.

5.5.2 If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Member and, as a result of such adjustment, the Company is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by the Company, such excess deduction shall be allocated to such Member or such reduced income shall be reflected in a reduction in income allocated to such Member. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Company and, as a result of such adjustment, any Member is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by such Member, the additional Company taxable income shall be allocated to such Member.

5.6  **Amounts Withheld.** All amounts withheld pursuant to Section 13.10 from any distribution to a Member shall be treated as amounts distributed to such Member pursuant to this Article 5 for all purposes under this Agreement.

5.7  **Tax Distributions.** The tax matters partner (as defined in Section 9.2) shall use reasonable efforts, subject to applicable covenants and restrictions contained in any loan agreements and other agreements or obligations to which the Company or its properties are subject, to cause the Company to distribute with respect to each Fiscal Year of the Company an amount of cash which in the good faith judgment of the tax matters partner equals (i) the amount of taxable income allocable to the each Member in respect of such Fiscal Year, multiplied by (ii) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (taking into account the deductibility of state income tax for federal income

5.7    **Tax Distributions.** The tax matters partner (as defined in Section 9.2) shall use reasonable efforts, subject to applicable covenants and restrictions contained in any loan agreements and other agreements or obligations to which the Company or its properties are subject, to cause the Company to distribute with respect to each Fiscal Year of the Company an amount of cash which in the good faith judgment of the tax matters partner equals (i) the amount of taxable income allocable to the each Member in respect of such Fiscal Year, multiplied by (ii) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (taking into account the deductibility of state income tax for federal income tax purposes and the character of the income), with such distribution to be made to the Members in the same proportions that taxable income was allocated to the Members during such Fiscal Year. Any distribution to a Member pursuant to Section 5.7 which exceeds the amount that would have been distributed to such Member had the amount distributed pursuant to Section 5.7 been distributed pursuant to Section 5.2 shall be treated as an advance distribution under Section 5.2 and shall be offset against subsequent distributions that such Member would otherwise be entitled to receive pursuant to Section 5.2. Such distributions may be made on a quarterly or other basis as shall be determined by the sole discretion of the tax matters partner, but not less than annually.

5.8    **Tax Allocations: Code Section 704(c).**

5.8.1    Items of income, gain, loss, deduction and expense of the Company shall be determined in accordance with Code Section 703 and, except as otherwise provided in this Article 5, the Members distributable share of such items for purposes of Code Section 702 shall be determined in accordance with Section 5.3.1.

5.8.2    In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

5.8.3    Any elections or other decisions relating to such allocations shall be made by the Members holding the Required Interest in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations pursuant to this Section 5.8 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member s Capital Account or share of Profits, Losses, other items or distributions pursuant to any provisions of this Agreement.

## ARTICLE 6
## MANAGEMENT

6.1    **Management by the Members.**

6.1.1    The Members holding the Required Interest shall have the exclusive right to manage the business of the Company, including, without limitation, the following:

(a)    entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in

Members holding the Required Interest. In all other cases, any matter to be decided or action to be taken by the Members requires, and shall be conclusively deemed approved and authorized only by, the approval of the members holding the Required Interest.

6.2    **Expansion.**

6.2.1    If at least two of the Founders (the **Expanding Founders** ) desire to open a restaurant in a location outside the greater Chicagoland area based upon the Restaurant s Concept (an **Expansion** ), the Expanding Founders shall deliver written notice (the **Expansion Notice** )   of the Expansion to the other Founders (the **Non-Expanding Founders** ) setting forth the material terms of the Expansion as well as the terms and conditions pursuant to which the Non-Expanding Founders may invest in the Expansion.  The terms and conditions of the Non-Expanding Founders  investment in the Expansion shall be no less advantageous than those offered to other investors in the Expansion (excluding the Expanding Founders). Upon receipt of the Expansion Notice, a Non-Expanding Founder shall have a period of ten (10) Business Days to deliver to the Expanding Founders his agreement to participate in the Expansion on the terms and conditions set forth in the Expansion Notice.  The Expanding Founders and the  Non-Expanding Founders agree to negotiate in good faith and agree to execute and deliver any additional documents and instruments necessary, proper or advisable to implement the provisions of this Section 6.2.  Notwithstanding the foregoing, if Members holding the Required Interest desire to open a restaurant in a new location within the greater Chicagoland area, all of the Founders must be afforded the opportunity to invest in such restaurant on terms that are no less advantageous than those available to other Founders, and each Founder shall be entitled to receive notice and shall deliver his or her agreement to participate in a manner consistent with the procedures established for an Expansion.  WITH RESPECT TO AN EXPANSION PURSUANT TO THIS SECTION 6.2, EACH NON-EXPANDING FOUNDER (AND EACH MEMBER THAT IS NOT A FOUNDER) HEREBY IRREVOCABLY WAIVES, RELEASES, ACQUITS AND FOREVER DISCHARGES THE EXPANDING FOUNDERS, AND EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, FROM AND AGAINST ANY AND ALL DEMANDS, ACTIONS, CAUSES OF ACTION, SUITS, PROCEEDINGS, COMPLAINTS OR OTHER ACTIONS OF ANY KIND, IN LAW OR EQUITY, ASSERTING THAT SUCH NON-EXPANDING FOUNDER (OR ANY MEMBER THAT IS NOT A FOUNDER) HAS AN INTEREST OF ANY KIND IN THE ITEMS OF INCOME, GAIN, LOSSES AND DEDUCTIONS AND EXPENSES ALLOCATED TO THE EXPANDING FOUNDERS IN AN EXPANSION, AND EACH NON-EXPANDING FOUNDER (AND EACH MEMBER THAT IS NOT A FOUNDER) FURTHER AGREES NOT TO CHALLENGE, DELAY OR OTHERWISE INHIBIT AN EXPANSION CARRIED OUT IN ACCORDANCE WITH THE TERMS OF THIS SECTION 6.2.  EACH NON-FOUNDER MEMBER SHALL HAVE NO RIGHT TO PARTICIPATE IN ANY EXPANSION OF THE CONCEPT UNDER THIS AGREEMENT.

6.2.2    For purposes of this Section 6.2,  Concept  shall mean a Japanese restaurant that has a menu, d cor and design (both interior and exterior) that is substantially similar to the Restaurant, and which incorporates the name  Japonais and/or the intellectual property of the Restaurant, including, without limitation, the Restaurant s trade names, trade marks, service marks, trade symbols, emblems, signs, slogans, insignia, copyrights and any of the foregoing that may exist from time to time.  Notwithstanding the foregoing, the Concept shall

not include the mere ownership or operation of a Japanese or sushi restaurant, or the serving of food items commonly served in a Japanese or sushi restaurant. The Members hereby acknowledge that Miae Lim owns a majority interest in the restaurant known as Mirai Sushi, located in Chicago, Illinois, and that the expansion of Mirai Sushi or similar restaurants shall not be construed as an Expansion under this Section 6.2 or otherwise be construed as a venture or opportunity in which any Member would have any right to participate.

6.3 **Expenses.** All of the Company s expenses shall be billed to and paid directly by the Company. All expenses or costs directly or indirectly incurred (and approved in accordance with this Article 6) by the Members incurred in connection with the management of the Company shall be paid by the Company. No Member shall be required to devote his full time to the performance of duties for the Company.

6.4 **No Compensation.** Except as provided in Section 5.4 or compensation received as an employee of the Restaurant, no Member shall be entitled to or shall receive any salary, fee or compensation.

6.5 **Conflicts of Interest.** Except as otherwise provided in Section 6.2, each Member at any time and from time to time may engage in and own interests in other business ventures of any and every type and description, independently or with others (including ones in competition with the Company, the Subsidiary or the Restaurant) with no obligation to offer to the Company, the Subsidiary or any other Member the right to participate therein. The Company may transact business with any Member; provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties. Other than with respect to an Expansion, no Member shall be obligated to present any investment or business opportunity to the Company or the Subsidiary.

## ARTICLE 7

## MEETINGS OF MEMBERS

### 7.1 Member Meetings.

7.1.1 A quorum shall be present at a meeting of Members if the Members holding a Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of all Members entitled to vote is required by the Act, the affirmative vote of the Members holding the Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

7.1.2 All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Delaware as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 7.5.

7.1.3 Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting or the Members holding the Required Interest shall have the power

to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the Members holding the Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

7.1.4   An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held at such place, within or without the State of Delaware, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred. If an annual meeting of Members is not held, such failure will not affect any action taken by the Members.

7.1.5   Special meetings of the Members for any proper purpose or purposes may be called at any time by the Members holding Units entitled to receive at least twenty percent of the Profits and Losses and other distributions more specifically described in Article 5 hereof. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

7.1.6   Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 15 nor more than 60 days before the date of the meeting, either personally or by overnight courier, by the Members calling the meeting, to each Member entitled to vote at such meeting. If sent by overnight courier, any such notice shall be deemed to be delivered when deposited with such courier, addressed to the Member at its address provided for in Section 13.2, with charges thereon prepaid.

7.1.7   The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Members holding the Required Interest declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof) or the Members entitled to receive such distribution.

7.1.8   There shall be no cumulative voting hereunder.

7.2   **Voting List.** The Managers shall make, at least ten days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof arranged in alphabetical order, with the address of and the Units held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who

are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

7.3    **Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers before or at the time of the meeting or execution of the written consent as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

7.4    **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be one of the Managers (or a representative thereof). The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.5    **Action by Written Consent or Telephone Conference.**

7.5.1   Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Member or Members holding not less than two-thirds of all Units. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the Member or Members holding not less than two-thirds of all Units are delivered to the Company by delivery to its registered office, its principal place of business or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed

14

by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

7.5.2 The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager.

7.5.3 If any action by Members is taken by written consent, any certificate or documents filed with the Secretary of State of Delaware as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

7.5.4 Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1 **Exculpation.** No Member shall be liable to the Company or to any other Member for any loss suffered by the Company unless such loss is caused by the Member's gross negligence or willful misconduct as determined by a non-appealable final judgment of a court of competent jurisdiction. No Member shall be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful misconduct. Each Member may consult with counsel and accountants in respect of Company affairs, and provided the Member acts in good faith reliance upon the advice or opinion of such counsel or accountants, the Member shall not be liable for any loss suffered by the Company in reliance thereon.

8.2 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article 8, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a **Proceeding**), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent possible (except to the extent limited by the Act as in effect on the date hereof) against

judgments, penalties (including excise and similar taxes and punitive damages), fines, amounts, paid in settlements and reasonable costs, charges and expenses (including, without limitation, attorneys fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 8 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 8 shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. This right of indemnification shall apply to (without limitation) any acts, omissions or alleged acts or omissions of a Member. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.3     **Advance Payment.** The right to indemnification conferred in this Article 8 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person s ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under Article 8 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 8 or otherwise.

8.4     **Indemnification of Employees and Agents.** The Company, in the sole discretion of the Members holding the Required Interest, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Persons who are not or were not a Member but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to a Member under this Article 8.

8.5     **Appearance as a Witness.** Notwithstanding any other provision of this Article 8, the Company may pay or reimburse expenses incurred by a Member in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6     **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article 8 shall not be exclusive of any other right which a Member or other Person indemnified pursuant to Section 8.4 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement.

8.7 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself, the Members and any Person who is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

8.8 **Savings Clause.** If this Article 8 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member as to costs, charges and expenses (including, without limitation, attorneys fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 8 that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE 9
## TAXES

9.1 **Tax Returns.** The Members shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making any elections the Members holding the Required Interest may deem appropriate and in the best interests of the Members. Each Member shall furnish to the other Members all pertinent information in its possession relating to Company s operations that is necessary to enable the Company s income tax returns to be prepared and filed. The Members shall cause the Company to furnish to each Member in a timely manner the information needed by each Member to complete such Member s federal and state income tax returns insofar as those returns are affected by such Member s ownership interest in the Company.

9.2 **Tax Matters Member.** Richard Wahlstedt shall be the tax matters partner of the Company pursuant to section 6231(a)(7) of the Code and shall take such action as may be necessary to cause each Member to become a notice partner within the meaning of section 6223 of the Code. The tax matters partner shall inform the other members of all significant matters that come to his attention in his capacity as tax matters partner by giving notice thereof on or before the fifth Business Day after becoming aware and determining the materiality thereof and, within that time, shall forward to each other Member copies of all significant written communications received in that capacity.

## ARTICLE 10
## BOOKS, REPORTS AND COMPANY FUNDS

10.1 **Maintenance of Books.** The Company shall keep books and records of accounts.

10.2 **Reports.** On or before the 120th day following the end of each Fiscal Year during the term of the Company, the Company shall cause each Member to be furnished with an unaudited balance sheet, an income statement and a statement of changes in Members capital of the Company for, or as of the end of, the prior Fiscal Year. The foregoing balance sheet and

17

statements shall be prepared on a compilation basis by a recognized firm of certified public accountants. These annual financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied (except as therein noted). The Company also may cause to be prepared and delivered to each Member quarterly unaudited financial statements and such other reports as it may deem appropriate. The Company shall bear the costs of all these reports.

## ARTICLE 11
## TRANSFERS

11.1    **Assignment by Members.** No Member shall sell, assign or transfer, or offer to sell, assign or transfer, or otherwise Dispose of all or any part of such Member s Units (whether voluntarily or involuntarily) without first complying with Section 11.7 below; provided, however, that in the event of the death of a Member (i) the economic interests in such Member s Units shall pass to such Member s heirs or legatees in accordance with such Member s testamentary documents or as otherwise required by intestate law, (ii) the voting rights with respect to such Units, if any, shall pass pro rata to the then remaining holders of Units and (iii) the Company shall have the right to acquire (pursuant to transfer documents reasonably acceptable to the Company) the economic interests in such Units at their fair market value (as determined by an independent appraiser selected by the Company).

11.1.1  No admission (or purported admission) of a Member, and no Disposition (or purported Disposition) of all or any part of a Member s interest in the Company (or any economic interest therein), whether to another Member or to a Person who is not a Member, shall be effective, and any such admission or Disposition (or purported admission or Disposition) shall be void ab initio, and no Person shall otherwise become a Member if after such admission or Disposition (or purported admission or Disposition) the Company would have more than 100 Members. For purposes of determining whether the Company will have more than 100 Members, each Person indirectly owning an interest in the Company through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a flow-through entity ) shall be treated as a Member unless the Members determine in their sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner s interest in the flow-through entity is attributable to the flow-through entity s interest (direct or indirect) in the Company.

11.2    **Void Assignment.** Any sale, exchange or other Disposition by any Member of any Units or other interests in the Company in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company. No Disposition or assignment of any Units shall be effective if such Disposition or assignment would, in the opinion of counsel to the Company, result in termination of the Company or the treatment of the Company as an association taxable as a corporation for purposes of any applicable law.

11.3    **Substituted Member.**

11.3.1  An assignee of any Unit of a Member (after first complying with <u>Section 11.7</u> below), or any portion thereof, shall become a substituted Member entitled to all the rights of a Member if and only if the assignor gives the assignee such right.

11.3.2  The Company and the Members shall be entitled to treat the record owner of any Unit as the absolute owner thereof and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such interest in the Company, which assignment is permitted pursuant to the terms and conditions of Section 11.7 hereof, has been received, accepted and recorded on the books of the Company.

11.3.3  Upon the admission of a substituted Member, <u>Schedule A</u> attached hereto shall be amended to reflect the name, address and Units of such substituted Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units.

11.4    **Effect of Assignment.**

11.4.1  Any Member who shall assign any Units shall cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units, except that unless and until the assignee of such Member is admitted as a substituted Member in accordance with the provisions of this <u>Article 11</u>, such assigning Member shall retain the statutory rights and obligations of a Member under applicable law.

11.4.2  Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units was subject to or by which such predecessor was bound.

11.4.3  The transferee of any Unit shall be treated as having made all of the Capital Contributions made by, and received all of the distributions from the Company received by, the transferor of such Unit with respect to such Unit.

11.5    **Effect of Incapacity.**  Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company.  In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Incapacitated Member shall be deemed to be the assignee of such Member s Units or other interests in the Company and may, subject to <u>Section 11.7</u>, become a substituted Member upon the terms and conditions set forth in <u>Section 11.3</u>.

11.6    **Interest in a Member.**  A Member that is not a natural Person may not cause or permit an interest, direct or indirect, in itself to be Disposed except in compliance with the provisions of this <u>Article 11</u>.

11.7  **Right of First Refusal.** If a Member desires to sell all or any portion of the Units held by such Member other than to affiliates (as such term is defined in Rule 144 under the Securities Act of 1933, as amended) of such Member or for estate planning purposes, such Member must first offer such Units to the other Members (the **Offer Units** ). The Member desiring to transfer such Offer Units (the **Offeror** ) shall deliver to the Members eligible to acquire such Units (individually, an **Offeree** and collectively, the **Offerees** ) written notice of the terms and conditions under which the Offeror desires to sell the Offer Units, including without limitation, the purchase price, earnest money and other material terms (the **Offer Notice** ). The Offeree shall then have a period of fifteen (15) Business Days after receipt of the Offer Notice within which to deliver to the Offeror its written agreement (the **Exercise Notice** ) to purchase the Offer Units in accordance with the terms and conditions set forth in the Offer Notice. If more than one Offeree delivers an Exercise Notice, all such Offer Units shall be divided pro rata among the Offerees based upon their current Unit holdings and such sale shall be consummated within sixty (60) days after the delivery of the Exercise Notice. All documents affecting such conveyance shall be reasonably acceptable to the Offeror and the Offerees. If none of the Offerees timely deliver an Exercise Notice, then the Offerees shall be deemed to have declined to exercise such right of first refusal. Thereafter, the Offeror shall be entitled to sell the Offer Units for a period of ninety (90) days after the date of the last Offerees' rejection (or deemed rejection) of its right of first refusal provided such sale by the Offeror is substantially on the same terms as are set forth in the Offer Notice. For purposes hereof, such sale shall be substantially on the same terms as are set forth in the Offer Notice if (A) the net economic consideration to be received by the Offeror is greater than ninety five percent (95%) of the net economic consideration to be received by the Offeror as set forth in the Offer Notice and if (B) the remaining terms are not materially less favorable to the Offeror than those terms set forth in the Offer Notice.

11.8  **Bring-Along Rights.** Notwithstanding Section 11.7, if Members holding the Required Interest desire to sell all of their Units (the **Forced Sale Units** ) to a single Person (the **Transferee** ) in a single transaction or a series of related transactions, the Members desiring to make such sale (the **Transferring Members** ) shall deliver to the other Members (the **Non-Transferring Members** ) written notice of the terms and conditions under which the Transferring Members desire to sell the Forced Sale Units, including the purchase price, the identity of the Transferee and other material terms (the **Forced Sale Notice** ).

Upon receiving the Forced Sale Notice, each Non-Transferring Member agrees to use its best efforts, in good faith and in a timely manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to sell his Units to the Transferee on the same terms and on the same conditions as set forth in the Forced Sale Notice.

11.9  **Buy-Out Option.** Upon the occurrence of a Buy-Out Event, Miae Lim shall have the option to sell to the Company, or the Company shall have the option to purchase from Miae Lim (each a **Buy-Out Option** ) not less than all of Miae Lim's then outstanding Units at the Buy-Out Price; provided that the sale or purchase of such Units, as the case may be, shall take place in not more than five separate closings to occur on each anniversary of the date on which the Buyout Event occurred (or such earlier date as the parties may agree). All Units sold to, or purchased by, the Company on each successive closing after the occurrence of a Buyout Event, as the case may be, shall immediately be cancelled by the Company and shall no longer represent

any interest in any of the income, gains, losses, deductions or expenses allocable to such Units, nor will such Units have any voting rights thereafter. The Buy-Out Option may not be exercised by the Company or Miae Lim (i) prior to the second anniversary of the date on which the Restaurant is first opened to the public for business (the **Grand Opening** ) or after the eighth anniversary of the Grand Opening and (ii) until the Company, as managing member of the Subsidiary, shall have received in any fiscal year, distributions in excess of $750,000, exclusive of any management fees received by the Company with respect to the Subsidiary.

## ARTICLE 12
## DISSOLUTION, LIQUIDATION AND TERMINATION

12.1 **Dissolution.** The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

    (a)    the written consent of the Members holding the Required Interest;

    (b)    all Members shall retire, resign or become Incapacitated, or there shall occur any other event that terminates the continued membership in the Company of all of the Members; or

    (c)    the entry of a decree of judicial dissolution of the Company under the Act.

Except as provided in Section 12.1(b), the retirement, resignation, expulsion or Incapacity of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

12.2 **Liquidation and Termination.** On dissolution of the Company, the Members shall act as liquidators or may appoint a third party as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Members. The steps to be accomplished by the liquidators are as follows:

    (a)    as promptly as possible after dissolution and again after final liquidation, the liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company s assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

    (b)    the liquidators shall cause the notice described in the Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder;

    (c)    the liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts to Members), liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make

adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members in accordance with Section 5.2.1 of this Agreement by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation).

12.3     **Cancellation of Certificate.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Members (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of Delaware, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

## ARTICLE 13
## GENERAL PROVISIONS

13.1     **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes to the Company, whether pursuant to loans from the Company or otherwise, may be deducted from that sum before payment.

13.2     **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Schedule A, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Members must be given at the addresses provided by written notice to each Member.

Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3     **Entire Agreement.**  This Agreement constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.4     **Effect of Waiver or Consent.**  A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure

22

continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

13.5 **Amendment or Modification.** This Agreement may be amended from time to time by the Members holding the Required Interest, including, without limitation, amendments (i) to add to the duties or obligations of the Members or surrender any right or power granted to the Members herein; (ii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement; and (iii) to delete or add any provision of this Agreement required to be so deleted or added by a State Securities or Blue Sky commissioner or similar official, which addition or deletion is deemed by such official to be for the benefit or protection of the Members; provided, however, that (A) except as otherwise expressly provided herein, an amendment or modification reducing disproportionately (vis-a-vis any other Members) a Member s interest in Profits or Losses or in distributions or increasing a Member s Capital Contribution shall be effective only with that Member s consent and (B) an amendment or modification affecting any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the interest theretofore required. Notwithstanding the foregoing and anything to the contrary contained here, the Members may amend and modify the provisions of this Agreement and Schedule A hereto to the extent necessary to reflect the issuance of new Units or other interests in the Company as contemplated by Sections 3.4 and 3.5 hereof as determined in good faith by the Members.

13.6 **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

13.7 **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF DELAWARE, EXCLUDING ANY CONFLICT-OF-LAWS RULES. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.8 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.9 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to demand any distribution or withdrawal of property from the Company or to maintain any action for dissolution of the Company or for partition of the property of the Company. No Member shall have the right to withdraw from the Company. EACH MEMBER HEREBY

IRREVOCABLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATING TO THIS AGREEMENT.

13.10  **Indemnification and Reimbursement for Payments on Behalf of a Member.** If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the **Indemnifying Member** ) shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Members, either:

> (a)  promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

> (b)  the Company shall reduce distributions which would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 3.1, the amount withheld shall not be treated as a Capital Contribution).

13.11  **Notice of Provisions.** By executing this Agreement, each Member acknowledges that it has actual notice of (i) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article 12) and (ii) all of the provisions of the Certificate.

13.12  **Counterparts.** This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

24

IN WITNESS WHEREOF, the parties hereto have hereunto duly set their hands as of the day and year first above written.

JEFFREY BEERS

LESTER BURGHER

JOE CARR

JUNE ICHIKAWA

GENE KATO

MIAE LIM

SANDY PARK  General manager

JONATHAN SEGAL

RICHARD WAHLSTEDT

**THIS AGREEMENT HAS BEEN PREPARED BY COUNSEL FOR THE COMPANY. EACH MEMBER IS ADVISED TO REVIEW THIS AGREEMENT WITH HIS OWN LAWYER.**

LODB01 #1028313 v7

## SCHEDULE A

| Member | Capital Contributions | Units | | |
|---|---|---|---|---|
| | | Class A Units | Class B Units | Class C Units |
| Jeffrey Beers Address: | $10 | 10 | | |
| Lester Burgher Address: | $3 | | | 3 |
| Joe Carr Address: | $1 | | 1 | |
| June Ichikawa Address: | $5 | 5 | | |
| Gene Kato Address: | $5 | | | 5 |
| Miae Lim Address: | $29 | 29 | | |
| Sandy Park, *(page 3) Address: | $3 | | | 3 |
| Jonathan Segal Address: | $15 | 15 | | |
| Richard Wahlstedt Address: | $29 | 29 | | |
| Total: | $100 | 83 | 6 | 11 |

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................................ 1

ARTICLE 2 ORGANIZATION ..................................................................... 4

ARTICLE 3 MEMBERS AND CAPITAL ........................................................ 5

ARTICLE 4 CAPITAL ACCOUNTS .............................................................. 7

ARTICLE 5 DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES .......... 7

ARTICLE 6 MANAGEMENT ....................................................................... 9

ARTICLE 7 ........................................................................................... 12

ARTICLE 8 EXCULPATION AND INDEMNIFICATION .................................... 15

ARTICLE 9 TAXES ................................................................................. 17

ARTICLE 10 BOOKS, REPORTS AND COMPANY FUNDS .............................. 17

ARTICLE 11 TRANSFERS ........................................................................ 18

ARTICLE 12 DISSOLUTION, LIQUIDATION AND TERMINATION ..................... 21

ARTICLE 13 GENERAL PROVISIONS ......................................................... 22

# WRITTEN CONSENT

## OF

## THE MEMBERS OF OSSS HOSPITALITY LLC.

The undersigned, being all the members of Osss Hospitality LLC, a Delaware limited liability company (the .Company ), in accordance with the authority granted pursuant to the provisions of the Delaware Limited Liability Company Act, hereby adopt the following resolutions without a meeting and waive all notice that may be required in connection therewith:

WHEREAS, the undersigned have determined that it is in the best interests of the Company for the Company's Operating Agreement, dated as of April 24, 2003 (the Original Operating Agreement ), to be amended and restated in accordance with Section 13.5 of the Original Operating Agreement to admit additional members, to reclassify the existing Units (as such term is defined in the Original Operating Agreement) into Class A Units, Class B Units and Class C Units and to make certain other changes detailed therein; and

WHEREAS, the undersigned have been presented with an Amended and Restated Operating Agreement, a copy of the form of which is attached hereto as Exhibit A (the Amended and Restated Operating Agreement ); and

WHEREAS, after discussing the Amended and Restated Operating Agreement, the undersigned have determined that the Amended and Restated Operating Agreement is in the best interests of the Company.

NOW, THEREFORE, BE IT RESOLVED, that the terms of the Amended and Restated Operating Agreement are approved and confirmed in all respects; and

FURTHER RESOLVED, that Richard Wahlstedt and Miac Lim (the Authorized Members ) are each hereby authorized, in the name of and on behalf of the Company, to retain such legal or other advisors with respect to the preparation, execution and delivery of the Amended and Restated Operating Agreement and such other documents as such Authorized Members deem necessary, advisable or appropriate and that the Company is authorized to pay any and all expenses and fees arising in connection therewith; and

FURTHER RESOLVED, that all actions taken by the Authorized Members prior to the date hereof in connection with the implementation of the foregoing resolutions, including the engagement of legal counsel and other advisors be, and each of them hereby are, ratified and approved in all respects.

This Consent may be executed in counterparts, each of which, when taken together, shall constitute one and the same Consent.

IN WITNESS WHEREOF, the undersigned have executed this Consent as of this 25th day of _February_ 2004.

_____
Jeffrey Beers

_____
June Ichikawa

_____
Miae Lim

_____
Jonathan Seagal

_____
Richard Wahlstedt

Being all the members of Osss Hospitality LLC.

# EXHIBIT C



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

# Trademarks > Trademark Electronic Search System(Tess)

*TESS was last updated on Sat Dec 31 04:12:36 EST 2005*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP | PREV LIST | CURR LIST |

| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

Logout | Please logout when you are done to release system resources allocated for you.

Start | List At: [    ] OR Jump | to record: [    ] **Record 2 out of 4**

| TARR Status | ASSIGN Status | TDR | TTAB Status | *( Use the "Back" button of the Internet Browser to return to TESS)*

# JAPONAIS

| | |
|---|---|
| **Word Mark** | **JAPONAIS** |
| **Translations** | The English translation of the word **JAPONAIS** is Japanese |
| **Goods and Services** | IC 043. US 100 101. G & S: restaurant and lounge services. FIRST USE: 20030901. FIRST USE IN COMMERCE: 20030901 |
| **Mark Drawing Code** | (5) WORDS, LETTERS, AND/OR NUMBERS IN STYLIZED FORM |
| **Design Search Code** | |
| **Serial Number** | 78709911 |
| **Filing Date** | September 9, 2005 |
| **Current Filing Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Owner** | (APPLICANT) Geisha Licensing LLC LTD LIAB CO DELAWARE 420 Lexington Avenue, Suite 1713 New York NEW YORK 10170 |
| **Attorney of Record** | Joan L. Long |
| **Description of Mark** | The mark consists of the word JAPONAIS in fanciful design form |
| **Type of Mark** | SERVICE MARK |
| **Register** | PRINCIPAL-2(F) |
| **Live/Dead** | |

Case: 1:06-cv-00057-Document #: 1 Filed: 01/05/06 Page 94 of 161 PageID #:1

**Indicator** LIVE

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP | PREV LIST | CURR LIST |
| NEXT LIST | FIRST DOC | PREV DOC | NEXT DOC | LAST DOC |

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

# EXHIBIT D

GEISHA NYC, LLC
A New York Limited Liability Company
d/b/a Japonais Restaurant and Bar

OPERATING AGREEMENT

Dated as of April 20, 2005

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

ARTICLE 1    DEFINITIONS ........................................................................................... 1

    1.1    Definitions ................................................................................................ 1

ARTICLE 2    ORGANIZATION ...................................................................................... 3

    2.1    Formation ................................................................................................. 3

    2.2    Name ........................................................................................................ 3

    2.3    Registered Office; Registered Agent; Principal Office; Other Offices ................. 3

    2.4    Purposes ................................................................................................... 3

    2.5    Foreign Qualification ................................................................................ 3

    2.6    Term ......................................................................................................... 4

    2.7    No State-Law Partnership ......................................................................... 4

ARTICLE 3    MEMBERS AND CAPITAL ...................................................................... 4

    3.1    Members ................................................................................................... 4

    3.2    Liability of Members ................................................................................ 5

    3.3    Lack of Authority ..................................................................................... 6

    3.4    Member Units ........................................................................................... 6

    3.5    Issuance of Additional Units and Interests; Additional Capital Contributions ......................................................................................... 6

ARTICLE 4    CAPITAL ACCOUNTS ............................................................................ 7

    4.1    Establishment and Determination of Capital Accounts ............................ 7

    4.2    Negative Capital Accounts ....................................................................... 7

    4.3    Company Capital ...................................................................................... 7

ARTICLE 5    DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES ............. 7

    5.1    Generally ................................................................................................. 7

    5.2    Distributions ............................................................................................ 8

    5.3    Allocation of Profits and Losses .............................................................. 8

    5.4    Special Allocations .................................................................................. 9

    5.5    Amounts Withheld ................................................................................... 9

    5.6    Tax Distributions ..................................................................................... 9

    5.7    Tax Allocations: Code Section 704(c) .................................................... 10

ARTICLE 6    MANAGEMENT ..................................................................................... 10

## TABLE OF CONTENTS
(continued)

Page

6.1     Management by the Managing Member ........................................... 10

6.2     Expenses .......................................................................................... 12

6.3     Compensation of Managing Member ............................................ 12

6.4     Conflicts of Interest ........................................................................ 12

6.5     Successor Managing Member ........................................................ 12

ARTICLE 7     MEETINGS OF MEMBERS .................................................... 13

7.1     Member Meetings ............................................................................ 13

7.2     Voting List ....................................................................................... 14

7.3     Proxies .............................................................................................. 15

7.4     Conduct of Meetings ....................................................................... 15

7.5     Action by Written Consent or Telephone Conference .................. 15

ARTICLE 8     EXCULPATION AND INDEMNIFICATION ........................ 16

8.1     Exculpation ...................................................................................... 16

8.2     Right to Indemnification ................................................................. 17

8.3     Advance Payment ............................................................................ 17

8.4     Indemnification of Employees and Agents .................................... 17

8.5     Appearance as a Witness ................................................................ 18

8.6     Nonexclusivity of Rights ................................................................ 18

8.7     Insurance .......................................................................................... 18

8.8     Savings Clause ................................................................................. 18

ARTICLE 9     TAXES ..................................................................................... 18

9.1     Tax Returns ...................................................................................... 18

9.2     Tax Matters Member ....................................................................... 19

ARTICLE 10     BOOKS, REPORTS AND COMPANY FUNDS ................... 19

10.1     Maintenance of Books ..................................................................... 19

10.2     Reports ............................................................................................. 19

ARTICLE 11     TRANSFERS ........................................................................... 19

11.1     Assignment by Members ................................................................ 19

11.2     Void Assignment ............................................................................. 20

11.3     Substituted Member ........................................................................ 20

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 11.4 | Effect of Assignment | 20 |
| 11.5 | Effect of Incapacity | 21 |
| 11.6 | Interest in a Member | 21 |
| ARTICLE 12 | DISSOLUTION, LIQUIDATION AND TERMINATION | 21 |
| 12.1 | Dissolution | 21 |
| 12.2 | Liquidation and Termination | 22 |
| 12.3 | Deficit Capital Accounts | 23 |
| 12.4 | Cancellation of Certificate | 23 |
| ARTICLE 13 | GENERAL PROVISIONS | 23 |
| 13.1 | Offset | 23 |
| 13.2 | Notices | 23 |
| 13.3 | Entire Agreement | 23 |
| 13.4 | Effect of Waiver or Consent | 24 |
| 13.5 | Amendment or Modification | 24 |
| 13.6 | Binding Effect | 24 |
| 13.7 | Governing Law; Severability | 24 |
| 13.8 | Further Assurances | 25 |
| 13.9 | Waiver of Certain Rights | 25 |
| 13.10 | Indemnification and Reimbursement for Payments on Behalf of a Member | 25 |
| 13.11 | Notice of Provisions | 25 |
| 13.12 | Counterparts | 26 |

### OPERATING AGREEMENT
### OF
### GEISHA NYC, LLC
### A New York Limited Liability Company

THIS OPERATING AGREEMENT of GEISHA NYC, LLC, a New York limited liability company (as the same may be amended or restated from time to time, the "**Agreement**"), dated as of April 20, 2005, is made by each signatory hereto as a Member.

### ARTICLE 1
### DEFINITIONS

1.1    **Definitions.**  As used in this Agreement, the following terms have the following meanings:

"**Act**" means the New York Limited Liability Company Act, and any successor statute, as amended from time to time.

"**Book Value**" means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation §1.704-1(b)(2)(iv)(d) - (g), provided, however, that the initial Book Value of any asset of the Company contributed by a Member to the Company shall be its fair market value at the time of its contribution.

"**Business Day**" means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of New York are closed.

"**Capital Contribution**" means the aggregate contribution made by a Member to the capital of the Company specified on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class A Units**" means the Units of the Members designated as Class A Units on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class B Units**" means the Units of the Members designated as Class B Units on Schedule A hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Class C Units**" means the Units of the Members designated as Class C Units on Schedule A hereto, if any, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company**" means Geisha NYC, LLC, a New York limited liability company.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"**Dispose**", "**Disposed**", "**Disposing**" or "**Disposition**" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance (including, without limitation, by operation of law) or the acts thereof.

"**Fiscal Year**" of the Company means the calendar year.

"**Incapacity**" or "**Incapacitated**" means (a) with respect to a natural person, the bankruptcy, death, incompetency or insanity of such person and (b) with respect to any other Person, the bankruptcy, liquidation, dissolution or termination of such Person.

"**Losses**" for any period means all items of Company loss, deduction and expense for such period determined according to Section 4.2.

"**Managing Member**" means the holder, from time to time, of the Class C Units. The initial Managing Member shall be OSSS Hospitality NYC, LLC, a New York limited liability company.

"**Member**" means any Person executing this Agreement as of the date of this Agreement as a member (including the Managing Member) or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(1).

"**Member Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i).

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"**Person**" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"**Proceeding**" has the meaning given that term in Section 7.2.

"**Profits**" or "**Losses**" means, for each period taken into account, an amount equal to the Company's taxable income or taxable loss for such period, determined in accordance with Federal income tax principles, adjusted to the extent the Managing Member determines that such adjustment is necessary to comply with the requirements of Section 704(b) of the Code.

"**Restaurant**" means the first-class, fully staffed restaurant, bar and private party facility to be operated by the Company at 225 Park Avenue South, Manhattan, New York.

"**Required Interest**" means one or more Members possessing a majority of the Units owned by all Members, with Class A Units, Class B Units and Class C voting together as follows: (i) until such time as Members owning Class A Units and Class B Units have been distributed cumulative distributions in the amounts set forth in Section 5.2.1(i) of this Agreement, each Class A Unit shall be entitled to five (5) votes, each Class B Unit shall be entitled to one (1) vote, and each Class C Unit shall be entitled to five (5) votes, and (ii) thereafter, each Class A Unit shall be entitled to five (5) votes, each Class B Unit shall be entitled to one (1) vote, and each Class C Unit shall be entitled to twenty (20) votes.

"**Units**" means, as applicable, the Class A Units, the Class B Units and the Class C Units of each Member, representing such Member's interest in the income, gains, losses, deductions and expenses of the Company as set forth on Schedule A hereto, as amended from time to time in accordance with the terms of this Agreement.

Other terms defined in this Agreement have the meanings so given them. Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine and neuter. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE 2
## ORGANIZATION

2.1     **Formation.** The parties hereby ratify the organization of the Company as a New York limited liability company by the filing of a Certificate of Formation (the "**Certificate**") under and pursuant to the Act.

2.2     **Name.** The name of the Company is "Geisha NYC, LLC," and all Company business shall be conducted in that name or such other name or names that comply with applicable law as the Managing Member may select from time to time.

2.3     **Registered Office; Registered Agent; Principal Office; Other Offices.** The registered office of the Company required by the Act to be maintained in the State of New York shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by law. The registered agent of the Company in the State of New York shall be the initial registered agent named in the Certificate or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by law. The principal office of the Company shall be at such place as the Managing Member may designate from time to time, which need not be in the State of New York, and the Company shall maintain records there. The Company may have such other offices as the Managing Member may designate from time to time.

2.4     **Purposes.** The purpose of the Company is to own and operate the Restaurant and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose (including, without

limitation, obtaining financing therefor) and that is not prohibited by the Act or the laws of the jurisdictions in which the Company engages in that business.

2.5 **Foreign Qualification**. Prior to the Company's conducting business in any jurisdiction other than New York, the Managing Member shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Managing Member, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction to the extent necessary. At the request of the Managing Member, each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments conforming with this Agreement that are necessary or appropriate (in the opinion of the Managing Member) to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business and to obtain liquor licenses for the Restaurant.

2.6 **Term.** The term of the Company commenced on the date the Certificate was filed with the office of the Secretary of State of New York and shall continue in existence until termination and dissolution of the Company as determined under Section 12.1 of this Agreement.

2.7 **No State-Law Partnership.** The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member or Manager shall be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and, if applicable, state tax purposes, and nothing in this Agreement shall be construed to the contrary. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment. Neither the Company nor the Managing Member shall elect to treat the Company as an association taxable as a corporation for Federal or state income tax purposes.

### ARTICLE 3
### MEMBERS AND CAPITAL

3.1 **Members.**

3.1.1 The names, residence, business or mailing addresses, Capital Contributions and, with respect to Members, Units, of the Members are set forth on Schedule A, as amended from time to time in accordance with the terms of this Agreement. Each Member shall make its aggregate Capital Contribution to the Company in cash as and when called by the Managing Member.

3.1.2 No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law or by this Agreement. Any Member may, with the approval of the Managing Member, make loans to the Company, and any loan by a Member to the Company shall not be considered to be a Capital Contribution.

3.1.3 Each Member shall execute a counterpart of this Agreement, and when a Person is admitted as a Member by the Managing Member, such Person shall execute a

counterpart of this Agreement and such Person shall be listed as a Member on <u>Schedule A</u> with such Member's address, Capital Contribution and Units. Each Member acknowledges that the Managing Member has the sole right and authority to admit other members to the Company (including, without limitation, additional Members), subject to <u>Section 3.5</u> below.

3.1.4   Each Member hereby represents and warrants to and acknowledges with the Company and the Managing Member that (a) he has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (b) he is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (c) he is acquiring interests in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (d) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; and (e) the execution, delivery and performance of this Agreement does not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound. Each Member further acknowledges that any subscription for Units is not binding unless accepted in writing by the Company (by the Managing Member) in its sole discretion after the Company's receipt of all subscription documents described in any private placement memorandum prepared by the Company, properly executed. If so accepted, subscriptions for Units (i) will be binding upon the subscriber's heirs, successors, legal representatives and assigns, (ii) may not be cancelled, terminated or revoked, (iii) is not contingent upon the Company receiving a minimum number of subscriptions and (iv) will be governed by and construed in accordance with the laws of the State of New York (without giving effect to any choice of law or conflict of law rules or provisions that would cause the application of the laws of any jurisdiction other than the State of New York).

3.2   **Liability of Members**.

3.2.1   Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatever in his capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or for any losses of the Company, and therefore, a Member shall be liable only to make his Capital Contribution to the Company and the other payments provided herein. Until the Capital Contribution for a Member as specified on <u>Schedule A</u> has been paid to the Company, such Member shall be liable to the Company for that portion of its Capital Contribution not so paid.

3.2.2   In accordance with the Act and the laws of the State of New York, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to <u>Article 5</u> hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or

distribution of any such property to any Members shall be deemed to be a compromise within the meaning of the Act, and the Members receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the Company or the other Members.

3.3 **Lack of Authority**. No Member holding Class A Units or Class B Units has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company or to make any expenditures or incur any obligations on behalf of the Company. Each Member hereby consents to the exercise by the Managing Member of the powers conferred on it by law and this Agreement.

3.4 **Member Units.** Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company and the right to vote on certain matters as provided in this Agreement (which are limited with respect to those Members owning Class A Units and Class B Units), shall be represented by the Units owned by such Member. The ownership of Units shall entitle each Member to allocations of Profits and Losses and other items and distributions of cash and other property as set forth in Article 5 hereof. Each Unit shall entitle the Member owning such Unit to the number of votes specified in the definition of "Required Interest" on any matter voted on by the Members as a whole or the Members owning a particular class of Units as provided in this Agreement or as required by applicable law. Upon receipt of each Member's Capital Contribution set forth opposite his name on Schedule A, such Member shall be deemed to own the number of Units set forth opposite his name on Schedule A. The Managing Member may in its discretion issue certificates to the Members representing the Units held by each Member.

3.5 **Issuance of Additional Units and Interests; Additional Capital Contributions.** The Managing Member shall have the right to cause the Company to issue or sell to Members, affiliates of Members or other Persons: (i) additional Units or other interests in the Company (including other classes or series thereof having different rights), (ii) obligations, evidences of indebtedness or other securities or interests convertible or exchangeable into Units or other interests in the Company and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other interests in the Company. The Members existing at the time of any such issuance or sale shall have no right to purchase or otherwise participate in any such issuance or sale unless the Managing Member, in its sole discretion, permits such participation.

## ARTICLE 4
## CAPITAL ACCOUNTS

4.1 **Establishment and Determination of Capital Accounts.** A capital account ("**Capital Account**") shall be established for each Member. Capital Accounts shall be maintained in accordance with Code Section 704(b) and Treas. Reg. § 1.704-1(b)(2)(iv), with such adjustments as may be required thereby.

4.2 **Negative Capital Accounts.** No Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

4.3 **Company Capital.** No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (i) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article 12 hereof, or (ii) to cause a partition of the Company's assets.

## ARTICLE 5
## DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES

5.1 **Generally.** Subject to the provisions of the Act and Section 5.6 of this Agreement, the Managing Member shall have sole discretion regarding the amounts and timing of distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company which shall include (but not be limited to) the payment or the making of provision for the payment when due of the Company's obligations, including the payment of any management or administrative fees and expenses, debt service of the Company (including payment on debt held by Members) or any other obligations. It is presently anticipated that the Managing Member will authorize distributions to be made on a semi-annual basis, within a reasonable time after the quarters ending June 30 and December 31. Without limiting the provisions of Section 13.10 hereof, the Company, if directed to do so by any court order or other governmental action, withhold distributions to a Member, or otherwise pay to another party, as directed in such court order or other governmental action, the distributions otherwise payable to such Member. In such instance, such Member shall be deemed to be an Indemnifying Member pursuant to Section 13.10.

5.2 **Distributions.**

5.2.1 Distributions of cash (other than tax distributions under Section 5.6 hereof) or property shall be made to the Members holding Class A Units, Class B Units and Class C Units in the following order and proportions:

(i) first, 60% to the Members owning Class A Units on a pro rata basis (according to their ownership of Class A Units) and 40% to the Members owning Class B Units on a pro rata basis (according to their ownership of Class B Units) until the Members holding Class A Units have been distributed cumulative distributions equal to 150% of such Members' aggregate Capital Contributions and the Members holding Class B Units have been distributed cumulative distributions equal to 100% of such Members' aggregate Capital Contributions;

(ii) thereafter, 20% to the Members owning Class A Units on a pro rata basis (according to their ownership of Class A Units), 20% to the Members owning Class B Units on a pro rata basis (according to their ownership of Class B Units)

and 60% to the Members owning Class C Units on a pro rata basis (according to their ownership of Class C Units);

(iii)     In the event of a sale of the Company, the net proceeds of such sale shall be distributed to the Members in accordance with subsections (i) and (ii) above, except that Members owning Class A Units will receive an additional distribution equal to ten percent (10%) of the distribution otherwise payable to Members owning Class A Units, which additional distribution shall be made from the distribution which would otherwise be payable to Members owning Class C Units. By way of example, if the net proceeds distributable to the Members after a sale of the Company are equal to $10,000,000, then pursuant to subsection (ii) above Members owning Class A Units would collectively be entitled to 20% of such distribution, or $2,000,000, Members owning Class B Units would collectively be entitled to 20% of such distribution, or $2,000,000, and Members owning Class C Units would collectively be entitled to 60% of such distribution, or $6,000,000. Pursuant to this subsection (iii), Members owning Class A Units would collectively be entitled to receive an additional 10% of the $2,000,000 distribution, or $200,000, for a total distribution upon sale of $2,200,000, and the distribution payable to Members owning Class C Units would be reduced to $5,800,000 ($6,000,000 minus the $200,000 payable to Members owning Class A Units).

5.3     **Allocation of Profits and Losses**.

5.3.1   For each Fiscal Year of the Company, after adjusting each Member's Capital Account for all Capital Contributions and distributions during such Fiscal Year and all special allocations pursuant to Section 5.4 with respect to such Fiscal Year, all Profits and Losses (other than Profits and Losses specially allocated pursuant to Section 5.4) shall be allocated to the Members' Capital Accounts in a manner such that, as of the end of such Fiscal Year, the Capital Account of each Member (which may be either a positive or negative balance) shall be equal to (i) the amount which would be distributed to such Member, determined as if the Company were to liquidate all of its assets for the Book Value thereof and distribute the proceeds thereof pursuant to Section 12.2 hereof, minus (ii) the sum of (A) such Member's share of Company Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(d) and (g)(3)) and Member Nonrecourse Debt Minimum Gain (as determined according to Treasury Regulation Section 1.704-2(i)) and (B) the amount, if any, which such Member is obligated to contribute to the capital of the Company as of the last day of such Fiscal Year.

5.4     **Special Allocations**.

5.4.1   Notwithstanding anything to the contrary in this Agreement, Profits and Losses shall be allocated as though this Agreement contained (and there is hereby incorporated herein by reference) a qualified income offset provision which complies with Treasury Regulation § 1.704-1(b)(2)(ii)(d) and minimum gain chargeback provisions which comply with the requirements of Treasury Regulation Section 1.704-2.

5.4.2 <u>Recharacterization</u>. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Member and, as a result of such adjustment, the Company is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by the Company, such excess deduction shall be allocated to such Member or such reduced income shall be reflected in a reduction in income allocated to such Member. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Company and, as a result of such adjustment, any Member is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by such Member, the additional Company taxable income shall be allocated to such Member.

5.5 **Amounts Withheld.** All amounts withheld pursuant to <u>Section 13.10</u> from any distribution to a Member shall be treated as amounts distributed to such Member pursuant to this <u>Article 5</u> for all purposes under this Agreement.

5.6 **Tax Distributions.** The Managing Member shall use reasonable efforts, subject to applicable covenants and restrictions contained in the Company's loan agreements and other agreements or obligations to which the Company or its properties are subject, to cause the Company to distribute to the Members with respect to each Fiscal Year of the Company an amount of cash which in the good faith judgment of the Managing Member equals (i) the amount of taxable income allocable to the Members in respect of such Fiscal Year, multiplied by (ii) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (taking into account the deductibility of state income tax for federal income tax purposes and the character of the income), with such distribution to be made to the Members in the same proportions that taxable income was allocated to the Members during such Fiscal Year. Any distribution to a Member pursuant to <u>Section 5.6</u> which exceeds the amount that would have been distributed to such Member had the amount distributed pursuant to <u>Section 5.6</u> been distributed pursuant to <u>Section 5.2</u> shall be treated as an advance distribution under <u>Section 5.2</u> and shall be offset against subsequent distributions that such Member would otherwise be entitled to receive pursuant to <u>Section 5.2</u>. Such distributions may be made on a quarterly or other basis as shall be determined by the Managing Member in its sole discretion.

5.7 **Tax Allocations: Code Section 704(c).**

5.7.1 Items of income, gain, loss, deduction and expense of the Company shall be determined in accordance with Code Section 703, and, except as otherwise provided in this <u>Article 5</u>, the Members' distributable share of such items for purposes of Code Section 702 shall be determined in accordance with <u>Section 5.3.1</u>.

5.7.2 In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

5.7.3 Any elections or other decisions relating to such allocations shall be made by the Managing Member in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations pursuant to this <u>Section 5.7</u> are solely for purposes of federal, state and

local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provisions of this Agreement.

## ARTICLE 6
## MANAGEMENT

6.1 **Management by the Managing Member.**

6.1.1 Except for cases in which the consent of the Members is required as set forth in Section 6.1.3 of this Agreement or by non-waivable provisions of applicable law, (i) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, the Managing Member and (ii) the Managing Member may make all decisions and take all actions for the Company not otherwise provided for in this Agreement and the Managing Member shall have the exclusive right to manage the business of the Company, including, without limitation, the following:

(a) entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b) maintaining the assets of the Company;

(c) collecting sums due the Company;

(d) opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(e) to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f) acquiring, utilizing for Company purposes and Disposing of any asset of the Company;

(g) hiring and employing executives, supervisors and other personnel;

(h) selecting, removing and changing the authority and responsibility of Restaurant consultants;

(i) obtaining insurance for the Company;

(j) determining and modifying the name, decor and menu of the Restaurant operated by the Company;

(k)     establishing accounting reserves on the Company's books for commitments and obligations (contingent or otherwise) of the Company;

(l)     selecting, removing or changing the authority and responsibility of lawyers, accountants and consultants for the Company; and

(m)     borrowing money or otherwise committing the credit of the Company, and granting liens on the assets of the Company.

6.1.2   If the Managing Member is not a natural Person, then any officer, director, member or other holder of an ownership interest in the Managing Member (individually, a "Manager" and collectively the "Managers") may act for and in the name of the Managing Member on behalf of Company in the exercise by the Company of any of its rights or powers. Persons dealing with the Company are entitled to rely conclusively on the power and authority any Manager of the Managing Member.

6.1.3   Notwithstanding the provisions of Section 6.1.1, without first obtaining the consent of the Members holding the Required Interest, the Managing Member may not cause the Company to (a) sell all or substantially all of the assets of the Company; (b) merge or consolidate the Company with or into another entity; or (c) amend this Operating Agreement (other than amendments to admit new members as contemplated by Section 3.5) that would materially and adversely affect the rights of Members hereunder.

6.2     **Expenses.** All of the Company's expenses shall be billed to and paid directly by the Company. All expenses or costs directly or indirectly incurred by the Managing Member or its Managers, incurred in connection with the obligations of the Managing Member hereunder, shall be paid by the Company (such matters to include, without limitation, salaries and business expenses). Neither the Managers nor the Managing Member shall be required to devote their full time to the performance of duties for the Managing Member or the Company, as applicable.

6.3     **Compensation of Managing Member.** The Managing Member shall be entitled to receive from the Company an annual management fee, payable monthly, equal to $300,000 per annum. Such compensation shall be in addition to any reimbursement of expenses made pursuant to Section 6.2 hereof.

6.4     **Conflicts of Interest.** Each Manager and Member at any time and from time to time may engage in and own interests in other business ventures of any and every type and description, independently or with others (including ones in competition with the Company or the Restaurant) with no obligation to offer to the Company or any other Member or Manager the right to participate therein. The Company may transact business with any Manager, Member, officer or affiliate thereof; provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties (the parties consenting to the payment of compensation and reimbursement of expenses as set forth herein). Neither any Member, the Managing Member nor any Managers shall be obligated to present any investment or business opportunity to the Company.

6.5     **Successor Managing Member.** With the consent of the Managing Member and of such number of the Members as are then required under the Act to consent to or ratify the

admission of a Managing Member, the Managing Member may at any time designate one or more Persons to be successors to such Managing Member with such participation in such Managing Member's interest as such Managing Member and such successor Managing Members may agree upon, provided that the interests of the Members shall not be adversely affected thereby. The Managing Member shall not have any right to retire or withdraw voluntarily from the Company or to sell, transfer or assign its interest, except (a) in connection with a transfer to a successor Managing Member pursuant to the foregoing sentence, and (b) that it may substitute in its stead (without any consent of the Members) as Managing Member any entity which has acquired substantially all of the Managing Member's stock or assets and continues its business.

6.6    **Right of First Offer**.  If the Company desires to sell additional Units in the Company or borrow funds through a private debt offering, the Company must first offer such Units (the "**Offer Units**") or such debt (the "**Offer Debt**") to all Members holding Class A Units and Class B Units (the "**Offerees**").  The Company shall deliver to the Offerees written notice of the terms and conditions under which the Company desires to sell the Offer Units or issue the Offer Debt (the "**Offer Notice**").  Each Offeree shall then have a period of ten (10) days from the date of the Offer Notice within which to deliver to the Company its written agreement (the "**Exercise Notice**") to purchase its *pro rata* share of the total number of Offer Units the Company proposes to sell or loan its *pro rata* share of the total amount of Offer Debt the Company proposes to borrower, and such sale or loan shall be consummated within thirty (30) days after delivery of the Exercise Notice, unless extended by the Company in its sole discretion. If an Offeree fails to deliver a timely Exercise Notice, then such Offeree shall be deemed to have declined its right of first offer.  Thereafter, the Company shall be entitled to sell the Offer Units or issue the Offer Debt to any other Member or third-party.  For purposes of this Section 6.6, "pro rata" share shall be based upon the proportionate percentage of distributions payable to such Offeree as of the date of the Offer Notice pursuant to Section 5.2.1(i) and (ii) of this Agreement.

6.7    **Japonais – Mirage**.  The members of the Managing Member are in discussions for an opportunity to open a "Japonais" restaurant in The Mirage Hotel and Casino in Las Vegas, Nevada ("**Japonais – Mirage**").  If and when a lease is executed and a new entity is formed to open and operate Japonais-Mirage, Members owning Class A Units in the Company shall collectively receive an interest in such entity which provides for such Members to receive 10% of the distributions of cash (other than tax distributions) or property made by such entity.  THE COMPANY CAUTIONS THAT THERE IS NO CERTAINTY THAT THE JAPONAIS-MIRAGE TRANSACTION WILL EVER TAKE PLACE, AND THE MEMBERS OWNING CLASS A UNITS SHALL NOT BE ENTITLED TO ANY ADDITIONAL INTEREST IN THE COMPANY OR OTHERWISE IN THE EVENT THAT THE JAPONAIS-MIRAGE FAILS TO CLOSE.  THE MEMBERS OWNING CLASS A UNITS SHALL NOT BE ENTITLED TO ANY ADDITIONAL INTEREST IN THE COMPANY OR OTHERWISE IN THE EVENT THAT THE MEMBERS OF THE MANAGING MEMBER OPEN A "JAPONAIS" RESTAURANT IN LAS VEGAS AT ANY LOCATION OTHER THAN THE MIRAGE HOTEL AND CASINO.

## ARTICLE 7
## MEETINGS OF MEMBERS

7.1     **Member Meetings.**

7.1.1   A quorum shall be present at a meeting of Members if the Members holding a Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of all Members entitled to vote is required by the Act, the affirmative vote of the Members holding the Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

7.1.2   All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of New York as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 7.5.

7.1.3   Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting or the Members holding the Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the Members holding the Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

7.1.4   An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held at such place, within or without the State of New York, on such date and at such time as the Managing Member shall fix and set forth in the notice of the meeting, which date shall be within thirteen months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred. If an annual meeting of Members is not held, such failure will not affect any action taken by the Managing Member, any Manager or any officer.

7.1.5   Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managing Member or the Members holding at least twenty percent of the Units of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

7.1.6   Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 15 nor more than 60 days before the date of the meeting, either personally or by overnight courier, by, or at the direction of the Managing Member or the Members calling the meeting, to each Member entitled to vote at such meeting. If sent by

overnight courier, any such notice shall be deemed to be delivered when deposited with such courier, addressed to the Member at its address provided for in <u>Section 13.2</u>, with charges thereon prepaid.

7.1.7    The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managing Member declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof) or the Members entitled to receive such distribution.

7.1.8    Except as otherwise expressly provided for in this Agreement, (i) all matters to be voted on pursuant to this Agreement shall require the approval of the Members owning a majority of the Class C Units and (ii) the Members owning Class A Units and Class B Units shall not be entitled to vote on any matters.

7.1.9    There shall be no cumulative voting in the section of Managers hereunder.

7.2    **Voting List.**  The Managers shall make, at least ten days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof arranged in alphabetical order, with the address of and the Units held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours.  Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting.  The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members.  Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

7.3    **Proxies.**  A Member may vote either in person or by proxy executed in writing by the Member.  A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section.  Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent as the case may be.  All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions.  No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy.  A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest.  Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree

13248849.2 05027356                              14

on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

7.4 **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be one of the Managers (or a representative thereof). The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.5 **Action by Written Consent or Telephone Conference.**

7.5.1 Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Member or Members holding not less than the minimum percentages of Units that would be necessary to take such action at a meeting at which all Members entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the Member or Members holding not less than the minimum Units that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office, its principal place of business or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

7.5.2 The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager.

7.5.3 If any action by Members is taken by written consent, any certificate or documents filed with the Secretary of State of New York as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

7.5.4 Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance

and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1     **Exculpation.** Neither the Managing Member nor any Manager shall be liable to the Company or to any Member for any loss suffered by the Company unless such loss is caused by the Managing Member's or Manager's gross negligence or willful misconduct. The Managing Member and Managers shall not be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful misconduct. The Managing Member and any Manager may consult with counsel and accountants in respect of Company affairs, and provided the Managing Member or Manager acts in good faith reliance upon the advice or opinion of such counsel or accountants, the Managing Member or Manager shall not be liable for any loss suffered by the Company in reliance thereon.

8.2     **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article 8, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "**Proceeding**"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was the Managing Member or Manager or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent possible (except to the extent limited by the Act as in effect on the date hereof) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 8 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 8 shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. This right of indemnification shall apply to (without limitation) any acts, omissions or alleged acts or omissions of a Manager. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.3     **Advance Payment.** The right to indemnification conferred in this Article 8 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to

the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under Article 8 and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article 8 or otherwise.

8.4 **Indemnification of Employees and Agents.** The Company, in the sole discretion of the Managing Member, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Persons who are not or were not the Managing Member or Managers but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to the Managing Member or Managers under this Article 8.

8.5 **Appearance as a Witness.** Notwithstanding any other provision of this Article 8, the Company may pay or reimburse expenses incurred by the Managing Member or a Manager in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this Article 8 shall not be exclusive of any other right which the Managing Member or a Manager or other Person indemnified pursuant to Section 8.4 may have or hereafter acquire under any law (common or statutory), provision of the Certificate or this Agreement.

8.7 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself, the Managing Member and any Person who is or was serving as a Manager or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article 8.

8.8 **Savings Clause.** If this Article 8 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Manager and the Managing Member as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this Article 8 that shall not have been invalidated and to the fullest extent permitted by applicable law.

# ARTICLE 9
# TAXES

9.1    **Tax Returns.**  The Managing Member shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making any elections the Managing Member may deem appropriate and in the best interests of the Members.  Each Member shall furnish to the Managing Member all pertinent information in its possession relating to Company's operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.2    **Tax Matters Member.**  The Managing Member shall be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code and shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of section 6223 of the Code.  The Managing Member shall inform each other Member of all significant matters that come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware and determining the materiality thereof and, within that time, shall forward to each other Member copies of all significant written communications he may receive in that capacity.

# ARTICLE 10
# BOOKS, REPORTS AND COMPANY FUNDS

10.1    **Maintenance of Books.**  The Company shall keep books and records of accounts.

10.2    **Reports.**  On or before the 30th day following the end of each June 30th and each Fiscal Year during the term of the Company, the Managing Member shall cause each Member to be furnished with an unaudited balance sheet, an income statement and a statement of changes in Members' capital of the Company for, or as of the end of, the prior fiscal quarter or Fiscal Year, as the case may be.  The foregoing balance sheet and statements shall  be prepared on a compilation basis by a recognized firm of certified public accountants.  These annual financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied (except as therein noted).  The Managing Member also may cause to be prepared and delivered to the Members quarterly unaudited financial statements and such other reports as it may deem appropriate.  The Company shall bear the costs of all these reports.

# ARTICLE 11
# TRANSFERS

11.1    **Assignment by Members.**  No Member shall sell, assign or transfer, or offer to sell, assign or transfer or otherwise Dispose of all or any part of such Member's Units (whether voluntarily or involuntarily) without the consent of the Managing Member, which consent may be withheld in the sole discretion of the Managing Member.

11.1.1    No admission (or purported admission) of a Member, and no Disposition (or purported Disposition) of all or any part of a Member's interest in the Company (or any economic interest therein), whether to another Member or to a Person who is not a Member, shall be effective, and any such admission or Disposition (or purported admission or Disposition) shall be void ab initio, and no Person shall otherwise become a Member if after such admission or

Disposition (or purported admission or Disposition) the Company would have more than 100 Members. For purposes of determining whether the Company will have more than 100 Members, each Person indirectly owning an interest in the Company through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each such entity a "flow-through entity") shall be treated as a Member unless the Managing Member determines in its sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Company.

11.2 **Void Assignment.** Any sale, exchange or other Disposition by any Member of any Units or other interests in the Company in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company. No Disposition or assignment of any Units shall be effective if such Disposition or assignment would, in the opinion of counsel of the Company, result in termination of the Company or the treatment of the Company as an association taxable as a corporation for purposes of any applicable law.

11.3 **Substituted Member.**

11.3.1 An assignee of any Unit of a Member, or any portion thereof, shall become a substituted Member entitled to all the rights of a Member if and only if the assignor gives the assignee such right, and the Managing Member has granted its prior written consent to such assignment and substitution, which consent may be withheld in the sole discretion of the Managing Member.

11.3.2 The Company and the Managing Member shall be entitled to treat the record owner of any Unit as the absolute owner thereof and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such interest in the Company, which assignment is permitted pursuant to the terms and conditions of Section 11.1 hereof, has been received, accepted and consented to by the Managing Member and recorded on the books of the Company.

11.3.3 Upon the admission of a substituted Member, Schedule A attached hereto shall be amended to reflect the name, address and Units of such substituted Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units.

11.4 **Effect of Assignment.**

11.4.1 Any Member who shall assign any Units shall cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units, except that unless and until the assignee of such Member is admitted as a substituted Member in accordance with the provisions of this Article 11, such assigning Member shall retain the statutory rights and obligations of an assignor Member under applicable law.

19

11.4.2 Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefits of the acquisition thereof to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units was subject to or by which such predecessor was bound.

11.4.3 The transferee of any Unit shall be treated as having made all of the Capital Contributions made by, and received all of the distributions from the Company received by, the transferor of such Unit with respect to such Unit.

11.5 **Effect of Incapacity.** Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Incapacitated Member shall be deemed to be the assignee of such Member's Units or other interests in the Company and may, subject to <u>Section 11.1</u>, become a substituted Member upon the terms and conditions set forth in <u>Section 11.3</u>.

11.6 **Interest in a Member.** A Member that is not a natural Person may not cause or permit an interest, direct or indirect, in itself to be Disposed except in compliance with the provisions of this <u>Article 10</u>.

**ARTICLE 12**
**DISSOLUTION, LIQUIDATION AND TERMINATION**

12.1 **Dissolution.** The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

(a) the written consent of the Members holding the Required Interest and the written consent of the Managing Member;

(b) the 30th anniversary of the date of the formation of the Company under New York law as provided under the Act;

(c) the Managing Member shall retire, resign or become Incapacitated, or there shall occur any other event that terminates the continued membership in the Company of the Managing Member, provided that if any event described in this <u>Section 12.1(c)</u> shall occur and there shall be at least two other Members remaining, the Company shall not be dissolved, and the business of the Company shall be continued, if the remaining Members holding the Required Interest so agree within 90 days of such event; and

(d) the entry of a decree of judicial dissolution of the Company under the Act.

Except as provided in <u>Section 12.1(c)</u>, the death, retirement resignation, expulsion, Incapacity, bankruptcy or dissolution of a Manager or Member, or the occurrence of any other event that terminates the continued membership of a Manager or Member in the Company, shall not cause

a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

12.2 **Liquidation and Termination.** On dissolution of the Company, the Managing Member shall act as liquidator or may appoint one or more Members as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Managing Member. The steps to be accomplished by the liquidators are as follows:

(a) as promptly as possible after dissolution and again after final liquidation, the liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b) the liquidators shall cause the notice described in the Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder;

(c) the liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts to Members), liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d) all remaining assets of the Company shall be distributed in accordance with Article 5 of this Agreement by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation), provided that if any Member holding Class A Units or Class B Units will not receive distributions under this Section 12.2(d) which, when added to all prior distributions with respect to such Member holding Class A Units or Class B Units under Article 5 hereof, equal or exceed the aggregate Capital Contributions to the Company with respect to such Member's Units, distributions otherwise payable to the holders of the Class C Units under this Section 12.2(d) shall be reduced and shall instead be paid to such Members holding Class A Units and Class B Units until such Members holding Class A Units and Class B Units have received cumulative distributions under Article V and this Section 12.2(d) equal to the Capital Contributions of the Members holding Class A Units.

12.3 **Deficit Capital Accounts.** Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their

respective interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

12.4 **Cancellation of Certificate.** On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Managing Member (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of New York, cancel any other filings made pursuant to <u>Section 2.5</u> and take such other actions as may be necessary to terminate the Company.

## ARTICLE 13
## GENERAL PROVISIONS

13.1 **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes to the Company, whether pursuant to loans from the Company or otherwise, may be deducted from that sum before payment.

13.2 **Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on <u>Schedule A</u>, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managing Member must be given at the addresses provided by written notice to each Member.

Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3 **Entire Agreement.** This Agreement constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.4 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

13.5 **Amendment or Modification.** This Agreement may be amended from time to time by the Managing Member, without the consent of any of the Members, including, without limitation, amendments (i) to add to the duties or obligations of the Managing Member or

13248849.2 05027356

22

surrender any right or power granted to the Managing Member herein; (ii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement; and (iii) to delete or add any provision of this Agreement required to be so deleted or added by a State Securities or "Blue Sky" commissioner or similar official, which addition or deletion is deemed by such official to be for the benefit or protection of the Members; provided, however, that (A) except as otherwise expressly provided herein, an amendment or modification reducing disproportionately (vis-à-vis any other Members) a Member's interest in Profits or Losses or in distributions or increasing a Member's Capital Contribution shall be effective only with that Member's consent and (B) an amendment or modification affecting any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the interest theretofore required. Notwithstanding the foregoing and anything to the contrary contained here, the Managing Member may amend and modify the provisions of this Agreement and Schedule A hereto to the extent necessary to reflect the issuance of new Units or other interests in the Company as contemplated by Sections 3.4 and 3.5 hereof as determined in good faith by the Managing Member.

13.6    **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

13.7    **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and any provision of the Certificate or any mandatory provision of the Act, the applicable provision of the Certificate or the Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.8    **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.9    **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to demand any distribution or withdrawal of property from the Company or to maintain any action for dissolution of the Company or for partition of the property of the Company. No Member shall have the right to withdraw from the Company.

13.10   **Indemnification and Reimbursement for Payments on Behalf of a Member.** If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member

(including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "**Indemnifying Member**") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Managing Member, either:

> (a)     promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

> (b)     the Company shall reduce distributions which would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 3.1, the amount withheld shall not be treated as a Capital Contribution).

13.11  **Notice of Provisions.**  By executing this Agreement, each Member acknowledges that it has actual notice of (i) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article 11) and (ii) all of the provisions of the Certificate.

13.12  **Counterparts.**  This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document.  All counterparts shall be construed together and constitute the same instrument.

Geisha NYC LLC
a New York Limited Liability Company

[Agreement of Membership Counterpart Signature Page]

IN WITNESS WHEREOF, the parties hereto have hereunto duly set their hands as of the day and year first above written.

Member:

_____
(Please print or type name)

By:_____
    Name:
    Title:

Managing Member:

OSSS HOSPITALITY NYC, LLC
a New York limited liability company

By:_____
    Name:   Rick Wahlstedt
    Title:    Member

## SCHEDULE A

| Member | Capital Contributions | Class A | Units Class B | Class C |
|---|---|---|---|---|
| OSSS Hospitality NYC, LLC | $3000,000 | | 3 | 3 |
| _____ <br> Address: | $ | | | |
| _____ <br> Address: | $ | | | |
| _____ <br> Address: | $ | | | |
| _____ <br> Address: | $ | | | |
| _____ <br> Address: | $ | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total | $4,000,000 | 4 | 20 | 3 |

13248849.2 05027356

# EXHIBIT E

**OSSS HOSPITALITY NYC, LLC**
A New York Limited Liability Company

## OPERATING AGREEMENT

Dated as of September 21, 2005

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS OPERATING AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933 OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS. SUCH INTERESTS MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ..............................................................................1

ARTICLE 2 ORGANIZATION .........................................................................3

ARTICLE 3 MEMBERS AND CAPITAL .........................................................5

ARTICLE 4 CAPITAL ACCOUNTS ................................................................7

ARTICLE 5 DISTRIBUTIONS; ALLOCATIONS OF PROFITS AND LOSSES.....................7

ARTICLE 6 MANAGEMENT ...........................................................................9

ARTICLE 7 ....................................................................................................11

ARTICLE 8 EXCULPATION AND INDEMNIFICATION ..............................14

ARTICLE 9 TAXES ........................................................................................15

ARTICLE 10 BOOKS, REPORTS AND COMPANY FUNDS ........................16

ARTICLE 11 TRANSFERS ............................................................................16

ARTICLE 12 DISSOLUTION, LIQUIDATION AND TERMINATION...............20

ARTICLE 13 GENERAL PROVISIONS.........................................................21

## OPERATING AGREEMENT
## OF
## OSSS HOSPITALITY NYC, LLC
### A New York Limited Liability Company

THIS OPERATING AGREEMENT OF OSSS HOSPITALITY NYC, LLC, a New York limited liability company (as the same may be further amended or restated from time to time in accordance with its terms, the **"Agreement"**), dated as of September ___, 2005, is made by and among the persons set forth on <u>Schedule A</u> hereto (each, a **"Member"** and collectively, the **"Members"**).

### ARTICLE 1
### DEFINITIONS

1.1    **Definitions.**  As used in this Agreement, the following terms have the following meanings:

**"Act"** means the New York Limited Liability Company Act, and any successor statute, as amended from time to time.

**"Book Value"** means, with respect to any Company property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time to reflect the adjustments required or permitted by Treasury Regulation §1.704-1(b)(2)(iv)(d)-(g); <u>provided</u>, <u>however</u>, that the initial Book Value of any asset of the Company contributed by a Member to the Company shall be its fair market value at the time of its contribution.

**"Business Day"** means any day other than a Saturday, a Sunday or a holiday on which national banking associations in the State of New York are required or authorized to be closed for business.

**"Capital Contribution"** means the aggregate contribution made by a Member to the capital of the Company specified on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

**"Class A Units"** means the Units of the Members designated as Class A Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.

**"Class B Units"** means the Units of the Members designated as Class B Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.  Class B Units shall be identical to the Class A Units, except that the Class B Units shall not be entitled to vote on any matters to be decided by a vote of the Members.

**"Class C Units"** means the Units of the Members designated as Class C Units on <u>Schedule A</u> hereto, as such Schedule is amended from time to time in accordance with the terms of this Agreement.  Class C Units shall be identical to the Class B Units, except that the Class C Units shall be subject to (a) vesting, 20% of which shall vest on each anniversary of the date of their issuance (except for the Director of Operations Units, 1/3 of which shall vest on each

1

anniversary of the date of their issuance, and as otherwise determined by the Members holding the Required Interest from time to time) and (b) the Vesting Requirements. For the avoidance of doubt, Class C Units will represent an interest in the income, gains, losses, deductions and expenses of the Company, whether or not then vested, so long as the Vesting Requirements are being satisfied.

"**Code**" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

"**Company**" means OSSS Hospitality NYC, LLC, a New York limited liability company.

"**Company Minimum Gain**" has the meaning set forth for "partnership minimum gain" in Treasury Regulation Section 1.704-2(d).

"**Dispose**", "**Disposed**", "**Disposing**" or "**Disposition**" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance, including, without limitation, by operation of law.

"**Fiscal Year**" of the Company means the calendar year.

"**Founders**" means Jeffrey Beers, Miae Lim and Nordic Management, Inc.

"**Incapacity**" or "**Incapacitated**" means (a) with respect to a natural person, the bankruptcy, death, incompetency or insanity of such person and (b) with respect to any other Person, the bankruptcy, liquidation, dissolution or termination of such Person.

"**Member**" means any Person executing this Agreement as of the date hereof as a member or hereafter admitted to the Company as a member as provided in this Agreement, but does not include any Person who has ceased to be a member of the Company.

"**Member Nonrecourse Debt Minimum Gain**" has the meaning set forth for "partner nonrecourse debt minimum gain" in Treasury Regulation Section 1.704-2(1).

"**Member Nonrecourse Deductions**" has the meaning set forth for "partner nonrecourse deductions" in Treasury Regulation Section 1.704-2(i).

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulation Section 1.704-2(b)(1).

"**Person**" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"**Profits**" or "**Losses**" means, for each period taken into account, an amount equal to the Company's taxable income or taxable loss for such period, determined in accordance with Federal income tax principles, adjusted to the extent the Members determine that such adjustment is necessary to comply with the requirements of section 704(b) of the Code.

"**Restaurant**" means the first-class, fully staffed dining room with sushi bar, lounge, catering, banquet, take-out and food service facility to be operated by the Company at 225 Park Avenue South in New York, New York.

"**Required Interest**" means one or more Members possessing a majority of the Class A Units owned by all Members.

"**Subsidiary**" means Geisha NYC, LLC, a New York limited liability company in which the Company, as of the date hereof, holds all of the issued and outstanding Class C membership units and for which the Company acts as the managing member.

"**Units**" means, as applicable, the Class A Units, the Class B Units and the Class C Units of each Member, representing such Member's interest in the income, gains, losses, deductions and expenses of the Company as set forth on Schedule A hereto, as amended from time to time in accordance with the terms of this Agreement.

"**Vesting Requirements**" means, except as otherwise determined by the Members holding the Required Interest from time to time, the continued employment by the Restaurant of any Person holding Class C Units. Should any Person holding Class C Units fail to satisfy the Vesting Requirements, any Class C Units that have not yet vested shall automatically be cancelled effective as of the date of such Person's date of termination or resignation, and at that time such Class C Units shall automatically be reallocated to Jeffrey Beers, Nordic Management, Inc. and Miae Lim equally as Class A Units. Notwithstanding the foregoing, any Person holding Class C Units shall not be deemed to have failed to satisfy the Vesting Requirements if such Person's employment by the Restaurant is terminated without cause. For purposes of this Agreement, termination "with cause" shall mean any termination of such Person as a result of (i) fraud, misappropriation, embezzlement, or other willful act of material misconduct by such Person against the Company and/or the Restaurant; (ii) such Person's conviction of or plea of guilty or nolo contendere to a felony; or (iii) any act or omission of such Person which materially damages or threatens to materially damage the business and/or reputation of the Company and/or the Restaurant.

Other terms defined in this Agreement have the meanings so given them. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Schedules are to Schedules attached hereto, each of which is made a part hereof for all purposes. Whenever the context requires: the singular number shall include the plural, and vice versa; and the masculine gender shall include the feminine and neuter genders. As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

## ARTICLE 2
## ORGANIZATION

2.1     **Formation.** The parties hereby ratify the organization of the Company as a New York limited liability company and the filing of Articles of Organization (the "**Articles**") under and pursuant to the Act.

2.2     **Name.**  The name of the Company is OSSS Hospitality NYC, LLC and all Company business shall be conducted in that name or such other name or names that comply with applicable law as the Members may select from time to time.

2.3     **Registered Office; Registered Agent; Principal Office; Other Offices.**  The registered office of the Company required by the Act to be maintained in the State of New York shall be the office of the initial registered agent named in the Articles or such other office (which need not be a place of business of the Company) as the Members may designate from time to, time in the manner provided by law.  The registered agent of the Company in the State of New York shall be the initial registered agent named in the Articles or such other Person or Persons as the Members may designate from time to time in the manner provided by law.  The principal office of the Company shall be at such place as the Members may designate from time to time, which need not be in the State of New York, and the Company shall maintain records there.  The Company may have such other offices as the Members may designate from time to time.

2.4     **Purposes.**  The purpose of the Company is to hold a membership interest in the Subsidiary and act as its managing member.  The purpose of the Subsidiary is to own and operate the Restaurant and to engage in any other business or activity that now or hereafter may be necessary, incidental, proper, advisable or convenient to accomplish the foregoing purpose (including, without limitation, obtaining financing therefor) and that is not prohibited by the Act or the laws of the State of New York.

2.5     **Foreign Qualification.**  Prior to the Company's conducting business in any jurisdiction other than New York, the Members shall cause the Company to comply, to the extent procedures are available and those matters are reasonably within the control of the Members, with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction to the extent such qualification is required.  Each Member shall execute, acknowledge, swear to and deliver all certificates and other instruments, and submit to all background checks and furnish information in connection therewith, that are necessary or appropriate to qualify, continue and terminate the Company as a foreign limited liability company in all such jurisdictions in which the Company may conduct business and to obtain liquor licenses and all other necessary or advisable licenses, permits or authorizations for the Restaurant, the Subsidiary and the Company.

2.6     **Term.**  The term of the Company commenced on the date the Articles was filed with the office of the Secretary of State of New York and shall continue in existence until termination and dissolution of Company under <u>Section 12.1</u> of this Agreement.

2.7     **No State-Law Partnership.**  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture, and that no Member shall be a partner or joint venturer of any other Member, for any purposes other than federal and, if applicable, state tax purposes, and nothing in this Agreement shall be construed to the contrary.  The Members intend that the Company shall be treated as a partnership for federal and state income tax purposes, and each Member and the Company shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment.  Neither the Company nor any Member shall elect to treat the Company as an association taxable as a corporation for Federal or state income tax purposes.

## ARTICLE 3
## MEMBERS AND CAPITAL

### 3.1 Members.

3.1.1 The names, residence, business or mailing addresses, Capital Contributions and Units of the Members are set forth on Schedule A, as amended from time to time in accordance with the terms of this Agreement.

3.1.2 No Member, as such, shall be required to lend any funds to the Company or to make any additional contribution of capital to the Company, except as otherwise required by applicable law or as expressly set forth in this Agreement. Any Member may, with the approval of the Members holding the Required Interest, make loans to the Company, and any stated loan by a Member to the Company shall not be considered to be a Capital Contribution.

3.1.3 Each Member shall execute a counterpart of this Agreement, and when a Person is admitted as a Member, such Person shall execute a counterpart of this Agreement and such Person shall be listed as a Member on Schedule A.

3.1.4 Each Member hereby represents, warrants and acknowledges to the Company and each other Member that: (i) he is an accredited investor within the meaning of Regulation D of the Securities Act of 1933, as amended; (ii) he has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (iii) he is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time; (iv) he is acquiring interests in the Company for investment purposes only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (v) the interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; and (vi) the execution, delivery and performance of this Agreement does not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

### 3.2 Liability of Members.

3.2.1 Except as otherwise required by applicable law and as expressly set forth in this Agreement, no Member shall have any personal liability whatever in his capacity as a Member, whether to the Company, to any of the other Members, to the creditors of the Company or the Subsidiary or the Restaurant or to any other third party, for the debts, liabilities, commitments or any other obligations of the Company or the Subsidiary or the Restaurant or for any losses of the Company or the Subsidiary or the Restaurant. A Member shall be liable only to make his Capital Contribution to the Company and the other payments provided herein. Until the Capital Contribution for a Member as specified on Schedule A has been paid to the

Company, such Member shall be liable to the Company for the unpaid portion of his Capital Contribution.

      3.2.2  In accordance with the Act and the laws of the State of New York, a member of a limited liability company may, under certain circumstances, be required to return amounts previously distributed to such member. It is the intent of the Members that no distribution to any Member pursuant to <u>Article 5</u> hereof shall be deemed a return of money or other property paid or distributed in violation of the Act. The payment of any such money or distribution of any such property to any Members shall be deemed to be a compromise within the meaning of the Act, and the Members receiving any such money or property shall not be required to return to any Person any such money or property. However, if any court of competent jurisdiction holds that, notwithstanding the provisions of this Agreement, any Member is obligated to make any such payment, such obligation shall be the obligation of such Member and not of the Company or the other Members.

      **3.3**    **Member Units.**  Each Member's interest in the Company, including such Member's interest in income, gains, losses, deductions and expenses of the Company and the right to vote on certain matters as provided in this Agreement, shall be represented by the Units owned by such Member. The ownership of Units shall entitle each Member to allocations of Profits and Losses and other items and distributions of cash and other property as set forth in <u>Article 5</u> hereof. Each Class A Unit shall entitle the Member owning such Class A Unit to one vote on any matter to be voted on by the Members under this Agreement or as required by applicable law. The Class B Units and the Class C Units shall not have any voting rights whatsoever. Upon receipt of each Member's Capital Contribution set forth opposite his name on <u>Schedule A</u>, such Member shall be deemed to own (subject to the satisfaction of the Vesting Requirements) the number of Units set forth opposite his name on <u>Schedule A</u>. The Company may (but shall not be required to) issue certificates representing the Units held by each Member.

      **3.4**    **Issuance of Additional Units and Interests; Additional Capital Contribution.** The Members holding the Required Interest shall have the right to cause the Company to issue or sell to the Members, affiliates of the Members or other Persons: (i) additional Units or other interests in the Company (including other classes or series thereof having different rights); (ii) obligations, evidences of indebtedness or other securities or interests in the Company; and (iii) warrants, options or other rights to purchase or otherwise acquire Units or other interests in the Company. The Members holding Class A Units existing at the time of any issuance or sale of Units shall have the right to purchase or otherwise participate in any such issuance or sale on a pro rata basis.

      **3.5**    **Director of Operations Units.**  The Members hereby agree that, upon the terms and conditions of this Agreement, the individual initially employed as the director of operations of the Restaurant, or any successor thereto (the "**Director of Operations**") may be allocated three (3) Class C Units (the "**Director of Operations Units**"), 1/3 of which shall vest on each anniversary of the date of their issuance, subject to the Vesting Requirements.

      **3.6**    **Non-Disparagement.**  Each Member hereby agrees that he or she will not, (either as a Member or after such Person ceases to be a Member) directly or indirectly (whether through an agent or other third party) criticize, disparage, defame or in any other way comment

6

negatively to any Person about (i) the Company, (ii) the Restaurant or (iii) another Member with respect to the operation of the Restaurant or the Company or such Members past conduct or practices.

## ARTICLE 4
## CAPITAL ACCOUNTS

4.1 **Establishment and Determination of Capital Accounts.** A capital account ("**Capital Account**") shall be established for each Member. Capital Accounts shall be maintained in accordance with Code Section 704(b) and Treas. Reg. § 1.704-1(b)(2)(iv), with such adjustments as may be required thereby.

4.2 **Negative Capital Accounts.** No Member shall be required to pay to the Company or any other Member any deficit or negative balance which may exist from time to time in such Member's Capital Account.

4.3 **Company Capital.** No Member shall be paid interest on any Capital Contribution to the Company or on such Member's Capital Account, and no Member shall have any right (i) to demand the return of such Member's Capital Contribution or any other distribution from the Company (whether upon resignation, withdrawal or otherwise), except upon dissolution of the Company pursuant to Article 13 hereof, (ii) to cause a partition of the Company's assets, or (iii) to withdraw from the Company.

## ARTICLE 5
## DISTRIBUTIONS; ALLOCATIONS OF
## PROFITS AND LOSSES

5.1 **Generally.** Subject to the provisions of the Act and Section 5.7 of this Agreement, the Members holding the Required Interest shall have sole discretion regarding the amounts and timing of distributions to Members, in each case subject to the retention of, or payment to third parties of, such funds as they deem necessary with respect to the reasonable business needs of the Company which shall include (without limitation) the payment or the making of provision for the payment when due of the Company's obligations, including the payment of any management or administrative fees and expenses, debt service of the Company (including payment on debt held by Members) or any other obligations.

5.2 **Distributions.**

5.2.1 Distributions of cash (other than tax distributions under Section 5.7 hereof) or property shall be made to the Members on a pro rata basis according to their ownership of Units.

5.3 **Allocation of Profits and Losses.**

5.3.1 Except as otherwise provided in this Article 5, for each Fiscal Year of the Company, all Profits and Losses shall be allocated to the Members on a pro rata basis according to their ownership of Units.

7

5.4    **Management Fees.**

5.4.1   Any management fees received by the Company with respect to its Subsidiary shall be allocated as follows: (i) $150,000 annually to each of Miae Lim and Nordic Management, Inc. payable in monthly installments.

5.5    **Special Allocations.**

5.5.1   Notwithstanding anything to the contrary in this Agreement, Profits and Losses shall be allocated as though this Agreement contained (and there is hereby incorporated herein by reference) a qualified income offset provision which complies with Treasury Regulation § 1.704-1(b)(2)(ii)(d) and minimum gain chargeback provisions which comply with the requirements of Treasury Regulation Section 1.704-2.

5.5.2   If the Internal Revenue Service successfully asserts an adjustment to the taxable income of a Member and, as a result of such adjustment, the Company is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by the Company, such excess deduction shall be allocated to such Member or such reduced income shall be reflected in a reduction in income allocated to such Member. If the Internal Revenue Service successfully asserts an adjustment to the taxable income of the Company and, as a result of such adjustment, any Member is entitled to a deduction or reduction in income for federal income tax purposes in excess of any gain recognized by such Member, the additional Company taxable income shall be allocated to such Member.

5.6    **Amounts Withheld.**  All amounts withheld pursuant to Section 13.10 from any distribution to a Member shall be treated as amounts distributed to such Member pursuant to this Article 5 for all purposes under this Agreement.

5.7    **Tax Distributions.**  The tax matters partner (as defined in Section 9.2) shall use reasonable efforts, subject to applicable covenants and restrictions contained in any loan agreements and other agreements or obligations to which the Company or its properties are subject, to cause the Company to distribute with respect to each Fiscal Year of the Company an amount of cash which in the good faith judgment of the tax matters partner equals (i) the amount of taxable income allocable to the each Member in respect of such Fiscal Year, multiplied by (ii) the combined maximum federal, state and local income tax rate to be applied with respect to such taxable income (taking into account the deductibility of state income tax for federal income tax purposes and the character of the income), with such distribution to be made to the Members in the same proportions that taxable income was allocated to the Members during such Fiscal Year. Any distribution to a Member pursuant to Section 5.7 which exceeds the amount that would have been distributed to such Member had the amount distributed pursuant to Section 5.7 been distributed pursuant to Section 5.2 shall be treated as an advance distribution under Section 5.2 and shall be offset against subsequent distributions that such Member would otherwise be entitled to receive pursuant to Section 5.2. Such distributions may be made on a quarterly or other basis as shall be determined by the sole discretion of the tax matters partner, but not less than annually.

5.8     **Tax Allocations; Code Section 704(c).**

5.8.1   Items of income, gain, loss, deduction and expense of the Company shall be determined in accordance with Code Section 703 and, except as otherwise provided in this Article 5, the Members' distributable share of such items for purposes of Code Section 702 shall be determined in accordance with Section 5.3.1.

5.8.2   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income, gain, loss, deduction and expense with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value at the time of contribution.

5.8.3   Any elections or other decisions relating to such allocations shall be made by the Members holding the Required Interest in any manner that reasonably reflects the purpose and intent of this Agreement. Allocations pursuant to this Section 5.8 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items or distributions pursuant to any provisions of this Agreement.

## ARTICLE 6
## MANAGEMENT

6.1     **Management by the Members.**

6.1.1   The Members holding the Required Interest shall have the exclusive right to manage the business of the Company, including, without limitation, the following:

(a)     entering into, making and performing contracts, agreements and other undertakings binding the Company that may be necessary, appropriate or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

(b)     maintaining the assets of the Company;

(c)     collecting sums due the Company;

(d)     opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(e)     to the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

(f)     acquiring, utilizing for Company purposes and Disposing of any asset of the Company;

(g)     hiring and employing executives, supervisors and other personnel;

(h)     selecting, removing and changing the authority and responsibility of Restaurant consultants;

(i)     obtaining insurance for the Company;

(j)     determining and modifying the name, decor and menu of the Restaurant, operated by the Company;

(k)     establishing accounting reserves on the Company's books for commitments and obligations (contingent or otherwise) of the Company;

(l)     selecting, removing or changing the authority and responsibility of lawyers, accountants and consultants for the Company;

(m)     borrowing money or otherwise committing the credit of the Company, and granting liens on the assets of the Company; and

(n)     causing the Company to take any action (including, without limitation, any of the foregoing actions) or sign and deliver any document or instrument, in each case by and behalf of the Subsidiary or otherwise in the Company's capacity as managing member of the Subsidiary.

6.1.2   Notwithstanding any other provision of this <u>Section 6.1</u>, Miae Lim and Nordic Management, Inc. (each a "<u>**Manager**</u>") shall be responsible for the management of the day-to-day operations of the Company, and to the extent provided herein, the Restaurant. To the extent that any of subsections 6.1.1(a) through (n) constitute such day-to-day operations, the same shall not require the approval of the Members holding the Required Interest. In all other cases, any matter to be decided or action to be taken by the Members requires, and shall be conclusively deemed approved and authorized only by, the approval of the Members holding the Required Interest.

6.2     **[Intentionally omitted.]**

6.3     **Expenses.** All of the Company's expenses shall be billed to and paid directly by the Company. All expenses or costs directly or indirectly incurred (and approved in accordance with this <u>Article 6</u>) by the Members incurred in connection with the management of the Company shall be paid by the Company. No Member shall be required to devote his full time to the performance of duties for the Company.

6.4     **No Compensation.** Except as provided in <u>Section 5.4</u> or compensation received as an employee of the Restaurant, no Member shall be entitled to or shall receive any salary, fee or compensation.

6.5     **Conflicts of Interest.** Except as otherwise provided in <u>Section 6.2</u>, each Member at any time and from time to time may engage in and own interests in other business ventures of any and every type and description, independently or with others (including ones in competition

with the Company, the Subsidiary or the Restaurant) with no obligation to offer to the Company, the Subsidiary or any other Member the right to participate therein. The Company may transact business with any Member; provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties. Other than with respect to an Expansion, no Member shall be obligated to present any investment or business opportunity to the Company or the Subsidiary.

## ARTICLE 7

### MEETINGS OF MEMBERS

7.1 **Member Meetings**.

7.1.1 A quorum shall be present at a meeting of Members if the Members holding a Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion of all Members entitled to vote is required by the Act, the affirmative vote of the Members holding the Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

7.1.2 All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of New York as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meeting by means of conference telephone or similar communications equipment pursuant to Section 7.5.

7.1.3 Notwithstanding the other provisions of the Articles or this Agreement, the chairman of the meeting or the Members holding the Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the Members holding the Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

7.1.4 An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held at such place, within or without the State of New York, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting, which date shall be within thirteen months subsequent to the date of organization of the Company or the last annual meeting of Members, whichever most recently occurred. If an annual meeting of Members is not held, such failure will not affect any action taken by the Members.

7.1.5 Special meetings of the Members for any proper purpose or purposes may be called at any time by the Members holding Units entitled to receive at least twenty percent of the Profits and Losses and other distributions more specifically described in Article 5 hereof. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the

11

notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

      7.1.6  Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than 15 nor more than 60 days before the date of the meeting, either personally or by overnight courier, by the Members calling the meeting, to each Member entitled to vote at such meeting. If sent by overnight courier, any such notice shall be deemed to be delivered when deposited with such courier, addressed to the Member at its address provided for in Section 13.2, with charges thereon prepaid.

      7.1.7  The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Members holding the Required Interest declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting (including any adjournment thereof) or the Members entitled to receive such distribution.

      7.1.8  There shall be no cumulative voting hereunder.

    7.2    **Voting List.** The Managers shall make, at least ten days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof arranged in alphabetical order, with the address of and the Units held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

    7.3    **Proxies.** A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers before or at the time of the meeting or execution of the written consent as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions concerning the qualification of voters, the validity of the proxies and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after eleven months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all

the powers of voting or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Units that are the subject of such proxy are to be voted with respect to such issue.

7.4     **Conduct of Meetings.**  All meetings of the Members shall be presided over by the chairman of the meeting, who shall be one of the Managers (or a representative thereof).  The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.5     **Action by Written Consent or Telephone Conference.**

7.5.1   Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the Member or Members holding not less than two-thirds of all Units.  Every written consent shall bear the date of signature of each Member who signs the consent.  No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the Member or Members holding not less than two-thirds of all Units are delivered to the Company by delivery to its registered office, its principal place of business or the Managers.  Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to a Manager.  A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section.  Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

7.5.2   The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers.  Delivery shall be by hand or by certified or registered mail, return receipt requested.   Delivery to the Company's principal place of business shall be addressed to a Manager.

7.5.3   If any action by Members is taken by written consent, any certificate or documents filed with the Secretary of State of New York as a result of the taking of the action shall state, in lieu of any statement required by the Act concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and that any written notice required by the Act has been given.

7.5.4   Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance

and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

# ARTICLE 8
## EXCULPATION AND INDEMNIFICATION

8.1 **Exculpation.** No Member shall be liable to the Company or to any other Member, for any loss suffered by the Company unless such loss is caused by the Member's gross negligence or willful misconduct as determined by a non-appealable final judgment of a court of competent jurisdiction. No Member shall be liable for errors in judgment or for any acts or omissions that do not constitute gross negligence or willful misconduct. Each Member may consult with counsel and accountants in respect of Company affairs, and provided the Member acts in good faith reliance upon the advice or opinion of such counsel or accountants, the Member shall not be liable for any loss suffered by the Company in reliance thereon.

8.2 **Right to Indemnification.** Subject to the limitations and conditions as provided in this Article 8, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a **"Proceeding"**), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he or she, or a Person of whom he or she is the legal representative, is or was a Member or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise shall be indemnified by the Company to the fullest extent possible (except to the extent limited by the Act as in effect on the date hereof) against judgments, penalties (including excise and similar taxes and punitive damages), fines, amounts, paid in settlements and reasonable costs, charges and expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article 8 shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this Article 8 shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any amendment, modification or repeal. This right of indemnification shall apply to (without limitation) any acts, omissions or alleged acts or omissions of a Member. It is expressly acknowledged that the indemnification provided in this Article could involve indemnification for negligence or under theories of strict liability.

8.3 **Advance Payment.** The right to indemnification conferred in this Article 8 shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has

met the standard of conduct necessary for indemnification under <u>Article 8</u> and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this <u>Article 8</u> or otherwise.

8.4 **Indemnification of Employees and Agents.** The Company, in the sole discretion of the Members holding the Required Interest, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Persons who are not or were not a Member but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him and incurred by him in such a capacity or arising out of his status as such a Person to the same extent that it may indemnify and advance expenses to a Member under this <u>Article 8</u>.

8.5 **Appearance as a Witness.** Notwithstanding any other provision of this <u>Article 8</u>, the Company may pay or reimburse expenses incurred by a Member in connection with his appearance as a witness or other participation in a Proceeding at a time when he is not a named defendant or respondent in the Proceeding.

8.6 **Nonexclusivity of Rights.** The right to indemnification and the advancement and payment of expenses conferred in this <u>Article 8</u> shall not be exclusive of any other right which a Member or other Person indemnified pursuant to <u>Section 8.4</u> may have or hereafter acquire under any law (common or statutory), provision of the Articles or this Agreement.

8.7 **Insurance.** The Company may purchase and maintain insurance, at its expense, to protect itself, the Members and any Person who is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this <u>Article 8</u>.

8.8 **Savings Clause.** If this <u>Article 8</u> or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Member as to costs, charges and expenses (including, without limitation, attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative to the full extent permitted by any applicable portion of this <u>Article 8</u> that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE 9
## TAXES

9.1 **Tax Returns.** The Members shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making any elections the

Members holding the Required Interest may deem appropriate and in the best interests of the Members. Each Member shall furnish to the other Members all pertinent information in its possession relating to Company's operations that is necessary to enable the Company's income tax returns to be prepared and filed. The Members shall cause the Company to furnish to each Member in a timely manner the information needed by each Member to complete such Member's federal and state income tax returns insofar as those returns are affected by such Member's ownership interest in the Company.

9.2    **Tax Matters Member.** Nordic Management, Inc. shall be the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code and shall take such action as may be necessary to cause each Member to become a "notice partner" within the meaning of section 6223 of the Code. The tax matters partner shall inform the other members of all significant matters that come to his attention in his capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware and determining the materiality thereof and, within that time, shall forward to each other Member copies of all significant written communications received in that capacity.

## ARTICLE 10
## BOOKS, REPORTS AND COMPANY FUNDS

10.1    **Maintenance of Books.** The Company shall keep books and records of accounts.

10.2    **Reports.** The Company may cause to be prepared and delivered to each Member unaudited financial statements and such other reports at such times and such frequency as it may deem appropriate in its sole discretion. The Company shall bear the costs of all these reports. Nothing herein shall require the Company to deliver any such reports to the Members at any time unless deemed appropriate in the sole discretion of the Members holding the Required Interest.

## ARTICLE 11
## TRANSFERS

11.1    **Assignment by Members.** No Member shall sell, assign or transfer, or offer to sell, assign or transfer, or otherwise Dispose of all or any part of such Member's Units (whether voluntarily or involuntarily) without first complying with Section 11.7 below; provided, however, that in the event of the death of a Member (or in the case of a Member which is a corporation, limited liability company, partnership or other legal entity, the death of any natural person owning a controlling interest in such Member), (i) the economic interests in such Member's Units shall pass to such Member's heirs or legatees in accordance with such Member's testamentary documents or as otherwise required by intestate law, (ii) the voting rights with respect to such Units, if any, shall pass pro rata to the then remaining holders of Units and (iii) the Company shall have the right to acquire (pursuant to transfer documents reasonably acceptable to the Company) the economic interests in such Units at their fair market value (as determined by an independent appraiser selected by the Company and reasonably acceptable to such Member's heirs or legatees).

11.1.1    No admission (or purported admission) of a Member, and no Disposition (or purported Disposition) of all or any part of a Member's interest in the Company (or any

economic interest therein), whether to another Member or to a Person who is not a Member, shall be effective, and any such admission or Disposition (or purported admission or Disposition) shall be void ab initio, and no Person shall otherwise become a Member if after such admission or Disposition (or purported admission or Disposition) the Company would have more than 100 Members. For purposes of determining whether the Company will have more than 100 Members, each Person indirectly owning an interest in the Company through a partnership (including any entity treated as a partnership for federal income tax purposes), a grantor trust or an S corporation (each entity a "flow-through entity") shall be treated as a Member unless the Members determine in their sole discretion, after consulting with qualified tax counsel, that less than substantially all of the value of the beneficial owner's interest in the flow-through entity is attributable to the flow-through entity's interest (direct or indirect) in the Company.

11.2 **Void Assignment.** Any sale, exchange or other Disposition by any Member of any Units or other interests in the Company in contravention of this Agreement shall be void and ineffectual and shall not bind or be recognized by the Company or any other party. No purported assignee shall have any right to any profits, losses or distributions of the Company. No Disposition or assignment of any Units shall be effective if such Disposition or assignment would, in the opinion of counsel to the Company, result in termination of the Company or the treatment of the Company as an association taxable as a corporation for purposes of any applicable law.

11.3 **Substituted Member.**

11.3.1 An assignee of any Unit of a Member (after first complying with Section 11.7 below), or any portion thereof, shall become a substituted Member entitled to all the rights of a Member if and only if the assignor gives the assignee such right.

11.3.2 The Company and the Members shall be entitled to treat the record owner of any Unit as the absolute owner thereof and shall incur no liability for distributions of cash or other property made in good faith to such owner until such time as a written assignment of such interest in the Company, which assignment is permitted pursuant to the terms and conditions of Section 11.7 hereof, has been received, accepted and recorded on the books of the Company.

11.3.3 Upon the admission of a substituted Member, Schedule A attached hereto shall be amended to reflect the name, address and Units of such substituted Member and to eliminate the name and address of and other information relating to the assigning Member with regard to the assigned Units.

11.4 **Effect of Assignment.**

11.4.1 Any Member who shall assign any Units shall cease to be a Member of the Company with respect to such Units and shall no longer have any rights or privileges of a Member with respect to such Units, except that unless and until the assignee of such Member is admitted as a substituted Member in accordance with the provisions of this Article 11, such assigning Member shall retain the statutory rights and obligations of a Member under applicable law.

11.4.2 Any Person who acquires in any manner whatsoever any Units or other interest in the Company, irrespective of whether such Person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed to have agreed to be subject to and bound by all the terms and conditions of this Agreement that any predecessor in such Units was subject to or by which such predecessor was bound.

11.4.3 The transferee of any Unit shall be treated as having made all of the Capital Contributions made by, and received all of the distributions from the Company received by, the transferor of such Unit with respect to such Unit.

11.5  **Effect of Incapacity.** Except as otherwise provided herein, the Incapacity of a Member shall not dissolve or terminate the Company. In the event of such Incapacity, the executor, administrator, guardian, trustee or other personal representative of the Incapacitated Member shall be deemed to be the assignee of such Member's Units or other interests in the Company and may, subject to Section 11.7, become a substituted Member upon the terms and conditions set forth in Section 11.3.

11.6  **Interest in a Member.** A Member that is not a natural Person may not cause or permit an interest, direct or indirect, in itself to be Disposed except in compliance with the provisions of this Article 11.

11.7  **Right of First Refusal.** If a Member desires to sell all or any portion of the Units held by such Member (or if the owner of a controlling interest in a Member which is a corporation, limited liability company, partnership or other legal entity (an "**Entity Member**") desires to sell a controlling interest in such Member) other than to affiliates (as such term is defined in Rule 144 under the Securities Act of 1933, as amended) of such Member or for estate planning purposes, such Member must first offer such Units (and in the case of a desired sale of a controlling interest in an Entity Member, all of such Entity Member's Units) to the other Members (the "**Offer Units**"). The Member desiring to transfer such Offer Units (the "**Offeror**") shall deliver to the Members eligible to acquire such Units (individually, an "**Offeree**" and collectively, the "**Offerees**") written notice of the terms and conditions under which the Offeror desires to sell the Offer Units, including without limitation, the purchase price, earnest money and other material terms (the "**Offer Notice**"). The Offeree shall then have a period of fifteen (15) Business Days after receipt of the Offer Notice within which to deliver to the Offeror its written agreement (the "**Exercise Notice**") to purchase the Offer Units in accordance with the terms and conditions set forth in the Offer Notice. If more than one Offeree delivers an Exercise Notice, all such Offer Units shall be divided pro rata among the Offerees based upon their current Unit holdings and such sale shall be consummated within sixty (60) days after the delivery of the Exercise Notice. All documents affecting such conveyance shall be reasonably acceptable to the Offeror and the Offerees. If none of the Offerees timely deliver an Exercise Notice, then the Offerees shall be deemed to have declined to exercise such right of first refusal. Thereafter, the Offeror shall be entitled to sell the Offer Units for a period of ninety (90) days after the date of the last Offerees' rejection (or deemed rejection) of its right of first refusal provided such sale by the Offeror is substantially on the same terms as are set forth in the Offer Notice. For purposes hereof, such sale shall be "substantially on the same terms" as are set forth in the Offer Notice if (A) the net economic consideration to be received by the Offeror is greater than ninety five percent (95%) of the net economic consideration to be received by the Offeror as

set forth in the Offer Notice and if (B) the remaining terms are not materially less favorable to the Offeror than those terms set forth in the Offer Notice.

11.8    **Bring-Along Rights.**  Notwithstanding Section 11.7, if Members holding the Required Interest desire to sell all of their Units (the "**Forced Sale Units**") to a single Person which is not an affiliate of any Member (the "**Transferee**") in a single transaction or a series of related transactions, the Members desiring to make such sale (the "**Transferring Members**") may require the other Members (the "**Non-Transferring Members**") to sell all of their Units to the Transferee for the same consideration per Unit and otherwise on the same terms and conditions upon which the Transferring Members sell the Forced Sale Units. In such event, the Transferring Members shall, at least ten (10) business days prior to the anticipated closing of the sale of the Forced Sale Units, deliver a written notice of the terms and conditions under which the Transferring Members desire to sell the Forced Sale Units, including the purchase price, the identity of the Transferee and other material terms (the "**Forced Sale Notice**").

Upon receiving the Forced Sale Notice, each Non-Transferring Member agrees to use its best efforts, in good faith and in a timely manner, to take, or cause to be taken, all action and to do, or cause to be done, all things necessary, proper or advisable to sell its Units to the Transferee on the same terms and on the same conditions as set forth in the Forced Sale Notice. Execution of this Agreement constitutes each Member's binding agreement to sell all of its Units on the same terms and conditions set forth in the Forced Sale Notice.

11.9    **Put Option.**  Notwithstanding anything herein to the contrary, if the Company receives an offer to sell all of the Units to a single Person which is not an affiliate of any Member (the "**Prospective Buyer**") in a single transaction or a series of related transactions, and any Founder not holding the Required Interest (the "**Original Selling Founder**") desires to accept such offer (the "**Tender Offer**"), the Original Selling Founder shall deliver to the other Founders written notice that it desires to accept the Tender Offer (the "**Purchase Notice**"). Within ten (10) business days after the delivery of the Purchase Notice, the other Founders shall deliver written notice to the Original Selling Founder indicating whether or not such Founder desires to accept the Tender Offer. If one or more of the other Founders so elect to accept the Tender Offer, such that the Founders so electing (which shall, together with the Original Selling Founder, collectively be referred to as the "**Selling Founders**") collectively hold the Required Interest, then such Selling Founders shall cause the Company to accept and proceed in accordance with the Tender Offer, subject to the terms and conditions of this Agreement and the Operating Agreement of the Subsidiary. If one or more of the Founders refuses to accept the Tender Offer (the "**Refusing Founders**") such that the Selling Founders do not collectively hold the Required Interest, then each Selling Founder shall have the option, to be exercised within ten (10) business days after receipt of notice from the Refusing Founders, to sell all of its Units to the Refusing Founders on the same terms and conditions that such Selling Founder would have received from the Prospective Buyer if the Tender Offer had been accepted by the Refusing Founders (the "**Put Option**"). The sale and purchase of such Units shall take place within sixty (60) days following receipt of the original Purchase Notice pursuant to this section.

11.10    **Buy-Sell Offer.**  At any time after the date of this Agreement, one or more of the Founders (collectively, the "**Offering Founder**") may send a written notice (the "**Buy-Sell Notice**") to one of the other Founders (the "**Offeree**") requesting that the Offeree elect to either:

(i)     buy all of the Offering Founder's Units at a specified price per Unit (the "**Buyout Price**"); or

(ii)    sell all of its Units to the Offering Founder at the Buyout Price.

The Buyout Price is the price per Unit designated by the Offering Founder in the Buy-Sell Notice. The Buyout Price shall be the same for purchases and sales. Upon receipt of the Buy-Sell Notice, the Offeree shall have ten (10) business days to provide its election to the Offering Founder. If no election is so provided, the Offeree shall be deemed to have elected to sell its Units to the Offering Founder. Within two (2) business days after the Offering Founder's receipt of the Offeree's election to sell its Units or buy the Offering Founder's Units (or the Offeree's deemed election to sell its Units), the Offering Founder shall provide a copy of the Buy-Sell Notice to the Founder which was not party to the original buy-sell offer and such Founder shall have the option, to be exercised in writing within ten (10) business days after receipt of the Buy-Sell Notice, to purchase one half (1/2) of the selling Founder's Units at the Buyout Price. If no election is so provided, such Founder shall be deemed to have elected not to purchase any of the selling Founder's Units. Such Units shall be deemed sold and transferred to the purchasing Founder(s) upon payment of the specified price to the selling Founder pursuant to this section. The closing of the purchase or sale, as applicable, shall occur not later than sixty (60) days following the Offeree's receipt of the Buy-Sell Notice pursuant to this section.

## ARTICLE 12
## DISSOLUTION, LIQUIDATION AND TERMINATION

12.1    **Dissolution.** The Company shall be dissolved and its affairs shall be wound up on the first to occur of the following:

(a)     the written consent of the Members holding the Required Interest;

(b)     all Members shall retire, resign or become Incapacitated, or there shall occur any other event that terminates the continued membership in the Company of all of the Members; or

(c)     the entry of a decree of judicial dissolution of the Company under the Act.

Except as provided in Section 12.1(b), the retirement, resignation, expulsion or Incapacity of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

12.2    **Liquidation and Termination.** On dissolution of the Company, the Members shall act as liquidators or may appoint a third party as liquidator. The liquidators shall proceed diligently to wind up the affairs of the Company and make final distributions as provided herein and in the Act. The costs of liquidation shall be borne as a Company expense. Until final distribution, the liquidators shall continue to operate the Company properties with all of the power and authority of the Members. The steps to be accomplished by the liquidators are as follows:

(a)     as promptly as possible after dissolution and again after final liquidation, the liquidators shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable;

(b)     the liquidators shall cause the notice described in the Act to be mailed to each known creditor of and claimant against the Company in the manner described thereunder;

(c)     the liquidator shall pay, satisfy or discharge from Company funds all of the debts (including debts to Members), liabilities and obligations of the Company (including, without limitation, all expenses incurred in liquidation) or otherwise make adequate provision for payment and discharge thereof (including, without limitation, the establishment of a cash fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine); and

(d)     all remaining assets of the Company shall be distributed to the Members in accordance with Section 5.2.1 of this Agreement by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of the liquidation).

12.3    **Cancellation of Articles.**  On completion of the distribution of Company assets as provided herein, the Company is terminated, and the Members (or such other Person or Persons as the Act may require or permit) shall file a certificate of cancellation with the Secretary of State of New York, cancel any other filings made pursuant to Section 2.5 and take such other actions as may be necessary to terminate the Company.

## ARTICLE 13
## GENERAL PROVISIONS

13.1    **Offset.**  Whenever the Company is to pay any sum to any Member, any amounts that Member owes to the Company, whether pursuant to loans from the Company or otherwise, may be deducted from that sum before payment.

13.2    **Notices.**  Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests and consents to be sent to a Member must be sent to or made at the address given for that Member on Schedule A, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Members must be given at the addresses provided by written notice to each Member.

Whenever any notice is required to be given by law, the Articles or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

13.3 **Entire Agreement.** This Agreement constitutes the entire agreement of the Members and their affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

13.4 **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

13.5 **Amendment or Modification.** This Agreement may be amended from time to time by the Members holding the Required Interest, including, without limitation, amendments (i) to add to the duties or obligations of the Members or surrender any right or power granted to the Members herein; (ii) to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provisions with respect to matters or questions arising under this Agreement which will not be inconsistent with the provisions of this Agreement; and (iii) to delete or add any provision of this Agreement required to be so deleted or added by a State Securities or "Blue Sky" commissioner or similar official, which addition or deletion is deemed by such official to be for the benefit or protection of the Members; provided, however, that (A) except as otherwise expressly provided herein, an amendment or modification reducing disproportionately (vis-a-vis any other Members) a Member's interest in Profits or Losses or in distributions or increasing a Member's Capital Contribution shall be effective only with that Member's consent and (B) an amendment or modification affecting any consent or vote in this Agreement shall be effective only with the consent or vote of Members having the interest theretofore required. Notwithstanding the foregoing and anything to the contrary contained here, the Members may amend and modify the provisions of this Agreement and Schedule A hereto to the extent necessary to reflect the issuance of new Units or other interests in the Company as contemplated by Sections 3.4 and 3.5 hereof as determined in good faith by the Members.

13.6 **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

13.7 **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK, EXCLUDING ANY CONFLICT-OF-LAWS RULES. In the event of a direct conflict between the provisions of this Agreement and any provision of the Articles or any mandatory provision of the Act, the applicable provision of the Articles or the Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held

invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

13.8 **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

13.9 **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to demand any distribution or withdrawal of property from the Company or to maintain any action for dissolution of the Company or for partition of the property of the Company. No Member shall have the right to withdraw from the Company. EACH MEMBER HEREBY IRREVOCABLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATING TO THIS AGREEMENT.

13.10 **Indemnification and Reimbursement for Payments on Behalf of a Member.** If the Company is obligated to pay any amount to a governmental agency (or otherwise makes a payment) because of a Member's status or otherwise specifically attributable to a Member (including, without limitation, federal withholding taxes with respect to foreign Persons, state personal property taxes, state unincorporated business taxes, etc.), then such Member (the "**Indemnifying Member**") shall indemnify the Company in full for the entire amount paid (including, without limitation, any interest, penalties and expenses associated with such payments). The amount to be indemnified shall be charged against the Capital Account of the Indemnifying Member, and, at the option of the Members, either:

(a) promptly upon notification of an obligation to indemnify the Company, the Indemnifying Member shall make a cash payment to the Company equal to the full amount to be indemnified (and the amount paid shall be added to the Indemnifying Member's Capital Account but shall not be treated as a Capital Contribution); or

(b) the Company shall reduce distributions which would otherwise be made to the Indemnifying Member, until the Company has recovered the amount to be indemnified (and, notwithstanding Section 3.1, the amount withheld shall not be treated as a Capital Contribution).

13.11 **Notice of Provisions.** By executing this Agreement, each Member acknowledges that it has actual notice of (i) all of the provisions hereof (including, without limitation, the restrictions on the transfer set forth in Article 12) and (ii) all of the provisions of the Articles.

13.12 **Counterparts.** This Agreement may be executed in multiple counterparts with the same effect as if all signing parties had signed the same document. All counterparts shall be construed together and constitute the same instrument.

IN WITNESS WHEREOF, the parties hereto have hereunto duly set their hands as of the day and year first above written.

_____
JEFFREY BEERS

_____
LESTER BURGHER

_____
JUNE ICHIKAWA

_____
GENE KATO,

_____
MIAE LIM

_____
SANDY PARK

NORDIC MANAGEMENT, INC.

_____
Name:  Richard Wahlstedt
Title:    President

_____
JULIO BURBANO

**THIS AGREEMENT HAS BEEN PREPARED BY COUNSEL FOR THE COMPANY. EACH MEMBER IS ADVISED TO REVIEW THIS AGREEMENT WITH HIS OWN LAWYER.**

## SCHEDULE A

| Member | Capital Contributions | Units | | |
| --- | --- | --- | --- | --- |
| | | Class A Units | Class B Units | Class C Units |
| Jeffrey Beers<br>311 East 83rd Street<br>New York, Ny 10028 | $28.17 | 28.17 | | |
| Lester Burgher<br>340 Thompson Boulevard<br>Buffalo Grove, IL 60089 | $2 | | | 2 |
| Jun Ichikowa<br>900 North Kingsbury, #902<br>Chicago, IL 60610 | $6 | | 6 | |
| Gene Kato<br>2020 West Division, #2B<br>Chicago, IL 60622 | $5 | | | 5 |
| Miae Lim<br>2607 West Huron Road<br>Chicago, Il 60612 | $28.17 | 28.17 | | |
| Sandy Park<br>520 North Halstead, Unit 415<br>Chicago, IL 60622 | $2 | | | 2 |
| Nordic Management, Inc.<br>83 Mustato Road<br>Katonah, NY 10536 | $28.17 | 28.17 | | |
| Julio Burbano<br>2022 West Division, #2A<br>_Chicago, IL 60622 | 0.5 | | | 0.5 |
| TOTAL; | $100 | 84.5 | 6 | 9.5 |

1284627.7 05027356

# EXHIBIT F

Mr. Jonathan Segal
65 East Scott, APT 6A
Chicago, IL 60610

May 16, 2005

Dear Jonathan,

Pursuant to Section 6.2.1 of the OSSS Hospitality LLC Amended and Restated Operating Agreement dated April 23, 2003 (the "Operating Agreement"), please be advised that founders Mr. Jeffrey Beers, Miae Lim and Rick Wahlstedt (the "Expanding Founders") have secured a lease for a new Restaurant based upon the Japonais Concept and to be located at 225 Park Avenue South, New York City, New York (the "Expansion").

We are offering you, as a Non-Expanding Founder, the opportunity to invest in the Expansion upon the same terms and conditions offered to other investors in the Expansion. The material terms of the Expansion as well as the material terms of this investment are set forth in the enclosed Offering Package for Geisha NYC, LLC ("Geisha NYC"). Pursuant to the Operating Agreement, please notify the Expanding Founders within ten (10) Business Days of your agreement to participate in the Expansion on the terms and conditions set forth in this Expansion Notice.

In addition to your opportunity to invest in the Expansion upon the same terms and conditions offered to other investors, the Expanding Founders further offer to you a maximum of three (3) Class B, non-voting Units in OSSS Hospitality NYC, LLC ("OSSS NYC"), as Managing Member of Geisha NYC with respect to the Expansion, in exchange for one and one-half (1 ½) of your existing Class A Units in OSSS Hospitality LLC ("OSSS Chicago") for each desired Class B Unit in OSSS NYC. For example, if you elect to obtain three (3) Class B Units in OSSS NYC, your existing balance of Class A Units in OSSS Chicago would be reduced by four and one-half (4 ½) Units. As stated in the enclosed Offering Package, OSSS NYC will receive three (3) Class C Units in Geisha NYC, in exchange for its services as Managing Member, which shall entitle OSSS NYC to sixty percent (60%) of the distributions made by Geisha NYC after the other investors have received a certain return on their investments. One Class B Unit in OSSS NYC will entitle the holder of such Unit to receive one percent (1%) of the total distributions made by Geisha NYC to OSSS NYC with respect to its three (3) Class C Units.

The Expanding Founders are also purchasing three (3) Class B Units in Geisha NYC upon the same terms that are being offered to you in the Offering Package. Please note that Holders of Class B Units in OSSS NYC will not receive any portion of distributions made by Geisha NYC with respect to such Class B Units purchased by the Expanding Founders.

In addition, please note that the Expanding Founders are in the early stages of negotiations for a new Restaurant based on the Japonais Concept to be located in The

Mirage Hotel and Casino in Las Vegas ("Japonais-Mirage"). If and when a lease is executed and a new entity is formed to open and operate Japonais-Mirage, the Expanding Founders will also offer to you a maximum of three (3) Class B, non-voting Unit in the Managing Member of such entity in exchange for one and one-half (1 ½) of your Class A Units in OSSS Hospitality LLC for each desired Class B Unit in the Managing Member of the Japonais-Mirage entity.

     If you have any questions about the terms of this Expansion Notice and the investment opportunity offered to you herein, please call Rick Wahlstedt.

Sincerely Yours,

Rick Wahlstedt

Miae Lim

Jeffrey Beers

# EXHIBIT G

# Freeborn & Peters LLP

October 21, 2005

Attorneys at Law

311 South Wacker Drive
Suite 3000
Chicago, Illinois
60606-6677
Tel 312.360.6000

Jeffrey J. Mayer
Partner
Direct 312.360.6474
Fax 312.360.6596
jmayer@
freebornpeters.com


Chicago

Springfield

**VIA E-MAIL AND FEDERAL EXPRESS**

Joshua P. Hanna
Mayer, Brown, Rowe & Maw LLP
70 South Wacker Drive
Chicago Illinois 60606-4637

   *Re: Geisha NYC, LLC*

Dear Mr. Hanna:

   We represent Jonathan Segal in connection with his interests in OSSS Hospitality LLC and Geisha LLC. In response to your letter of October 7, 2005, our client, Jonathan Segal, rejects the offers set forth by your clients in their letter of May 16, 2005 to invest in Geisha NYC, LLC and participate in OSSS Hospitality NYC, LLC. The terms offered by your clients violate Mr. Segal's rights and your clients' obligations under the parties' controlling agreements. As you know, among other rights, Mr. Segal is a Founding member in OSSS Hospitality LLC and, as such, he is entitled to the rights and opportunities available to his fellow Founding members and to be treated in a fair and just manner. The offers your clients have presented to Mr. Segal are neither fair nor lawful and, accordingly, they are hereby rejected. We further demand that you provide Mr. Segal the right to invest on the same basis as the other Founders.

   Mr. Segal further demands a full explanation of the circumstances and events that led to the expansion of Japonais and of the relationship among the entities and investors involved in the expansion of the Japonais concept.

   Mr. Segal reserves all of his rights.

       Very truly yours,

       Jeffrey J. Mayer

JJM/srw

Joshua P. Hanna
October 21, 2005
Page 2

**Freeborn & Peters LLP**

bcc:  John Stiefel
       Jonathan Segal

952891

# EXHIBIT H



**MAYER**
**BROWN**
**ROWE**
**& MAW**

October 28, 2005

Mayer, Brown, Rowe & Maw LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

**BY E-MAIL AND MESSENGER**

Main Tel (312) 782-0600
Main Fax (312) 701-7711
www.mayerbrownrowe.com

Jeffrey J. Mayer, Esq.
Freeborn & Peters LLP
311 S. Wacker Drive
Suite 300
Chicago, Illinois 60606

**Joshua P. Hanna**
Direct Tel (312) 701-8823
Direct Fax (312) 706-8270
jhanna@mayerbrownrowe.com

Re:     Geisha NYC, LLC

Dear Mr. Mayer:

We are in receipt of your letter dated October 21, 2005 regarding Jonathan Segal's rejection of
the offers made to him pursuant to and in accordance with Section 6.2.1 of the Amended and
Restated Operating Agreement of OSSS Hospitality LLC dated as of April 23, 2004 (the
"Operating Agreement") as a Non-Expanding Founder (as defined in the Operating Agreement).
The Expanding Founders accept Mr. Segal's rejection of the offers, but categorically dispute and
reject every other assertion and demand raised in your letter.

Sincerely,

Joshua P. Hanna

JPH/mep

cc:     Richard Wahlstedt
        Miae Lim
        Jeffrey Beers
        Paul Meyer
        John Touhy
        John Steifel

Berlin  Brussels  Charlotte  Chicago  Cologne  Frankfurt  Houston  London  Los Angeles  New York  Palo Alto  Paris  Washington, D.C.
Independent Mexico City Correspondent:  Jauregui, Navarrete y Nader S.C.

Mayer, Brown, Rowe & Maw LLP operates in combination with our associated English limited liability partnership in the offices listed above.
1304809.1  05027356